ISMAIL RAMSEY (Bar No. 189820)
izzy@ramsey-ehrlich.com
KATHARINE KATES (Bar No. 155534)
katharine@ramsey-ehrlich.com
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
(510) 548-3600 (Tel)
(510) 291-3060 (Fax)

Attorneys for Defendant Robert Rose

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>ROBERT ROSE,<br><br>　　　　Defendant. | Case No.: 2:11-CR-00292 WBS<br><br>**DEFENDANT ROBERT ROSE'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**<br><br>The Honorable William Shubb<br>Courtroom 5, 14th Floor<br>Date: September 12, 2016<br>Time: 9:00 a.m. |

# I. PRELIMINARY STATEMENT

Prior to this case, Rob Rose's life exemplified an American success story. He grew up with little, but through hard work and diligence he built a successful career and became a loving and supportive father.

Born in 1964, Rob grew up in Pleasant Hill, California. Unfortunately, his parents were alcoholics and abusive toward one another. The home was not a supportive environment for children. At 18, he moved out and was completely on his own. So at 19, he started a car-wash-and-detail business, the first of several he owned and ran through his twenties. After a brief detour as a bike racer and mountain climber, Rob again got a "real job," starting a successful pool-remodeling business. But he dreamed of a career in real estate. With his wife Angie's consent, he took the exam and, at 33, began a new career. With great dedication and a tremendous work ethic, Rob became a top agent. Rob and Angie had two daughters. Rob coached his daughters' soccer teams, supported charitable causes, and assisted many friends and acquaintances in real estate transactions – sometimes for free.

In 2006, his life was upended. Doctors diagnosed Angie with a rare and incurable Lymphoma. To have time to help care for his wife and to make sure she received the best possible treatment, Rob stopped working. Throughout, Rob maintained a positive attitude and continued his community involvement. In 2008-2009, he restarted his real estate business – and made the bad decision to participate in the bid-rigging scheme that led to this case.

Rob's offense presents a one-time divergence from an otherwise law-abiding life. He has never previously committed a crime – or even been arrested.

Here, Rob did not come to the courthouse steps planning to break the law. He came to learn the process, and he hoped to buy homes legally. But others more culpable individuals teamed up against Rob to prevent him from winning any homes. And then they physically threatened him not undermine their control of the auction process. They demanded: work with us or beat it. Rob succumbed to the Group's pressure tactics and

agreed to participate in their side auctions so that he could buy homes to renovate and flip.

But once the side auctions came to light, Rob took responsibility. He recognized the seriousness of his offense, admitted his wrongdoing, and cooperated with the U.S. Attorney's Office. He provided information about others involved in the bid-rigging scheme, providing the government with valuable information through interviews and attorney proffers. Further, at the government's request, he delayed sentencing in his own case for five years to testify at trial against others who refused to admit their own guilt, if needed. The government has filed a motion for a downward departure under section 5K1.1.

Under these circumstances, the defense asks this Court sentence Rob to one year of probation. A probationary sentence will properly recognize his limited role in the bid-rigging scheme, his taking responsibility for his conduct and subsequently cooperating with the government for five years, and his exemplary life prior to this case. And the sentence will still provide general deterrence in the context of the whole case. One year of probation will satisfy this Court's obligation to impose a sentence that is "sufficient, but no greater than necessary" to achieve the statutory objectives set forth in 18 U.S.C. 3553(a).

Further, along with a number of defendants in related cases, Rob has requested a continuance in sentencing based on the recent change in the legal landscape with regard to liability for mail fraud arising from foreclosure auctions. In a Northern District of California case arising from non-competitive foreclosure auctions in Alameda County, with facts similar to those here, Chief Judge Phyllis Hamilton dismissed the Antitrust Division's mail fraud count. *United States v. Galloway,* Case No. CR 14-607 PJH, Docket 139 (August 15, 2016). The government did not appeal this Order in *Galloway*. Indeed, subsequently, the government notified defendants in related cases who had pled guilty to a mail fraud charge that it would set aside that count. So under a similar factual scenario, defendants in Alameda County who initially pled guilty to mail fraud will avoid those

convictions.  But the government has refused to set aside the mail fraud counts for the defendants before this Court.  To avoid disparities in sentencing and treatment among similarly-situated defendants, this Court should consider the serious collateral consequences Rob will suffer from a mail fraud conviction.  Alternatively, a limited continuance of the sentencing date would allow the Rob and other defendants to sort out the implications of that decision for the real estate foreclosure auction cases before this Court.

## II.   BACKGROUND

### A. Personal History

Rob is a hard-working individual who has achieved much professionally.  But his success did not come easily.  As a child, his parents were alcoholics who fought constantly – police regularly intervened at their home.  By the time Rob was 10, his three older sisters left the house.  Meanwhile, Rob struggled in school; he now believes that he suffered from ADHD.  At the time, family members told him he was "good for nothing," and teachers actually urged him to drop out of school.  Fortunately, Rob was athletically gifted.  At 13, he toured the pro skateboard circuit, supported by sponsors.  At 15, he earned sponsorships for BMX bike racing.  Rob learned discipline in these pursuits.  After his mother told him that he would need to pay rent, he dropped out of high school and moved out of the house.  At 18, he was completely independent from, and received no further financial or other support from, his parents.  *See* Letter from Rob Rose, Exh. A.

On his own, Rob threw himself into his work.  While in high school, he worked at a car dealership in Walnut Creek.  As mentioned above, from age 19 through his twenties, he started and ran several car-wash and auto-detailing businesses.  During this period, he also earned his GED and took classes at a local junior college.  Though he considered a career in rock climbing or biking in his late twenties, he instead started a pool refinishing business.  Then, when he was 33, he became a real estate agent.  In his first six months, he earned the Rookie of the Year award from East Bay Association of

Realtors. His business plan, daily work schedule, and marketing plan became a model for Prudential California Realty's training programs. From 2002-2006, he was a top-100 agent with Re/Max. This was a prosperous time for Rob and his family. During it, he shared his success by assisting others and donating to charity. *See Id.*

Rob also devotes his abundant energy to his family. He married his wife, Angie, 28 years ago. They have two daughters, now 24 and 15. Rob is an exemplary father; he is involved with his daughters' activities – including coaching their soccer teams – and always encourages them to live up to their potential. Despite his own difficult childhood, he has made amends with his parents and assists them in their old age, financially and otherwise, as well as his nieces and nephews. Angie describes Rob's character:

> Rob and I are on our 28th year of marriage and every day since I met him, he has been the epitome of discipline and hard work. . . . I am proud to say he still lives his life with the utmost work ethic with everything he does, from his Real Estate business to coaching our daughter's soccer teams to raising money for the American Cancer Society. . . . Furthermore, Rob has been a wonderful father to our 2 daughters. . . . I have seen Rob to be very supportive to his mom, dad, sister, nieces and nephews through the years. Rob is always the one to help out his family financially and in other ways. He is always there to help his dad with a project around the house or getting his mom to the doctor.

Letter from Angie Rose, Exh. B.

When Angie was diagnosed with a rare form of Lymphoma in 2006, Rob dedicated himself to her care, putting his real-estate business on hold. Despite the financial impact, Rob persevered with doctors, nurses, and pathologists to assure that Angie received the best and proper treatment. *See Id.* His father-in-law explains:

> I truly believe my daughter may not be alive if it wasn't for Rob, when she was found to have stage 4 cancer he would not take no for an answer until he found her the best care possible to save her life. For that I will always be indebted to him.

Letter from Herb Antone, Exh. C.

Further, having closed over six hundred real-estate transactions without a single complaint, numerous current and former clients attest to Rob's business integrity:

> We were very impressed with Rob's honesty, integrity and work ethic. We kept in touch. Rob assisted us in the selling of our first home and buying of our second home. We used Rob as a resource for real estate investing. Eventually we partnered with Rob to buy and sell properties. Rob was a model business partner. He created a fair and equal profit sharing business for us. We always had the utmost trust and respect. Rob conducted business equally and fairly. At one point, Rob had over $500,000 of our money in the form of a cashier's check made out to him. Needless to say, I would only hand the check to Rob and watch him leave my house if I had full and complete trust in him..

Letter from David Gehrke, Exh. I.

And many attest to his extraordinary personal generosity. Rob has conducted numerous real estate transactions for the benefit of friends and family in which he refused to take any profit for himself. The letter from Michael Meadows describes one example:

> Before the economy crash and on three separate occasions I witnessed Rob help families who were stuck in their home for various reasons. Rob made up the difference by selling their home for free. On one occasion Rob helped his friend and past client who had health and financial problems. Rob not only sold their home for free but he also dug into his own pocket and paid for all the necessary repairs that had to be made in order to close escrow. It was into the thousands of dollar, Rob didn't ask for anything in return.

Letter from Michael S. Meadows, Exh. O.

In addition, Rob contributes substantial time and resources to charitable causes. He has volunteered his time for troubled youth, helped raise significant funds for the American Cancer Society, and regularly donates to a variety of causes. *See e.g.,* Letters of Daryl Bothwell, Exh. E, Grant Freeman, Exh. G, Linda Lyon, Exh. M,.

The conduct that brings Rob before this Court represents an exception to a life filled with hard work, family, and helping others.

**B. Offense Conduct**

The bid-rigging scheme underlying these related cases originated with a "Group" or "Regulars" who controlled the auctions for foreclosed houses in San Joaquin County. *See* PSR ¶¶ 4-12. The "Group" of original conspirators was comprised of Wiley C. Chandler, Richard W. Northcutt, Anthony B. Ghio, and Andrew B. Katakis. *Id.* at ¶ 8. These five rigged the bids in the public auctions for foreclosed homes in order to suppress competition. In short, the Group agreed not to bid against each other at the official public auction. Instead, in the absence of competing bids, one of the Group purchased the property at the lowest price requested by the trustee at the public auction. Then, they held a second, private auction, in which they re-auctioned the property among themselves to the highest bidder. The highest bidder then paid the other conspirators the difference between the winning bid at the public auction and the winning bid at the private, secondary auction.

In 2008, Rob began attending real estate auctions to observe. He was trying to learn the process. When he started bidding on properties in 2009, he was trying to operate legally. But the Group's members threatened and verbally harassed him when he attended the auctions. At times, they physically surrounded him and warned he'd never be able to succeed in the auctions. They coordinated aggressive bids against him to make it economically impracticable to buy property without the approval of their clan. Then, the Group delivered an ultimatum to Rob—cooperate with us or go to another county to try to buy their homes—and they again did so in a physically threatening manner.

Eventually, Rob succumbed and made the poor decision to join the scheme. From August 23 to September 24, 2009, Rob purchased five homes through the rigged auctions valued at $1,135,505.02 and received $24,128.00 in payoffs from co-conspirators. *See* PSR ¶ 57.

Rob has pled guilty to two counts: 1) bid-rigging under 15 U.S.C. § 1; and 2) conspiracy to commit mail fraud under 18 U.S.C. §1349.

### C. The Order in *United States v. Galloway*

As stated above, in a real-estate foreclosure auction case from Alameda County with factual allegations similar to those here, Judge Hamilton dismissed the mail fraud count. *United States v. Galloway*, NDCA Case No. CR 14-607 PJH, Docket 139 (August 15, 2016). In part, her Order resulted from how the government set forth the allegations of mail fraud in indictment. More substantively, however, Judge Hamilton held that the mail fraud charge was based on a theory that the defendants concealed facts that they had no obligation to disclose (6:20-21); under Ninth Circuit precedent, this theory did not support a fraud charge. *Id.* at 3:27-4:6, 6:20-7:24. The government did not appeal this order and has announced that it will not supersede on the indictment. Consequently, in the cases headed for trial before Judge Hamilton, the sole charge will be bid-rigging. Subsequently, the government informed defendants in Alameda County who had already pled guilty to bid-rigging and mail fraud that it would set aside the mail fraud count – thus relieving these defendants of the consequences of a conviction for mail fraud.

Though the defense brought the Judge Hamilton's Order to the attention of the prosecutors here, the government has stated that it will not drop the mail fraud counts here, as they have in *Galloway*.

### D. Guidelines Calculations and Sentencing Recommendations

#### 1. Government's sentencing recommendation under the plea agreement.

Rob pled guilty to one count of bid-rigging under the Sherman Act and one count of conspiracy to commit mail fraud. The government agreed to "recommend that [Rob] be sentenced to the bottom of the applicable Guidelines range for his offense, as determined by the United States Probation Office." Plea Agreement, Section III.A.

In addition, the plea provides that the government will recommend a fine of $20,000. Plea Agreement, Section III.D.

#### 2. Probation office's guidelines calculation and recommended sentence

The probation office calculated the Adjusted Total Offense Level at 11. The probation office applied the guidelines provisions for bid-rigging, with an initial offense

level of 15, based on the volume of commerce. The probation office then recognized that Rob was a minor participant in the foreclosure auction conspiracy and afforded a downward adjustment for Rob's role in the offense of 2 levels, in addition to the downward adjustment for acceptance of responsibility of 2 levels. The probation office calculates Rob's Criminal History as Category I. Notably, the probation office's calculation is separate from any potential downward departure under 5K1.1 that the government will recommend or that this court may apply.

Based on an Offense Level of 11 and a Criminal History Category of I, the applicable guidelines range is 8-14 months imprisonment and is within Zone B. This allows for a sentence to be satisfied by home confinement.

The probation office recommends a four-month term of imprisonment plus two years of supervised release that includes four months of home confinement. It also recommends a fine of $28,387.

The probation office's sentencing recommendation relies upon its determination that the count for conspiracy to commit mail fraud is a Class B felony, and therefore, the sentencing guidelines and 18 U.S.C. § 3561(a)(1) preclude a probationary sentence. As a preliminary matter, conspiracy to commit mail fraud is only a Class B felony if it affects a financial institution, because in that instance, the maximum sentence is 30 years, otherwise, it is a Class C felony, because the maximum sentence is 20 years. *See* 18 U.S.C. §§ 1341, 3559. The factual basis for Rob's plea states that he "participated in a conspiracy to defraud or obtain money or property by means of materially false pretenses, representations, or promises from the mortgage holders and owners of properties" that were being sold at auction. This factual allegation is too vague to establish that a financial institution was affected by the fraud.

Further, as the defense has noted in its objections to the presentence report, Docket No. 42, section 5C1.1(c) allows for a sentence of home confinement for a Zone B guidelines sentencing range. And § 3561(a)(1) does not require a term of custody for a defendant

**DEFENDANT'S SENTENCING MEMORANDUM**
*U.S. v. Rose,* **Case No. 2:11-CR-00292**

- 9 -

convicted of a Class B felony whose guidelines range is within Zone B of the Sentencing Table. Section 5C1.1, entitled "Imposition of a Term of Imprisonment," provides:

> If the applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied by
>
> * * *
>
> (3) a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e)
>
> U.S.S.G. §5C1.1(c)(3)

Similarly, 18 U.S.C. § 3561(a)(1), which provides that probation is not available for individuals convicted of a Class B Felony, does not preclude probation for individuals convicted of a Class B felony in all circumstances. *See, e.g., United States v. Roth*, 32 F.3d 437, 439-440 (9th Cir. 1994), adopting *United States v. Daiagi*, 892 F.2d 31, 33 (4th Cir. 1989) (probation available for Class B felons where the government brings a motion under 5K1.1).

In addition, although 18 U.S.C. § 3561(a)(1) precludes straight probation, that statute ***does not*** require a term of imprisonment. *See United States v. Lahey*, 186 F.3d 272, 274 (2d Cir. 1999) ("nothing in the statute [§ 3561] requires a minimum term of imprisonment"). *See also United States v. Swanson*, 253 F.3d 1220, 1224 (10th Cir. 2001) (because "custody" does not require confinement in prison, a term of imprisonment may be served in a halfway house). Following *Lahey* and *Swanson*, under §5C1.1 (c)(3), a term of imprisonment may be served as probation *with a condition of home confinement*.

### 3. Government recommended departure and sentence and its obligations under the plea agreement

The government has recommended a seven-month sentence followed by a period of supervised release. Docket No. 47, 1:23. The government comes to this through an eight-month recommendation at the low-end of the sentencing guidelines range minus 10

percent as credit for cooperation.  The government states this should be served through incarceration.  *Id*. at 4:22-24.

This call for jail-time violates the terms of the plea agreement.   As set forth above, the government agreed to "recommend that [Rob] be sentenced **to the bottom of the applicable Guidelines range** for his offense, as determined by the United States Probation Office." Plea Agreement, Section III.A.  In this context, "sentenced to the bottom" means the most lenient sentence available within the guidelines—in other words, the sentence most favorable to the defendant that does not require a departure or variance.  To the extent that the government argues that this phrase "to the bottom" is ambiguous – which it is not – the Court must interpret it in the reasonable manner most favorable to the defendant.  Plea agreements are interpreted under contract law principles. *United States v. Lee*, 725 F.3d 1159, 1166 (9th Cir. 2013).  "In construing an agreement, the court must determine what the defendant reasonably understood to be the terms of the agreement when he pleaded guilty." *Id*. (quotation omitted).  Significantly, "any ambiguity is read against the government." *Id*.  Under these principles, if the defendant's interpretation of the plea agreement is reasonable, the language will be construed against the government.  *See, e.g., United States v. Spear*, 2014 U.S. App. LEXIS 10465 (9th Cir. 2014) (agreeing with the defendant's interpretation of the term "sentence"); *Lee*, 725 F.3d at 1167 (agreeing with the defendant's interpretation of the term "ice" in her plea agreement); *United States v. de la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993) (agreeing with the defendant's interpretation of the provision for the sentencing guidelines range).

It is worth noting that, after the defense's objections, the government indicated that, to comply with the plea agreement, it would remain neutral on how the defendant should serve the government's recommended sentence – through home confinement or otherwise.  The government's filed sentencing memo, however, takes a different position.

Again, the probation office determined that Rob's total adjusted offense level to be Level 11, with a Criminal History Category I – thus falling squarely within Zone B.  As

stated, the most lenient guidelines sentence under U.S.S.G. §5C1.1(c) for Zone B is home confinement.

To comply with the terms of the plea agreement, the government must recommend, at most, that Rob serve a seven-month sentence in home confinement. Accordingly, the defense asks this Court to treat the government's recommendation for a seven-month sentence as one for home confinement, which would constitute the bottom of the applicable Guidelines range determined by the probation office. This is necessary to ensure compliance with the plea agreement.

### III.   ARGUMENT

**THE COURT SHOULD IMPOSE A SENTENCE OF
ONE YEAR PROBATION**

**A. Rob's cooperation with the government was substantial and warrants a significant departure under §5K1.1.**

Rob's assistance to the government demonstrates that a significant departure is warranted. After the illegal conduct came to light, he admitted his wrongdoing and settled his case with the government. He then cooperated against others involved in the bid-rigging scheme, providing the government with valuable information through two in-person interviews and several attorney proffers. He also gave information that he had learned regarding foreclosure auction improprieties in other counties -- Alameda and Contra Costa. This information was used by the government in its investigation of the co-conspirator defendants and in other cases. Further, the government asked that he delay resolution of his case for *five years* to continue cooperating with the government and make himself available cooperate to testify at trial – against co-conspirators who refused to admit their own guilt. Ultimately, the government did not ask Rob to testify, but he agreed to the continuances and stood ready.

For all these reasons, Rob's cooperation warrants a substantial departure under §5K1.1.

### B. A variance from the Probation Officer's Guidelines and sentencing recommendation is warranted; a probationary sentence fulfills the sentencing objectives set forth in 18 U.S.C. § 3553(a).

Here, the Probation Office has determined that the applicable guideline range should be criminal history category I and adjusted offense level 11, for a Zone B sentence of 8-12 months. This was without considering any credit for cooperation under 5K1.1.

After the Supreme Court's decision in *Booker*, the Guidelines are advisory, not mandatory. They serve as a set of important guideposts meant to inform, but not shackle, district judges as they engage in *individualized* sentencing.[1] The "overarching statutory charge" under 18 U.S.C. §3553 is for the district court to "'impose a sentence [that is] sufficient, but not greater than necessary.'" *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc), *quoting* 18 U.S.C. § 3553(a). Although the district court must always first determine the applicable Guidelines range, that range is merely the "starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007); *Carty*, 520 F.3d at 991. Further, a district court "may not presume that the Guidelines range is reasonable." *Carty*, 520 F.3d at 991, *citing Rita v. United States*, 551 U.S. 338, 350-51 (2007). To arrive at a sentence that is sufficient but not greater than necessary, the district court must consider all the factors listed in 18 U.S.C. §3553(a), including:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public from further crimes;

(3) the kinds of sentences available;

(4) the advisory guidelines;

(5) any pertinent policy statement by the Sentencing Commission;

---

[1] *United States v. Booker*, 543 U.S. 220 (2005); *Rita v. United States*, 551 U.S. 338 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007). *See also United States v. Carty*, 520 F.3d 984, 990 (9th Cir. 2008) (en banc);*United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008).

(6) the need to avoid unwarranted sentence disparities among defendants; and

(7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. §3553(a).  Applying these enumerated factors to the circumstances of this case demonstrates that a term of one year probation will satisfy the statutory goals of sentencing in this case.

### 1. The nature and circumstances of the offense support a downward variance

Rob's extremely abbreviated participation in the conspiracy and the circumstances under which he joined the conspiracy warrants a downward variance because the sentencing guidelines have not fully accounted for these factors.  It is undisputed that Rob participated in the conspiracy for only one month – August 23, 2009 to September 24, 2009.  *See* PSR ¶ 57.  He purchased only five properties during this brief period – far fewer than the core group who conspired for approximately thirteen months and purchased 30-113 properties.  Further, the volume of commerce on the properties purchased is $1.135 million, a number dwarfed by the volumes of the core group, which obtained properties worth $6.636 - $12.379 million (though we note that some of these amounts were shared with business partners).  Consequently, Rob is far less culpable than the core conspirator group, a fact that is not fully addressed by the two-level reduction provided for in the adjustment for role in the offense recommended by the Probation Office.  *Id.*

Simply put, the original Group strong-armed Rob into joining the conspiracy, after he initially tried to purchase homes on his own, apart from the conspiracy.  At first, Rob intended only to purchase homes from the open, public auction.  But, as noted above, this Group bid aggressively against Rob in an effort to make his independent purchases of auctioned real estate economically impractical.  Further, the conspirators threatened him, and told him: cooperate or get lost.  This distinguishes Rob from many of his co-defendants and also the typical conspirator who joins a bid-rigging conspiracy, purely of their own accord, solely motivated to make more money.  By contrast, though fully

responsible for his own actions, Rob succumbed to the pressure to join the conspiracy so that he could continue doing business in a county where the public auction process seemingly was controlled by a few.

Taken together, these circumstances warrant a downward variance under 18 U.S.C. §3553(a).

### 2. Rob's personal history and characteristics favor leniency

As stated above, Rob's offense presents a one-time departure from law-abiding life – in which Rob had succeeded by hard work and determination. Rob moved out of his parents' home at 18, to escape his alcoholic and abusive parents. With no financial assistance from his parents, he has worked consistently to establish himself as a successful businessman. At 19, he started a car-detailing business; later, he created a pool remodeling business; then, in his early thirties, he became a real estate agent. Rob has been married to his wife, Angela, for 28 years. He has also been a devoted and active father to his two daughters, one of whom is still in high school. *See e.g.,* Letters of Herb Antone, Exh. C, Ginger Bone, Exh. D, David Gherke, Exh. I. And he has made amends with his parents, providing assistance – both financial and otherwise – as they grow old.

In addition to running his business and caring for his wife and family, Rob contributes substantial time and resources to charitable causes. In his late twenties, he volunteered as a rock-climbing instructor for youth groups and troubled teens. *See* Letter of Daryl Bothwell, Exh. E. More recently, he has helped raise significant funds for the American Cancer Society and regularly donates to a variety of causes. *See* Letters of Grant Freeman, Exh. G., Linda Lyon, Exh. M. In addition, he is extraordinarily generous on a personal level; he has frequently foregone his own profits in real-estate transactions for the benefit of others. *See, e.g.,* Letters of Dan Fillipi, Exh. F, Jody Hauger, Exh. K, Michael S. Meadows, Exh. O. For example, Rob helped a long-time friend and United States Army veteran purchase a home in California. Not only did Rob volunteer his services, but also sold this friend one of his investment properties at his cost, taking no

profit.  *See* Letter of Matt Macniak, Exh. N.  Moreover, his real estate associates and clients attest to his integrity in business transactions.  *See, e.g.,* Letters of Jerry Statdler, Exh. R, Grant Freeman, Exh. G, Kim T. Osaki, Exh. P, Paddy Kehoe, Exh. L.  To quote just one example:

> Rob has, over the years, become one of my closest friends, and a man I trust as having the utmost integrity and meticulous attention to customer service.  He helped me sell my house in 2009 at a significant discount to his commission, checked on my family and children as I had already been transferred out of state, and ensured my family and I were looked after.  He has been generous with his time, his family, home and attention.

Letter of Charles Piper, Exh. Q.

Further, Rob's need to take care of his wife, Angie, and younger daughter warrants leniency in this case.  It is undisputed that in 2005 Angie became ill and that in 2006 she was diagnosed with a rare and incurable form of lymphatic cancer.  Since her diagnosis, Rob has been dedicated to her care, making sure she receives the best treatment possible.  At one point, he shut down his business in order to assist her.  *See* Letter of Herb Antone, Exh. C.  In her letter addressing this issue, Exh B, Angie explains how her treatment has changed over the years.  Initially, she received regular blood transfusions; next she received the drug Rituxan, which was infused weekly over a two-month period.  After this drug stopped working, she now receives the oral drug Ibrutinib, which she takes daily and has been working well.  If this new drug stops working, however, she may need more aggressive treatments.  Nonetheless, Angie remains anemic, which makes it difficult to do many day-to-day tasks:

> This condition can cause severe anemia and makes it hard to do anything, due to being tired and out of breath.  Best way for me to describe how it feels is "hyperventilating" 24/7 without the hard breathing.  I become short of breath and dizzy.  Shortness of breath causes stress or maybe sometimes even the feeling of depression.  I get headaches and over all do not feel well.  I can't think straight, cannot perform simple day to day tasks.

Letter of Angela Rose, Exh. B.

Under these circumstances, Rob's presence at home will make a tremendous difference to Angie and to their younger daughter, who is still in high school. In sum, Rob's outstanding personal history and his wife's need for continued assistance in her fight against cancer support a downward variance under 18 U.S.C. §3553(a).

### 3. A sentence of probation will reflect the seriousness of the offense, satisfy the goals of specific and general deterrence, and protect the public

Under the circumstances of this case, a sentence of probation will reflect the seriousness of the offense, promote respect for the law, and provide just punishment. The felony convictions have already had, and will continue to have, significant collateral consequences for Rob. He has lost business due to his status as a convicted felon. More importantly, as a result of his conviction, Rob is in serious danger of losing his real estate license. Without his license, after almost two decades earning his living as a real estate agent and broker, Rob would face extreme difficulties supporting himself and his family.

Further, a variance from the guidelines range is warranted because Rob poses no danger to the public. As a first-time offender with no prior arrests, Rob is highly unlikely to re-offend. Rob fully understands the seriousness of his actions, feels remorse, and will not commit any future criminal conduct. As Rob states:

> I know I broke the law and I take full responsibility for my actions. I apologize to the Court for what I did . . . You can be certain that going forward I will never violate the law again.

Letter of Rob Rose, Exh. A.

Rob's friends also describe how Rob has taken responsibility for his actions, as his friend Dan Filippi states:

> I know Rob is being charged with bid-rigging, and he often says that he is very sorry for his actions. . . . Rob said his biggest mistake was not standing up and saying NO. Rob and I both understand he's not a victim, Rob acknowledges this

**DEFENDANT'S SENTENCING MEMORANDUM**
*U.S. v. Rose,* **Case No. 2:11-CR-00292**

> and has said over and over he wished he had only stood up and said NO. [¶] Rob is the most principled and trustworthy person I know.

Letter of Dan Filippi, Exh. F.

Similarly, his real estate colleague Jerry Stadtler states:

> I am aware of the charges filed against Rob Rose (rigging bids at public auctions) and I am also aware, through continuous contact with Rob, how sorry and completely devastated he is regarding this huge mistake he has made. . . . I know Rob is completely remorseful for his actions. . . . I know he will never forget his mistake. I know it will never happen again.

Letter of Jerry Stadtler. Exh. R.

Further, as a matter of general deterrence, the fact of a felony conviction, combined with probation and its attendant restrictions, will afford meaningful punishment for Rob's participation in the conspiracy.

### 4. The need to avoid unwarranted sentence disparities also supports a probationary sentence

As stated above, in Alameda County, following the Order in *Galloway,* the government has decided to set aside the mail fraud counts for defendants who pled guilty to bid-rigging and mail fraud as a result of their participation in a real estate foreclosure auction conspiracy. As a result, certain defendants who are similarly situated to Rob may receive a straight probationary sentence (even without cooperation considered) because they will not be burdened with the conviction of a Class B felony. Consequently, this Court should consider the potential sentencing disparities between defendants in Alameda County and San Joaquin County who pled guilty to essentially the same conduct.

### 5. A fine of $20,000 is appropriate

The defense believes that the Court should accept the government's recommendation of a fine of $20,000, as it is within the guideline range of U.S.S.G. §

2R1.1(c)(1), which states that for an individual the guideline fine range shall be from one to five percent of the volume of commerce, but not less than $20,000.

## IV. CONCLUSION

For the foregoing reasons, the defense requests that the Court sentence Robert Rose to a term of one year probation. The defense also requests the fine be capped at $20,000, as recommended by the government.

Dated: September 6, 2016.                         Respectfully Submitted,

                                                  RAMSEY & EHRLICH LLP

                                                  //s//

                                                  ISMAIL RAMSEY
                                                  KATHARINE KATES
                                                  *Attorneys for Robert Rose*