```
 1     IN THE UNITED STATES DISTRICT COURT; SACRAMENTO, CALIFORNIA
                 FOR THE EASTERN DISTRICT OF CALIFORNIA
 2            BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

 3   UNITED STATES OF AMERICA,
                            Plaintiff,
 4                vs.                         No. 2:10-cr-00144 WBS

 5   ANTHONY B. GHIO,
                       Defendant.
 6   _____
     THEODORE B. HUTZ,                        No. 2:10-cr-00238 WBS
 7                     Defendant.
     _____
 8   JOHN R. VANZETTI,                        No. 2:10-cr-00239 WBS
                       Defendant.
 9   _____
     RICHARD W. NORTHCUTT,                    No. 2:11-cr-00038 WBS
10                     Defendant.
     _____
11   YAMA MARIFAT,                            No. 2:11-cr-00039 WBS
                       Defendant.
12   _____
     GREGORY L. JACKSON,                      No. 2:11-cr-00090 WBS
13                     Defendant.
     _____
14   WALTER DANIEL OLMSTEAD,                  No. 2:11-cr-00291 WBS
                       Defendant.
15   _____
     ROBERT ROSE,                             No. 2:11-cr-00292 WBS
16                     Defendant,
     _____
17   KENNETH A. SWANGER,                      No. 2:11-cr-00492 WBS
                       Defendant,
18   _____
     WILEY C. CHANDLER and                    No. 2:11-cr-00511 WBS
19   ANTHONY B. JOACHIM,
                       Defendants.
20   _____
                       REPORTER'S TRANSCRIPT
21                   JUDGEMENT AND SENTENCING
              MONDAY, SEPTEMBER 12, 2016; 9:00 A.M.
22
        Court Reporter:     MICHELLE L. BABBITT, CSR#6357
23                          Official Court Reporter, USDC
                            501 I Street, Suite 4-200
24                          Sacramento, California 95814
                            916-448-7938
25   Transcript prepared by computer-aided transcription
```

```
 1                          APPEARANCES:

 2                          ---o0o---

 3   For the Government:        UNITED STATES DEPARTMENT OF JUSTICE
                                ANTITRUST DEPARTMENT
 4                              450 Golden Gate Avenue, 10th Floor
                                San Francisco, California 94102
 5                              By:  KELSEY LINNETT
                                Assistant United States Attorney
 6
                                UNITED STATES DEPARTMENT OF JUSTICE
 7                              450 5th Street, NW
                                Washington, DC 20530
 8                              By:  ANN MARIE O'BRIEN
                                Assistant United States Attorney
 9
     For Defendant Ghio:        BONJOUR, THORMAN, BARAY & BILLINGSLEY
10                              24301 Southland Dr. Suite 312
                                Hayward, California 94545
11                              By:  MICHAEL THORMAN
                                Attorney at Law
12
     For Defendant Hutz:        BARTH DALY LLP
13                              431 I Street, Suite 201
                                Sacramento, California 95814
14                              BY:  KRESTA DALY
                                Attorney at Law
15
     For Defendant             CHRISTOPHER WING
16   Vanzetti:                 Attorney at Law
                                2701 Del Paso Road, Suite 130, #45
17                              Sacramento, California 95835

18   For Defendant             DORON WEINBERG
     Northcutt:                Attorney at Law
19                              523 Octavia Street
                                San Francisco, California 94102
20
     For Defendant Marifat:    DAVID COHEN
21                              Attorney at Law
                                300 Montgomery Street, Suite 660
22                              San Francisco, California 94104

23   For Defendant Jackson:    DONALD H. HELLER
                                Attorney at Law
24                              3638 American River Drive
                                Sacramento, California 95684
25
```

```
 1                         APPEARANCES:

 2                         ---o0o---

 3   For Defendant         ALAN ELLIS
     Olmstead:             Attorney at Law
 4                         80 Pinheiro Circle
                           Novato, California 94945
 5
     For Defendant Rose:   RAMSEY & EHRLICH LLP
 6                         803 Hearst Avenue
                           Berkeley, California 94710
 7                         BY:  ISMAIL J. RAMSEY
                           Attorney at Law
 8
     For Defendant Swanger:  WILLIAM J. PORTANOVA
 9                         Attorney at Law
                           400 Capitol Mall, Suite 1100
10                         Sacramento, California 95814

11   For Defendant Chandler: K&L GATES LLP
                           Four Embarcadero Center, Suite 1200
12                         San Francisco, California 94111
                           BY:  EDWARD SANGSTER
13                         Attorney at Law

14   For Defendant Joachim:  THOMAS JOHNSON
                           Attorney at Law
15                         400 Capitol Mall, Suite 1620
                           Sacramento, California 95814
16

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2                            ---o0o---

 3   MORNING SESSION                          Pg. 5

 4   AFTERNOON SESSION                        Pg. 113

 5
     JUDGMENT AND SENTENCES
 6
     ANTHONY B. GIHO                          Pg. 62
 7   THEODORE B. HUTZ                         Pg. 83
     JOHN R. VANZETTI                         Pg. 98
 8   RICHARD W. NORTHCUTT                     Pg. 114
     GREGORY L. JACKSON                       Pg. 143
 9   WALTER DANIEL OMSTEAD                    Pg. 155
     ROBERT ROSE                             Pg. 175
10   KENNETH A. SWANGER                       Pg. 193
     WILEY C. CHANDLER                        Pg. 206
11   ANTHONY B. JOACHIM                       Pg. 206

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   SACRAMENTO, CALIFORNIA, MONDAY, SEPTEMBER 12, 2016; 9:00 A.M.
 2                           ---o0o---
 3            THE COURT:  There are a number of cases on the
 4   calendar this morning.  I'm aware of motions of continuances,
 5   to withdraw as substitution of counsel and so forth.  I'd like
 6   to have a discussion with all of you before we get into those
 7   matters.
 8       I'd like each of you to identify your appearance and your
 9   clients, please, starting with Mr. Ghio.
10            MR. THORMAN:  Good morning, Your Honor.  Michael
11   Thorman.
12            THE COURT:  Is Mr. Ghio present?
13            MR. THORMAN:  Yes.
14            THE COURT:  We need to have seats for everyone.
15   People standing in the back, we need to have them come in on
16   this side of the bar and sit on the bench.
17       Let's have the lawyers on this side of the bar and that
18   will make more space for the non-lawyers on the other side.
19            Thank you, Mr. Thorman.
20       Mr. Hutz?
21            MS. DALY:  Good morning, Your Honor.  Kresta Daly on
22   behalf of Mr. Hutz.  He is standing in the back.
23            THE COURT:  Mr. Vanzetti next.
24            MR. WING:  Good morning, Your Honor.  Christopher
25   Wing.  I represent Mr. Vanzetti, who is sitting over there.
```

```
 1              THE COURT:  Mr. Northcutt?
 2              MR. WEINBERG:  Good morning, Your Honor.  Doron
 3   Weinberg appearing for Mr. Northcutt.  Mr. Northcutt is here.
 4              THE COURT:  Thank you.  Mr. Marifat, I know there's a
 5   motion.  Who is present today?
 6              MR. COHEN:  David Cohen on behalf of Mr. Marifat,
 7   present.  Richard Tamor is also here before the court.
 8              THE COURT:  Thank you.  Mr. Jackson?
 9              MR. HELLER:  Good morning, Your Honor.  Donald H.
10   Heller for Mr. Jackson, standing in court.
11              THE COURT:  Mr. Olmstead?
12              MR. ELLIS:  Good morning, Your Honor.  Alan Ellis
13   here with my client standing.
14              THE COURT:  Thank you.  Mr. Rose?
15              MR. ROSE:  Good morning, Your Honor.  Ismael Ramsey
16   on behalf of Mr. Robert Rose, standing in the second row in
17   the rear.
18              THE COURT:  Thank you.
19              Mr. Swanger, Kenneth Swanger?
20              DEFENDANT SWANGER:  I'm here.
21              THE COURT:  Mr. Swanger is present.  Mr. Portanova
22   not present yet?  All right.  We'll see what is holding him up
23   this morning.  Mr. Chandler?
24              MR. SANGSTER:  Good morning, Your Honor.  Ed Sangster
25   for Wiley Chandler, present in court.
```

1              THE COURT:  Thank you.  And Mr. Joachim?  Is

2    Mr. Johnson, Ms. Kellogg, are they present?  Is Mr. Joachim

3    present?  All right.  We will see what is holding them up

4    because I do need to make some remarks and have discussions

5    with you before we proceed with any of the individual cases,

6    and my remarks and discussions are going to cover all of the

7    defendants' cases.

8         I'll ask the clerk -- first of all, anybody seen Mr.

9    Portanova this morning or talked to him?  I happened to see

10   him Friday and remarked that I would see him today, and he

11   said yes.  He was with Mr. Johnson at the time.  Maybe they're

12   still where I saw them on Friday.

13        The clerk got an e-mail Mr. Johnson would be here in

14   five minutes.

15              Would you call Mr. Portanova's office?

16              THE CLERK:  Yes.

17              THE COURT:  I know he knows about this appearance.

18   Here he is.

19              (Mr. Portanova enters the courtroom.  9:05 a.m.)

20              THE COURT:  The record will reflect that Mr.

21   Portanova is present.  Is that Mr. Swanger with you?

22              MR. PORTANOVA:  That is Mr. Fowler.  Thank you.

23              THE COURT:  And there's Mr. Swanger.  All right.

24              THE CLERK:  We're still waiting for Mr. Johnson.

25              THE COURT:  We're waiting for Mr. Johnson.

1    Mr. Portanova, come up to this side of the bar and have a

2    seat.

3         MR. PORTANOVA:  Thank you, Your Honor.  Sorry for

4    being late.

5         THE COURT:  Any other lawyers that don't have seats,

6    feel free to sit at one of the chairs at counsel table this

7    side over here.

8    (Mr. Johnson enters the courtroom. 9:08 a.m.)

9         THE COURT:  The record will reflect Mr. Johnson has

10   arrived.  We were waiting.  Is your client present?

11        MR. JOHNSON:  He is.

12        THE COURT:  All defendants are present with counsel.

13   I wanted to have a discussion with all of you on some

14   matters that pertain to the sentencing hearings in all these

15   cases.

16   I had deliberately set these all at the same time for two

17   good reasons.  I set them at a time I told you would not be

18   continued.  There are common issues that need to be addressed

19   in each of these matters.  I believe that the discussion of

20   the common issues would probably be more extensive than

21   discussion of any of the individual issues relating to each of

22   the defendants.

23   Just to give you some examples, the government has made

24   reference to Section 2R1.1 of the sentencing guidelines which

25   talk about the need for incarceration as a, if you will,

1    sentence of preference over types of sanctions such as

2    monetary sanctions, alternative service, and so forth.  I want

3    to discuss that with you, because, quite frankly, I don't

4    understand the rationale for that determination.

5         Another issue has to do with the fine.  To me, the

6    sentence has to be considered as a whole.  You don't consider

7    the fines separately from any term of incarceration.  If it's

8    to be punishment, it has to be considered as a whole.  It

9    stands to reason that the greater the fine, perhaps the lesser

10   incarceration is necessary.  It depends upon the individual

11   and the case.

12        In this case or in these cases, the government may have

13   tied the court's hands by agreeing to the same fine,

14   virtually, for every defendant, regardless of that defendant's

15   wealth, regardless of that defendant's involvement, and to me

16   in the case of many of the defendants, it is almost obscenely

17   low.

18        Another issue that applies to all the cases is

19   availability of probation.  An argument can be made that

20   probation is not available for those defendants who have

21   entered pleas to the mail fraud charges or conspiracy to

22   commit mail fraud charges because those are class B felonies

23   and Section 3561(a)(1) precludes a sentence of probation.

24        However, another argument could be made that because in

25   each of these cases the government has moved under 5k1.1 under

1    the sentencing guidelines for departure that the court is not

2    bound by that mandatory provision, and there is some case law,

3    specifically in the Fourth Circuit, that would support that

4    proposition.

5         That case law has, in my view, been approved by language

6    in cases within the Ninth Circuit.  I want to discuss that

7    issue with all of you.  I don't want to have to have that

8    discussion with some of you and others not participate in that

9    discussion or not be bound by it or have some opportunity to

10   come back and ask the court to second guess whatever ruling

11   the court might make on any of those issues or others that

12   pertain to all defendants.

13        For that reason it is important to the court to proceed

14   with the sentencing hearings in all these cases together.

15   It's also important to the court to proceed promptly because I

16   really do believe that justice delayed is justice denied.

17        These cases have now been on file for six years.  The

18   public has a right to know what the sentences are for those

19   offenses within a reasonable period of time after the offenses

20   have been committed.  If it's to serve as a deterrent, if it's

21   to serve most of the purposes of Section 3553(a), then prompt

22   disposition of criminal matters is necessary.

23        It's also very important for the defendants.  I have

24   witnessed the anxiety that a number of the defendants have

25   been going through as a result of having to wait all this time

1   to know what their sentence is going to be.  The anxiety in

2   many cases can be worse than the actual punishment.  I don't

3   say that factiously.

4       So it's important to me that we proceed with these matters

5   altogether and it's also important that we proceed promptly.

6   For that reason, I thought I made it clear to all of you when

7   I set these matters together that they would proceed today.

8       Now, I'm ready to address the requests for continuances.

9   I'll hear from you, first, Mr. Cohen.

10          MR. COHEN:  Good morning, Your Honor.  I understand

11  that this case has been pending for a long time and I was

12  hired last Tuesday, the day after Labor Day.

13          THE COURT:  So the case has been pending now for over

14  six years, and your client entered a plea of guilty how long

15  ago?

16          MR. COHEN:  He entered a plea of guilty on March 4th

17  of 2011.

18          THE COURT:  Since 2011, some five years, he has known

19  that he would be sentenced.  When was this case set for

20  sentencing today; do you recall?

21          MR. COHEN:  Well, the case was set for sentencing

22  today probably early this year, perhaps late last week.  I

23  have the docket in front of me.

24          THE COURT:  So he's known for some six to

25  eight months at least that the matter was to proceed for

1    sentencing today, and now Tuesday he decides to hire a new

2    lawyer?

3          MR. COHEN:  If I could be heard.

4          THE COURT:  You can be heard.  I just wanted to make

5    sure I understood the chronology.

6          MR. COHEN:  I've looked at the docket.  I'm not

7    trying to come in here and tell the court what has happened

8    for the last number of years, but in looking at the docket, it

9    appears that a number of these defendants entered into

10   cooperation agreements with the government and that some

11   defendants decided to proceed to trial.

12      There were 13 separate applications for continuances.

13   Sometimes it was styled as a status conference and the

14   sentencing was taken off calendar.  Sometimes it was styled as

15   a sentencing hearing, but there were 13 separate stipulated

16   continuances, not only with this court but with Judge Garcia

17   starting from the time of the plea -- the first sentencing in

18   this case was scheduled for --

19         THE COURT:  You don't have to go through 13 different

20   dates.

21         MR. COHEN:  My point is, during all of this time, my

22   client was advised by his attorney there's another

23   continuance, the other defendants still haven't gone to trial.

24   It wasn't until this year -- it wasn't as if there was a

25   probation report prepared back in 2011 and there were

1    continuances all this time.

2        My client was told in the middle part of the summer that

3    he had to go appear for his probation interview.  No probation

4    report was prepared.  The probation report in this case was

5    actually prepared, the draft report, exactly 35 days before

6    this matter was set for sentencing.

7            THE COURT:  That's true for every one of the other

8    people in this room.

9            MR. COHEN:  I'm not saying it's not.  All I'm saying,

10   Your Honor, is the --

11           THE COURT:  Mr. Weinberg, where are you going?

12           MR. WEINBERG:  I need to step out.  I'll be right

13   back.

14           THE COURT:  I want you present for the discussion.

15           MR. WEINBERG:  I understand, Your Honor, but I'm not

16   part of the request for continuance.  I'll be right back.

17           THE COURT:  Go ahead.

18           MR. COHEN:  I'm sorry.  I wanted him to be present,

19   but he seems to need to leave.  I like Mr. Weinberg to be

20   present whenever I'm talking.  He has a lot of good advice a

21   lot of times.

22           THE COURT:  Do you want to take a little break for

23   him to come back?

24           MR. COHEN:  It depends on what the court feels.

25           THE COURT:  I want everybody to be present.  I don't

1  want anyone to tell me later on they missed something.

2           MR. COHEN:  Sounds like the court would prefer to

3  wait a couple minutes before he comes back.

4           THE COURT:  I saw somebody else leave.  I don't want

5  any defendants leaving.  If your clients are inclined to

6  leave, let me know.  I want them present for these

7  proceedings.

8           MR. COHEN:  I'll check with him, Your Honor.

9           THE COURT:  Well, if he's going to take a minute, I

10  will proceed.

11          MR. COHEN:  He doesn't appear to be outside.

12          THE COURT:  Let's proceed then.  He was voluntarily

13  absenting himself and didn't need to hear what you had to say.

14          MR. COHEN:  From my client's perspective, he was

15  carried along in these continuances due to the posture of the

16  case and his cooperation.  As soon as the other trials were

17  finished --

18          THE COURT:  There was only one other trial.

19          MR. COHEN:  That may be the case.  As I indicated in

20  the papers, I'm trying to gather all the information.  He was

21  carried along in the continuance until the final trial, and

22  all these matters, which had been set for sentencing on the

23  12th of September, it was time for them all to be sentenced.

24     There were times in the past during the course of these

25  other continuances where dates were set nine months, a year in

1    advance and later continued.  My client, from his perspective,

2    he was just waiting for his attorney to tell him to do what is

3    necessary.

4        This time after the trial occurred, he was told by his

5    attorney, look, you have to come in and talk to probation, and

6    then the report was prepared on the schedule on the local

7    rules, as I previously indicated, 35 days before and then the

8    final report 14 days before.

9        The court issued an order saying you've got to get all

10   your objections and filings in on a certain time schedule,

11   which is all in the docket.

12       My point to all this is if this had happened in 2011, if

13   the initial sentencing hearing that had been set by Judge

14   Garcia in May of 2011 was proceeding as a pace, my client may

15   have come in May of 2011 and he may have said, look, I need

16   another two months or three months or hire a new attorney and

17   have that attorney review the case and represent me at

18   sentencing, and there wouldn't have been all these years,

19   intervening years, but from my client's perspective, it's the

20   same thing.

21       He didn't cause the five-and-a-half-year delay, and this

22   is the first time now that this matter is put on the local

23   rule schedule that he's coming in and saying, wow, the

24   sentencing is actually coming up, all these filings are being

25   made and I'd like to hire a new attorney.

1          THE COURT:  I know, but in every case, whether

2     there's a delay or not, the sentencing follows the plea or the

3     trial, and it follows the plea or trial by a period of time,

4     and that doesn't mean that you get to come in to court and get

5     a new attorney just because you saw the presentence report.

6          (Mr. Weinberg reenters the courtroom.  9:24 a.m.)

7          MR. COHEN:  I would disagree.

8          THE COURT:  Disagree with me.  Go ahead.

9          MR. COHEN:  In a case where somebody has gone to

10    trial and the probation report is prepared, I think it is

11    relatively common that a person would go out --

12         THE COURT:  Tell me this.

13         MR. COHEN:  -- go out and hire a lawyer.

14         THE COURT:  Tell me this.  You've got a roomful of

15    lawyers and people that have come for their sentencing

16    hearings.  Do you think the court has discretion to insist

17    upon hearing all these matters at the same time or do you

18    think that you have a right to have your matter heard at a

19    different time from all the other defendants?

20         MR. COHEN:  I think that Mr. Marifat does have a

21    right to an individual sentence, and while I appreciate the

22    fact that the court believes there are some issue that are the

23    same in all these cases, and, undoubtedly, there are,

24    obviously each defendant has a right --

25         THE COURT:  You'll get it then.  Here's the story.

1   I'm going to have a discussion with the lawyers that do want

2   to proceed to judgment and sentence.  You're not going to be

3   part of that discussion.  If I make a decision on some issue

4   that may persuade me by the time I get to your case to make

5   that same decision in your case, the converse may be true.

6       Are you willing to have your case separated from all the

7   others and not participate in the discussion that I'm going to

8   have with the other parties?

9           MR. COHEN:  We are, but I just -- from our

10  perspective, I think Mr. Marifat is entitled to make whatever

11  arguments are appropriate at his sentencing.  Now, I agree,

12  and this happens in other cases, the court may address this

13  issue in related cases and make a determination and may say

14  when we come here, look, I've looked at the same issue and

15  this is the decision I've made.

16      That happens frequently, but I still think that Mr.

17  Marifat should have a right to address that specific issue.

18          THE COURT:  All right.  Let me hear from the

19  government.  If that's what he wants to do, he can come in

20  later.

21          MS. O'BRIEN:  Ann O'Brien on behalf of the United

22  States.  We agreed to the stipulation to continue only because

23  of the new appearance or motion to appear, so we agree on that

24  basis.  There was a motion to withdraw the plea filed last

25  night which also presents an issue.

```
 1              THE COURT:  All right.  Maybe we ought to address
 2      that right now.  If he's going to withdraw the plea, then we
 3      don't have to worry about resetting this matter for judgment
 4      and sentence.
 5          The court's general inclination, whenever anyone wants to
 6      withdraw their plea before judgment, is to give favorable
 7      consideration to it, because the argument is that there isn't
 8      the same prejudice that would occur if the motion is made
 9      after the sentencing.
10          In this case, it looks like we have another trial coming
11      up anyway.  He can just go to trial with the other defendants
12      that we have to retry.
13          What would be your position with regard to a motion to set
14      aside the plea?
15              MS. O'BRIEN:  We received the motion very late last
16      night.  We would like an opportunity to --
17              THE COURT:  Look.  Ordinarily I would take a recess
18      and give you a chance to read this, but we've got a courtroom
19      full of people here.  I think we really need to know.
20              MS. O'BRIEN:  Our position is that there is no basis
21      to withdraw based on what's stated in this tentative --
22              THE COURT:  Let's hear the argument on it and why you
23      want to withdraw the plea.  You got a pretty good deal, you
24      know, in this plea agreement.
25              MR. COHEN:  What I made clear in the motion to
```

1  withdraw the plea is that I have not had a chance to review

2  this entire file yet.

3          THE COURT:  Why are you prematurely making a motion

4  then?

5          MR. COHEN:  Because Your Honor indicated that you

6  were going to go forward today and he would have lost his

7  right to make a motion if Your Honor proceeded with

8  sentencing.

9          THE COURT:  So you don't really want the court to

10  grant the motion at this time?

11          MR. COHEN:  I would like the court to continue the

12  motion.  I've asked for the opportunity to continue this

13  matter until October 24th, at which point I will have an

14  opportunity to review the entire file.  I've asked for the

15  opportunity to file a replacement motion or a supplemental

16  motion based upon my full review of the file and my full

17  research.

18      I have also told the government that after I'll fully

19  reviewed this matter I may withdraw the motion to withdraw the

20  plea.  That's where I am.  I don't think it's fair to anybody

21  for me proceed with sentencing or a motion to withdraw the

22  plea today until I have the entire file.  I have a piece of it

23  and there are a number of transactions in this case that I

24  need to review.

25          THE COURT:  Why do you think you'll be able to do all

1    this in one month?

2            MR. COHEN:  Well, I certainly will have a better

3    chance than I have --

4            THE COURT:  I don't care how long you put it over.

5    How long do you really want to put it over?

6            MR. COHEN:  I would like to put it over more time

7    than that, obviously, ideally until the beginning of next

8    year.

9            THE COURT:  All right.  Let's do that then.  What

10   date do you suggest?

11           MR. COHEN:  Your Honor, when is the other trial

12   scheduled?

13           THE COURT:  The other trial will never go.  It's one

14   of those things that gets continued from time to time.  It's

15   in the foreseeable future.  I don't have any realistic

16   expectation that it's going to proceed to trial.

17           MR. COHEN:  I have --

18           THE COURT:  Look.  None of these other people have

19   the right to have that other case go to trial before they get

20   sentenced unless they come in now and make the same motion

21   they see you making, so do you think you have a right to have

22   the other case go to trial before you proceed?

23           MR. COHEN:  No, I'm not saying I do.  I was only

24   saying that for the convenience of the court.

25           THE COURT:  Well, it's already inconvenient to the

1    court.  Don't worry about that.

2            MR. COHEN:  If Your Honor would allow me to look at

3    my calendar, I can suggest a date in January.

4            THE COURT:  All right.

5            MR. COHEN:  What is the preferred day of the week?

6            THE COURT:  Monday.

7            MR. COHEN:  Can I suggest the -- would Your Honor

8    have a calendar on the day after Martin Luther King Day on the

9    17th of January?

10           THE COURT:  Yes.

11           MR. COHEN:  That's a bad date.  I'm sorry, Your

12   Honor.  Let me suggest the 23rd of January.

13           THE COURT:  All right.  Is that for judgment and

14   sentence or just for status on whether or not you want to

15   withdraw your plea?

16           MR. COHEN:  That would be on status, whether or not

17   he would withdraw the plea.

18           THE COURT:  When you get here on the 23rd, you'll

19   tell me whether he's going to withdraw his plea and set

20   another date for judgment and sentence?

21           MR. COHEN:  If that would be all right with Your

22   Honor.  I imagine the government will object to him

23   withdrawing his plea if he wants to, but, yes.

24           THE COURT:  All right.  The matter is then continued

25   to January 23rd at 9:00 a.m. for status conference.

1        Now, have a seat.

2              MR. COHEN:  Can I ask that Your Honor grant my motion

3    to have Mr. Tamor and Mr. Dubois relieved in this case?

4              THE COURT:  Let me have Mr. Tamor up here.

5              MR. TAMOR:  Good morning, Your Honor.

6              THE COURT:  Good morning.  You're ready to have

7    Mr. Cohen take over the case for you?

8              MR. TAMOR:  Yes.

9              THE COURT:  Would you be prepared to turn over

10   whatever materials you have that would be useful to him so

11   that he can have access to those?

12             MR. TAMOR:  Yes, sir.

13             THE COURT:  Would you like to be relieved at this

14   time?

15             MR. TAMOR:  Yes.

16             THE COURT:  That will be the order.

17      Now, we had one other request for continuance.  I'll hear

18   that one.

19             MR. RAMSEY:  Good morning, Your Honor.  Ismael Ramsey

20   on behalf of Robert Rose.  Our situation is different than the

21   previous one.  We are concerned about the issuance of the

22   order in the Galloway case in the Northern District of

23   California.

24      That being said, we've fully briefed all the issues for

25   sentencing and are prepared today to proceed if the court

1    desires.  I definitely understand the need for efficiency to

2    have everyone heard.

3          THE COURT:  The court definitely desires to proceed

4    all at once, as I've indicated.  I read your brief with regard

5    to the case in the Northern District.  All we're talking about

6    is whether you might be able to enter into further

7    negotiations with the United States Attorney to proceed only

8    on the bid rigging count and not the mail fraud count; is that

9    correct?

10         MR. RAMSEY:  That's correct.  Like I said, we'd be

11   prepared to proceed, briefed and could argue everything today.

12       The only thing I would suggest is if it would make sense

13   to bifurcate, we could do everything up to the pronouncement

14   of sentence and then ask the court to continue just that with

15   respect to Mr. Rose to give some more time for those

16   discussions, but if not, we are fully prepared to proceed.

17         THE COURT:  That solution doesn't make sense to me.

18   If I were to do that, I would have to proceed in the same

19   fashion as every other defendant.  We would do everything but

20   the sentence, and that's what we're here for, and then when we

21   finally got around to imposition of a sentence, counsel would

22   want to be heard again, I'm sure.  I don't think we would

23   accomplish much if I accepted that suggestion.

24         MR. RAMSEY:  So the court understands, the unusual

25   situation with respect to Mr. Rose is that he has a real

1    estate license, and so the collateral consequences of mail

2    fraud, I'm told by a licensing attorney, are significant and

3    may be different than just the bid rigging, so those were the

4    considerations that we had.

5        I don't think those apply to the other defendants, and

6    that's why we made the motion to continue.

7            THE COURT:  Well, that particular consideration may

8    not apply as to the other defendants, but the other argument

9    that you made is that the guidelines seem to be more severe

10   for mail fraud than they are for the bid rigging and would

11   apply across the board to all the defendants.

12           MR. RAMSEY:  That is not significant to us except for

13   the argument on probation and we believe there are other

14   reasons he is eligible for probation.  With respect to the

15   actual guidelines and offense level for Mr. Rose, his offense

16   level is driven by the bid rigging guidelines, not by the

17   fraud guidelines.

18           THE COURT:  What is the government's position with

19   regard to this motion?

20           MS. O'BRIEN:  We did file a written opposition to

21   this motion for many of the reasons Your Honor mentioned.  We

22   do not plan to engage in renegotiations with this defendant.

23           THE COURT:  I'm going to deny that motion.  If the

24   only concern is the possible loss of license, that, it seems

25   to me, can be dealt with in other ways.  I don't know who the

1    authority is that would make the decision to withdraw the

2    license, but I would think the same arguments you might make

3    to the court could be made to that authority.

4              MR. RAMSEY:  Yes, Your Honor.  I understand the

5    difference is when we were before that authority, if we're

6    arguing with a conviction for mail fraud, that would be

7    different than if we were arguing without the conviction for

8    mail fraud.  We would obviously bring up the collateral

9    consequences of a mail fraud conviction in the context of his

10   overall conviction if we are proceeding, but that is the

11   issue.

12             THE COURT:  All of the arguments that you would like

13   to make based upon this Northern District case are arguments

14   that you could have made before and that you could have taken

15   into consideration when you decided to enter into the plea

16   agreement.  I see no valid reason to postpone this matter so

17   that you can consider those arguments further.

18             MR. RAMSEY:  Yes, Your Honor.  Thank you for your

19   consideration.

20             THE COURT:  Now, after hearing the discussion I've

21   had with counsel so far, is there anybody else that is asking

22   for a continuance of these proceedings today?

23        I see no hands and hear no response.

24        The court can proceed with judgment and sentence with

25   regard to all defendants other than Mr. Marifat.

1        I'd like to start with the discussion that I suggested we

2   have.  You've heard some issues that I want to have addressed

3   globally with regard to these.  One of them is whether

4   probation is available.  You've just heard counsel,

5   Mr. Ramsey, make reference to that.

6        I'd like to know what the government's position is with

7   regard to that.

8            MS. O'BRIEN:  Yes, Your Honor.  Ms. Linnett and I

9   will handle different defendants, but these overall issues,

10  I'm happy to address with Your Honor.  I think this may be

11  relatively easily resolved, although a slightly complex issue.

12       As noted in Mr. Ramsey's pleading, we did not, in fact,

13  specifically allege that the mail fraud count affects a

14  financial institution which would trigger a 30-year maximum

15  and a class B ineligibility for probation.

16           THE COURT:  So your point is that, really, it is not

17  a class B offense because you did not allege that a financial

18  institution was affected?

19           MS. O'BRIEN:  We did not allege that.  When this

20  issue has come up in other matters around the country, I think

21  it's appropriate that the court sometimes apprises the

22  defendant of the availability of the higher statutory maximum,

23  but as alleged in these matters, these informations, we did

24  not -- or the indictment, we did not allege that, so we're not

25  going to take the position that probation -- these defendants

1    are ineligible for probation.

2            THE COURT:  That answers my question then.  I'm glad

3    you clarified that.  I actually thought we would have to go to

4    the next step and make a determination as to whether the fact

5    that you've made a motion under 5k1.1 made the monetary

6    imprisonment inapplicable.

7        The case I was referring to in the Fourth Circuit, so the

8    record is clear, was United States versus Daiagi, D-A-I-A-G-I,

9    892 Fed. 2d 31, Fourth Circuit 1989, and the Ninth Circuit

10   case is United States versus Roth, 32 Fed. 3d 437, Ninth

11   Circuit 1994, which I believe reaffirms the guy in the Ninth

12   Circuit and leads to the conclusion that the mandatory

13   sentence is not applicable when the government moves under

14   Section 5k1.1.

15       It's been within the discretion of the court in each of

16   these cases to decide whether or not to grant the defendant's

17   request for probation?

18            MS. O'BRIEN:  Yes, that is our position, Your Honor.

19            THE COURT:  The next issue I would like you to

20   address -- I don't need to hear from the defendants on that

21   because I don't think anybody would take issue with that.

22       If anybody does, you can raise your hands.

23       No hands.

24       The next issue I'd like you to address is the fine.  Now,

25   I know there's some formula by which you have arrived at the

 1   amount of the fine that you recommend, and I'd like to hear

 2   the reasoning of how you get to those numbers and why it's so

 3   low with regard to some of these defendants that are

 4   multi-millionaires literally.

 5        MS. O'BRIEN:  Yes, Your Honor.  I'm happy to address

 6   that.  Just taking, for instance, I'll speak to the language

 7   in the plea agreements.  We have different ones, Your Honor.

 8   Taking the plea agreement of Mr. Hutz, and I believe similar

 9   language is in each of them, looking at paragraph 3(d), that

10   does address the agreement as to the fine.

11        The statement is, (Reading:)

12             Fine:  The government agrees to recommend that the

13             defendant be ordered to pay the mandatory minimum

14             fine of $20,000 pursuant to 2R1.1(c)(1) or other

15             amount as recommended by United States Probation.

16        Out of fairness, we found it appropriate to take the

17   position across the board, to stick to the $20,000

18   recommendation; however, probation does come out higher.

19        THE COURT:  That's right.  So your agreement is

20   consistent with a recommendation that the court impose a fine

21   recommended by the probation officer?

22        MS. O'BRIEN:  Our agreement does allow for that;

23   however, I will address your concern about the low fines, and

24   I understand that concern.  We've recommended the antitrust

25   guideline minimum of 20,000 across the board because we

believe incarceration is a more substantial deterrent.
Oftentimes with white collar criminals that we see in
antitrust cases, they feel that they can buy their way out of
consequences of the crime.

In fact, offer to pay higher crimes for recommendations of
lower jail sentence, but we believe a sentence of
incarceration reflects the serious harm that economic crime
causes and sends the message that these crimes can carry real
consequences and they can't buy their way out of them.

That's the basis behind our rather low recommendation.

THE COURT:  That is all laudable rhetoric, but I
really, as I indicated earlier, have a hard time understanding
the rationale for this idea that incarceration seems to be
more appropriate in antitrust violations such as these than it
is in other types of cases.

These are crimes that were motivated by greed.  They're
not motivated by passion.  They're not motivated by animus.
They're not motivated by some of the other reasons that we see
for crimes that people are now in prison for having committed.

It seems to me that an appropriate response from the
government is to hit them where it hurts.  These people
committed the crimes to enhance their coffers.  If you hit
them in their coffers where it hurts, that seems to be a case
where the punishment more fits the crime than taking somebody
like -- and I could name any one of these defendants -- and

1    locking them up in prison.  There is not a single one of these

2    defendants that I think the public needs to be protected from

3    that requires them to be locked up.

4        So explain to me why, other than what you've just said,

5    buying your way out of prison -- if you hit them hard enough,

6    yeah, $20,000 is pocket change for some of these defendants.

7    They would gladly -- and they have their checks in

8    their pockets right now.  They would gladly pay that to get

9    rid of some time in prison, but if you hit them for half of

10   what they own, that's real punishment.  That fits the crime.

11       So tell me what's wrong with that.

12           MS. O'BRIEN:  Your Honor, that's totally within your

13   discretion to decide.  I think hitting them where it hurts is

14   what we're trying to do.  They've come prepared with the

15   checks because they have the money.

16           THE COURT:  That's right.  I'm talking about bigger

17   fines.  They won't like to hear it and it's not even what's

18   recommended by the probation officer, but that's what I'm

19   thinking about, and I want to know whether my thinking is

20   somehow wrong, whether it's in disagreement with the learned

21   judges who are on the Sentencing Commission and talked about

22   Section 2R1.1 or whether I'm correct.

23           MS. O'BRIEN:  These defendants haven't just come

24   ready with $20,000 in their pockets.  Some of them have come

25   to pay the full restitution amounts.  That is important to us.

1    Restitution is very important.  We do believe it should come

2    first.

3              THE COURT:  Wait a minute.  That's another issue, but

4    I want you to be thinking about this.  You've agreed that

5    restitution will be determined after the court imposes

6    judgment.  So to say that restitution comes first is almost

7    inconsistent with that because we don't know at the time I'm

8    going to pronounce judgment what the restitution will be.

9        I know the guidelines say in determining the amount of any

10   fine, the court should take into account restitution.  Well,

11   this system is set up so that the court can't do that.  This

12   system is set up so that we don't know what the total

13   financial impact on a defendant is going to be at the time I

14   have to pronounce judgment.  That's just wrong.

15       I've had cases where banks are alleged to be the victim

16   and they don't even want any restitution.  I've had them.

17   They don't care.  In a case like this, they'll say, we got

18   exactly what we were asking for that property.  We've written

19   it off.  We're on to something else.  We can't even figure out

20   what our restitution should be.  Forget it.

21       That's what they've said.  It may well be when we get to

22   the restitution hearing, there's no restitution.  I will have

23   really regretted imposing a low fine, such as the type that

24   you're asking me to impose.

25       Tell me how we reconcile the idea that we consider

1    restitution in determining the amount of fine with the fact

2    that you are not asking me to determine restitution until

3    after I've imposed the fine?

4           MS. O'BRIEN:  That's a fair point, Your Honor, and I

5    did raise with the defense counsel that I did engage with on

6    this issue.  We attempted to reach stipulated restitution

7    orders prior to.  There's a couple that we have and those

8    defendants are prepared and their counsel would like to tell

9    you they have come prepared to pay with the money.  They have

10   given it to the clerk of the court.

11          THE COURT:  That's exactly what you were talking

12   about earlier.  That's chump change to them.

13          MS. O'BRIEN:  As to the others, that's a very fair

14   point.  There is language in each plea agreement that does

15   stipulate a minimum restitution amount and I have cited that

16   in our sentencing memorandum.  I take your point, but that is

17   a baseline number, so we will discuss --

18          THE COURT:  It's a baseline number.  I'm afraid by

19   the time we get to the restitution hearing, it may not even

20   reach the baseline.  If you don't have any banks saying that

21   they've suffered losses up to the amount that you've

22   stipulated to in the plea agreement for restitution, what's

23   the court going to do?

24          MS. O'BRIEN:  We have worked very hard to identify

25   the successor banks that hold the underlying loans that were

1    the issue of the foreclosure auction and we do have

2    identifiable victims in other matters like this around the

3    country.  We have in fact imposed restitution and that money

4    will go out to the victims.

5         We are very close.  We believe before that 90-day period

6    we will certainly with most, if not all, be able to provide

7    the clerk and the court's office with the agreed upon

8    restitution amount with a number of them.

9         I see your concern and perhaps defense counsel can address

10   that in their remarks, but we have reached that.  We do have

11   identifiable victims here.  Some are successor banks, Your

12   Honor, but they still do want that money.

13        THE COURT:  Are you saying that at least with regard

14   to the minimum amounts that you have agreed to in the plea

15   agreements that you have assurance that there will be banks

16   who will be ready and willing to make the claim for and to

17   take those sums?

18        MS. O'BRIEN:  Your Honor, we have sent out victim

19   notifications to those financial institutions.  None of them

20   have appeared here.  We do believe that they will accept those

21   checks.  They do want that money, and that has been the case

22   in other real estate foreclosure matters in the southeast.

23        THE COURT:  That's not quite the answer I hoped for,

24   but it's close.

25        MS. O'BRIEN:  Your Honor, if I could address your

1    concern about the commentary in 2R1.1 and provide a little

2    context on that.  The language we pointed to our application

3    notes in 2R1.1, particularly application note 5, that says,

4    (Reading:)

5                    It's the intent of the commission that alternatives

6                    such as community confinement not be used to avoid

7                    imprisonment of antitrust offenders.

8         Also in the background, Your Honor, in the third paragraph

9    there is a statement about, (Reading:)

10                   Under the guidelines, prison terms for these

11                   offenders should be much more common and usually

12                   somewhat longer than typical under pre-guidelines

13                   practice.

14        It goes on to say, (Reading:)

15                   Absent adjustments, the guidelines require some

16                   period of confinement in the great majority of cases

17                   that are prosecuted, including all bid rigging cases.

18        To provide a little context of my understanding working

19   with this guideline for 16 years, that language -- when the

20   guidelines came into effect in 1987, and the historical notes

21   do note that, that language was in there.  That was because

22   when the guidelines came into effect, most, if not all,

23   antitrust defendants, criminal defendants were not receiving

24   jail time.

25                   THE COURT:  That's an interesting observation because

1   my recollection of how the guidelines came about was that

2   there was a study, if you will, of what sentences the judges

3   were actually imposing, and the role of the Sentencing

4   Commission was not to substitute its judgment for what judges

5   had been doing, but to gather a consensus of what judges were

6   doing and to try to quantify that.

7       So I'm surprised to hear that the Sentencing Commission as

8   it was composed at that time saw fit to impose guidelines that

9   were inconsistent with what judges were doing before the

10  guidelines.

11       MS. O'BRIEN:  Fair point, Your Honor, and the

12  Antitrust Division did appear before the Sentencing

13  Commission.  I will tell you I sat there before the Sentencing

14  Commission with my boss then who was testifying in 2005, the

15  2005 amendments.  In 2004, in a post -- that was reaffirmed by

16  the Sentencing Commission.

17       That language that had been there originally, they then

18  kept that language in and it was discussed and we did provide

19  statements at that time before the commission.  These are

20  application notes.  These are background.  Your Honor has,

21  particularly post Booker, the full discretion to make your

22  findings.

23       We point them out clearly, just as background, as they are

24  intended background and application notes because they are

25  there.  It's not --

1          THE COURT:  Since you were sitting there, what did

2   your boss say to the Sentencing Commission that was so

3   persuasive to cause them to include this language?

4          MS. O'BRIEN:  The testimony is on the record and

5   publicly available.  The gist of it is some of the arguments

6   made before Your Honor today.  We believe these defendants

7   have the means to pay fines, and so to have them pay high

8   fines and not serve jail time is merely a slap on the economic

9   wrist that they have.

10          THE COURT:  I hear that, but people that work for

11   their money really don't like to part with it.  That is a

12   severe sanction, whether your boss recognized that when he was

13   speaking with the commission or not.

14          MS. O'BRIEN:  I agree with you, Your Honor, and you

15   have done many more sentencings than I have, but when the

16   tears come, the tears come when the families -- when they have

17   to leave their families.  I understand people have different

18   views on that, but we have personally heard from defense

19   counsel that they are prepared to pay this money.  It is not

20   hurting them the way --

21          THE COURT:  I know they're prepared.  That's the low

22   fine.  They're prepared to pay $20,000.  I agree with you

23   there.  I'm talking about the possibility of a greater fine.

24   Now you're telling me that the plea agreement is consistent

25   with imposing a fine of what the probation officer recommends.

1          Is your plea agreement consistent with the court imposing

2    a fine of greater than what the probation officer recommended?

3          MS. O'BRIEN:  This is a two-party agreement, the

4    government and the defendant.  It encapsulates our agreement.

5    I think we're trying to be fair where this language has come

6    up in a couple of places, Your Honor.  Where it's to the

7    detriment of the defendant, we're sticking by the plea

8    agreement.

9          Your Honor may get tired of us saying that, but we're

10   sticking by that recommendation, even though the United States

11   Probation is recommending higher.  I don't know that it

12   requires us --

13         THE COURT:  Your plea agreement, though, is

14   consistent with whatever the probation officer recommended,

15   even though it's higher than $20,000; right?

16         MS. O'BRIEN:  It's consistent that I believe we could

17   recommend that.

18         THE COURT:  So you would be sticking with the plea

19   agreement if you recommended what the probation officer

20   recommended?

21         MS. O'BRIEN:  I don't think we would be in violation,

22   Your Honor, but out of fairness --

23         THE COURT:  Fairness?  You just got through saying it

24   isn't fair for those people to get away with a $20,000 fine.

25   It doesn't mean anything to them.

```
 1          MS. O'BRIEN:  The money -- our position is, Your
 2    Honor, and you can take it for it's worth, is that the money
 3    does not mean that much to them.  What means to them is time
 4    away from their homes.  You've seen the letters.  You know
 5    when the tears will come, and it's at the thought of being
 6    separated from your family.
 7          THE COURT:  But the idea is not to cause tears from
 8    the family.  The idea is not to punish people's families.
 9    Sometimes that goes along with the kind of sentence that the
10    judge feels he or she has to impose, but the idea is to
11    punish, deter, set an example, et cetera for the defendant,
12    not his family.
13          MS. O'BRIEN:  I agree, Your Honor, and my comments
14    were only to your comment of "hit them where it hurts."
15          THE COURT:  All right.  Thank you.  Some of what
16    you've had to say is very, very helpful.
17          MS. O'BRIEN:  Thank you, Your Honor.
18          THE COURT:  I would like to hear and I don't -- you
19    don't all have to speak, but I would like to hear if the
20    defense has some response to what the government has said with
21    regard to those issues that I've asked the antitrust lawyers
22    about.
23          MR. SANGSTER:  Good morning, Your Honor.  Ed Sangster
24    for Wiley Chandler.
25          THE COURT:  Come up to the lecture.
```

1          MR. SANGSTER:  Mr. Chandler's plea agreement does not

2     include the language government's counsel just suggested

3     regarding payment of the fine.

4          THE COURT:  Good.  So let's talk about that for a

5     minute.  Do you agree that the court has to consider the

6     sentence as a whole, including the fine and any term of

7     incarceration, in determining whether the factors in

8     Section 3553(a) have been met, and that it's almost a sliding

9     scale, the greater the fine, the lesser incarceration and vice

10    versa?

11         MR. SANGSTER:  I do agree with that, Your Honor.

12         THE COURT:  So if I stick with the plea agreement on

13    Mr. Chandler, it would mean that the court would be more

14    likely to consider a greater term of incarceration than if I

15    decided to impose a higher fine?

16         MR. SANGSTER:  Mr. Chandler would prefer a shorter

17    term of incarceration.  I don't want to confuse the issue, but

18    I do think -- in his case, I thought it was important to

19    correct the factual issue here, which is his plea agreement is

20    different than the plea agreement that the government just

21    described.

22         THE COURT:  All right.  But it puts the court in a

23    tougher position yet; right?

24         MR. SANGSTER:  I think the court's description of it,

25    that it is a sliding scale, is appropriate, and I believe I

1    made a similar argument to that in our sentencing memorandum,

2    although the way I argued it was in terms of the court needs

3    to consider both the restitution and the fine.

4        So my client would much rather -- and I think in his case

5    for the reasons that we discussed in our sentencing

6    memorandum, I think the shortest possible term of

7    incarceration makes sense for him.

8            THE COURT:  Well, it makes sense that that's what he

9    would like, but Mr. Chandler, by my calculations, netted over

10   $600,000 from the round robins that many argue he set up, and

11   he would only have to pay $20,000, and that means that he's

12   got another $600,000 profit that he made off of this.

13       I don't know what the restitution is going to be at the

14   time I have to impose sentence.  If it should happen that the

15   restitution doesn't come up with the full amount that he

16   profited, then crime will have paid for Mr. Chandler.

17           MR. SANGSTER:  He tried to address that in his plea

18   agreement.  He stipulated to the restitution amount in the

19   full amount of his profits, so he has done what he can do in

20   terms of trying to make good on this crime.

21       I don't think that he should pay in any way for the fact

22   that the government -- here we are years into this and the

23   government was not able to provide the list of the restitution

24   victims.

25       Mr. Chandler has been ready -- he's ready to do that.  I

1    think for the purpose of sentencing, the government is the one

2    who controls the ability and the timing on the restitution

3    here, not Mr. Chandler, so I think --

4            THE COURT:  It's not a question of fault as to who is

5    responsible for the fact that we're not sure what the

6    restitution will be.  It's just a fact.  If he's ready to pay

7    $600,000 restitution, then it would be a miscarriage of

8    justice if the restitution doesn't turn out to be anything

9    like that and the court doesn't impose a fine that's anything

10   like that.  He will have profited from his crime.

11           MR. SANGSTER:  As I said, he has done what he can do

12   up to this point.  I think the court, in making the decision,

13   is in the position where it has to assume that the restitution

14   amount will be paid or will be imposed.  That's not -- that is

15   the plea agreement.

16       If it turns out that some of the other victims haven't

17   been identified at this point -- as the court pointed out

18   earlier this morning, this sentencing has been on calendar for

19   an awfully long time, so there's really no reason Mr. Chandler

20   should pay a penalty because the government is not prepared to

21   make the restitution showing.

22       Thank you, Your Honor.

23           THE COURT:  Who else wants to address some of these

24   issues?  Mr. Weinberg?

25           MR. WEINBERG:  Thank you, Your Honor.  There's a

1    fundamental question or conflict in the approach to the

2    sentencing here, and that is the relationship between bid

3    rigging and fraud.

4        It was the government's determination early in the process

5    to require people to plead guilty to fraud and stipulate to

6    fraud guidelines.  Restitution is intended only to fraud.

7    It's not intended to bid rigging.  There's isn't a restitution

8    common to a bid rigging sentence.  Had we proceeded in bid

9    rigging, the court would be setting a fine.  The court would

10   also not be looking at restitution.

11       I would suggest to the court that Mr. Northcutt, of

12   course, is interested in the shortest possible incarceration

13   and would be prepared to pay a substantial fine.  I don't know

14   what the court has in mind, but prepared to pay a substantial

15   fine, and I think a fine is more appropriate for his conduct

16   than incarceration.

17       What I'm concerned about is double punishment, having both

18   restitution and a fine in substantial amounts so his penalties

19   double.  We are in that position because of the artificial

20   requirement that people plead to mail fraud, which we agreed

21   to do under the circumstances.  I think I made it clear in my

22   papers, we accept the bargain that we made, but that bargain

23   was made on the expectation that it would be treated as a

24   fraud sentence and not as bid rigging.

25       What the probation did was impose both, both restitution

1    and a fine that is a percentage of the volume of commerce.

2    That's not fair.  That's double punishment.

3        And so in the case of Mr. Northcutt, we're prepared to

4    face the financial penalties under one guise or the other, one

5    description or another, but not under both.

6            THE COURT:  Tell me why we could not have proceeded

7    with the restitution hearing at the same time, in other words,

8    today?  Why did we have to put over the restitution hearing to

9    some other day?

10           MR. WEINBERG:  Only because the government has not

11   identified all of the victims or hasn't gotten their

12   participation and their clarification of their requirements,

13   their demands, et cetera.  We've had six-plus years.

14           THE COURT:  Is there some reason we couldn't have

15   agreed on the amount of restitution?

16           MR. WEINBERG:  In our plea agreement we agreed to

17   whatever it is, $349,000.

18           THE COURT:  $349,000, that's not enough of a fine for

19   Mr. Northcutt.

20           MR. WEINBERG:  If the government had come to us and

21   said, let's change that figure with the understanding that

22   there won't be a fine in the bid rigging charge, we would have

23   proceeded on that.

24           THE COURT:  Well, it's not what would have happened.

25   It's a question of what is going to happen now.  I think if we

```
 1    had -- if we were able now to agree upon the amount, whether
 2    we know who it goes to or not, if we could agree on the amount
 3    of restitution, then I could determine the amount of fine
 4    knowing it's in addition to the restitution.
 5         You would be willing to do that, I assume?
 6              MR. WEINBERG:  If Your Honor is suggesting that if we
 7    could arrive at an appropriate financial figure that
 8    encompasses both a fine and restitution --
 9              THE COURT:  No.  No.  I'm going to decide the fine.
10    I want you to decide the restitution and I'll decide whether
11    that's good enough or more is required by way of fine.
12              MR. WEINBERG:  Understood.  And with the
13    understanding that this balance is against the potential of a
14    punitive incarceration penalty.
15              THE COURT:  Is there any reason the government can't
16    enter into that kind of agreement?  That's why we're having
17    this discussion globally right now.  If we can, I'd like to
18    know.
19              MR. WEINBERG:  Certainly I would be prepared to
20    discuss it with Mr. Northcutt and I think we would be disposed
21    to do that.
22              MS. O'BRIEN:  We have tried, Your Honor.  As evidence
23    of that, with two of the defendants, Mr. Rose and Mr. Joachim,
24    we have stipulated amounts that we prepared.  I put that in
25    our sentencing memo and it's my understanding that those
```

amounts we will ask jointly Your Honor to recommend the

stipulated amounts in the judgment today and we are prepared

to do that.  I did raise this issue.  I was on phone calls

with Mr. Weinberg and we did raise this issue of if we could

work out an amount.

     I need to point out two things.  With respect to Mr.

Northcutt -- and we'll get into this -- but with the clerical

error that was involved, our position is that that number in

the plea agreement, because it's based on that, is not going

to be the restitution number.

          MR. WEINBERG:  We've agreed to that.  We understood

that and agreed to it.

          MS. O'BRIEN:  It's the 614,982 number.

          THE COURT:  What is the total amount of restitution?

          MS. O'BRIEN:  $614,982,000; however, it is

complicated with respect to some of the defendants who have

partnerships, Your Honor.  There are some issues with respect

to that, which is really some of the holdup.

          THE COURT:  I see.  This discussion probably doesn't

have to get so detailed, but the $614,000 you're talking

about, as I understand it, is the amount of profit Mr.

Northcutt made from the round robins, and that is a

complicated process.

          MS. O'BRIEN:  Correct.

          THE COURT:  You have Mr. Ghio's notes and you have

1    all of these calculations that were made as to who gets what

2    from the round robins.  That's very difficult to translate

3    into the loss that any particular bank victim may have

4    incurred.

5        To ask the banks to engage in that exercise of translating

6    the profits from the round robins to the losses incurred by

7    the banks may be more than the banks want to handle.  The

8    banks, in my experience, may just as likely come in here and

9    say, we don't want to engage in that process.  We'll take

10   whatever you want to give us in a check, but we're not going

11   to give you a statement saying, "This is our loss."

12       If I'm correct in that assessment, that's why it makes

13   sense to say, look, here's the amount.  Here's a number.

14   That's the number that each defendant owes for restitution.

15   The government will collect it and we'll decide which banks to

16   give it to, but we're not going to require the banks to

17   identify which part or parts of it they think they're entitled

18   to.

19       MS. O'BRIEN:  That's exactly what we've attempted to

20   do, Your Honor.  Different from a mortgage fraud case, what we

21   did here, we have a methodology for restitution that does

22   equate to the amount of the loss as somewhat of a proxy

23   because the idea is to disgorge the total amount of payoffs

24   out of the pocket to each individual lender and back to the

25   lender who is entitled to that.

1          That's what we've done.  That's the numbers that are

2     contained in the plea agreement and that is our intent to do.

3     There are complications because of some of the successor

4     banks, but we --

5               THE COURT:  What are the complications?  You've given

6     those banks enough time to tell you if they disagree with your

7     calculations, haven't you?

8               MS. O'BRIEN:  We have -- I have experience in matters

9     in other regions, similar matters, and I don't think there is

10    much need for the bank's engagement on that amount of money.

11    How it's worked in the Northern District of Georgia, for

12    instance, is that we have this amount, stipulated amount, the

13    order is entered.

14        We're prepared to do that here, Your Honor.  The

15    government provides to the clerk of the court the amounts.

16    We've done that for those two defendants here in these

17    matters.

18               THE COURT:  Why can't we do it for all defendants

19    today?  Why can't I get each one of these lawyers up and ask

20    if they agree to this amount and we'll find out?

21               MS. O'BRIEN:  I think that's fine, Your Honor.  I

22    point out with respect to Mr. Northcutt particularly, the

23    amount in his plea agreement was based on a clerical error,

24    but with respect to the others, the number is contained in

25    there.

```
 1              THE COURT:  He's willing to correct the clerical
 2     error.
 3              MR. WEINBERG:  I've made that clear.
 4              THE COURT:  Okay.  It's $614,982.60?
 5              MR. WEINBERG:  I have not discussed that with Mr.
 6     Northcutt specifically, but, as I said, we understand that
 7     there was a clerical error and we understand that the
 8     government agrees that the sentencing would go forward on the
 9     basis of the agreement, but the restitution will be made on
10     the basis of the real amount.
11              MS. O'BRIEN:  Your Honor, if I could address one
12     additional point that Mr. Weinberg --
13              THE COURT:  Go ahead.  I'm digesting that last
14     statement.  What do you mean, "the restitution will be made on
15     the basis of the real amount"?
16              MR. WEINBERG:  If it's 614,000, then that --
17              THE COURT:  Gotcha.  Do you see any reason I couldn't
18     have each one of these defense counsel come up here now and
19     tell me whether they agree to the amount of restitution you
20     will tell them you're going to ask the court to impose?
21              MS. O'BRIEN:  I don't, Your Honor.  That would be
22     fine.
23              THE COURT:  We'll see if it works.
24              MS. O'BRIEN:  One additional point that I would like
25     to correct for purposes of the record, Mr. Weinberg has stated
```

1    and also Mr. Ramsey with respect to Mr. Rose, that the mail

2    fraud is the reason he provides the statutory basis for the

3    restitution.  I don't think that is correct, Your Honor.

4        Antitrust cases against individuals, restitution is

5    available as a discretionary condition of supervised release

6    under 18 U.S.C., 3583(d) or as a discretionary condition of

7    probation under 18 U.S.C., 3563(b)(2) and as agreed to by the

8    parties in plea agreements, as we've done here, under 18

9    U.S.C., 3663(a)(3).

10        THE COURT:  All right.  So Mr. Ramsey may want to

11    think about that.  It's an academic question right now, but

12    she's saying it doesn't make any difference whether you had

13    the mail fraud in there or not, restitution is still an issue.

14        MR. RAMSEY:  I would say, Your Honor, Mr. Rose has

15    agreed to a restitution amount with the government and it's

16    actually an amount slightly higher than we agreed to in the

17    plea agreement.  The government came back to us and we're

18    fully prepared to make good on restitution.

19        THE COURT:  I would like to go through these cases

20    now and see if I can get counsel to agree on the restitution.

21    That will answer one of the questions that I had.

22        MR. WEINBERG:  Would it be fair to ask the court to

23    give us five minutes for all counsel to talk with their

24    clients?

25        THE COURT:  Sure.  Good time to take a break.  We'll

```
 1   take a ten-minute recess.

 2        (A break was taken at 10:12 a.m.)

 3        (On the record. 10:27 a.m.)

 4        THE COURT:  Counsel, I hope you've had an opportunity

 5   to talk to your clients.  I'd like to address each of you now,

 6   starting with Mr. Thorman.  Let's have the government counsel

 7   up here.

 8      What is the amount of restitution that the government

 9   believes is appropriate and to which banks?

10        MS. LINNETT:  Kelsey Linnett for the United States,

11   Your Honor.  The amount is $214,544.50.

12        THE COURT:  How would that be broken down to victims?

13        MS. LINNETT:  Well, this is one situation that is a

14   little bit complex because of Mr. Ghio's partnership with Mr.

15   Vanzetti, so we do have the victim list.  What we need to

16   spend some time doing is just finalizing the distribution

17   between Mr. Ghio and Mr. Vanzetti as to those specific

18   victims.

19        THE COURT:  I don't know that it makes any difference

20   to the victims how you divide it up between Mr. Vanzetti and

21   Mr. Ghio.  Why can't you tell me now what you suggest and

22   we'll see if their attorneys disagree.

23        MS. LINNETT:  Because it's just complex to get to the

24   exact numbers.  There's like perhaps 7,000 to one victim,

25   1,000 to another victim, and so making it exactly equal, the
```

1  total amounts that Mr. Ghio and Mr. Vanzetti are prepared to

2  pay in restitution -- I think we can get there because Mr.

3  Ghio and Mr. Vanzetti have the records that they have

4  maintained, so we --

5            THE COURT:  You're making those so complicated.

6  They're partners.  Are they equal partners?

7            MR. THORMAN:  Yes, Your Honor, and the two of them

8  can work it out between themselves.

9            THE COURT:  That's the point.  Give me the gross

10  amount.  See, what the clerk needs to have is when the money

11  comes in for restitution, they need to have where they send

12  it.  So if it's going to be a check from Mr. Ghio for

13  $214,544.50, they need to know which persons to send which

14  part of that to.

15      If he and Mr. Vanzetti are equal partners -- why don't we

16  get Mr. Wing up here.

17            So would your suggestion be the same thing for

18  Vanzetti, the same number?

19            MS. LINNETT:  No, Your Honor.

20            MR. WING:  Your Honor, I've sent a proposed order to

21  the court with the number on it.  Well, 271,454,44.

22            THE COURT:  $271,454.44.  I remember seeing that.

23  Why can't you just say which amount of that 271 goes to which

24  victim and which amount of the 214 goes to which victim?  Is

25  it a percentage?

1          MS. LINNETT:  It's a percentage in each individual

2     property.  For example, there was some properties --

3          THE COURT:  You've had six years to figure this out.

4          MS. LINNETT:  In those intervening six years, there

5     have been changes to who the actual victim is.

6          THE COURT:  This is why Judge Karlton did what he did

7     in a case and got reversed by the Ninth Circuit.  He just said

8     no restitution.  If you can't figure it out, the court is not

9     going to figure it out for you.

10          MS. LINNETT:  We are very close, Your Honor, to

11     figuring it out.

12          THE COURT:  Then get there.  What does it take to get

13     there?

14          MS. LINNETT:  We just need -- we need to spend a few

15     minutes going through each individual property with the two

16     defendants and assess which one goes to which property.

17          THE COURT:  And you haven't done that in six years?

18          MR. WING:  Your Honor, if it helps, basically, a

19     couple weeks ago there was a hope a new government spreadsheet

20     would be made available to us.  Now, unfortunately, it had to

21     have some changes made and I got it, I think it was, on Friday

22     or Saturday.  I got it to Mr. Vanzetti.  I don't know if you

23     got a copy of.  Anyway...

24        What it's got is all the properties based upon the dates

25     and their address and all of the potential victims.  It's not

```
 1   going to be rocket science for us to sit down -- on probably

 2   85 percent of these there's 50/50.  On some of the others,

 3   it's one-third one-third.

 4          THE COURT:  How long does it take and when do you

 5   propose to do it?

 6          MR. WING:  I suggested to the government as far as

 7   being able to come up with that absolute number to be able to

 8   divide the checks up that we are going to give the court

 9   today, if the court would make them, to do it by the end of

10   the month.

11          THE COURT:  I want to do it by the end of the day.

12          MR. WING:  Okay.  Then we will do it by the end of

13   the day.

14          MR. THORMAN:  We will try.

15          THE COURT:  We know the totals right now.  We just

16   don't know how it will be divided up; right?

17          MR. WING:  Right.

18          THE COURT:  For me, that's the most important thing.

19   I need to know the total.  I really don't care how it's

20   divided up.  The clerk needs to have that in order to write

21   the checks, but if we agree on the totals, then I proceed

22   here.

23          MR. WING:  That would be 500,000.

24          THE COURT:  The total is what we just said.

25          MR. WING:  Right.
```

```
 1              THE COURT:  Okay.  We've got these two defendants
 2    then; right?
 3              MR. THORMAN:  Yes.  Mr. Ghio also brought with him
 4    the cashier's check to pay the 214,455.50 today.
 5              THE COURT:  All right.  Mr. Vanzetti can do the same?
 6              MR. WING:  I've got the check in my pocket, Your
 7    Honor.
 8              THE COURT:  We'll take care of that.  You can do that
 9    by the end of the day?
10              MS. LINNETT:  I think we can do it by the end of the
11    day.
12              MR. THORMAN:  We can try.
13              THE COURT:  Thank you.  Let's go to Mr. Hutz now.
14              MS. DALY:  Yes, Your Honor.
15              THE COURT:  From the government, what is the total
16    amount of restitution?
17              MS. O'BRIEN:  With respect to Hutz, the number that
18    we have --
19              MS. DALY:  Hold on, Your Honor.  It's $67,670.30 to
20    which the defendant will stipulate, and I have list of the
21    banks.  We can provide a stipulation to the court, I would
22    say, within ten days at the very longest as to the specific
23    identifies of the victims, but I can see them before me.
24              THE COURT:  You have a list of the banks, and the
25    next thing you have to decide is how much to each bank.
```

1              MS. DALY:  We have that as well, Your Honor.

2              MS. O'BRIEN:  I have provided that to defense

3    counsel, Your Honor.  I will note here that the amount in the

4    plea agreement was $96,500, but tying it to identifiable

5    banks, this is the only one I have that we have that amount as

6    the stipulated amount.

7              THE COURT:  So we have a commitment on both sides

8    that that will be the sum total of the restitution.  No more,

9    no less.

10             MS. DALY:  Yes, Your Honor.

11             MS. O'BRIEN:  Yes, Your Honor.

12             THE COURT:  Thank you.  Mr. Northcutt, what is the

13   government's position on restitution?  I think we covered that

14   a moment ago.

15             MS. O'BRIEN:  Yes, Your Honor.  The amount is

16   $614,982, and because of the partnership of this defendant, we

17   have not provided him with a chart as to each victim, but we

18   can be prepared to do that very shortly.  We can provide that

19   to the clerk of the court.

20             THE COURT:  When you say "very shortly," the last one

21   somebody said ten days and that was a little disturbing.

22   Anything can happen in ten days.

23        What's the shortest time that you can provide this to the

24   clerk?

25             MS. O'BRIEN:  If I can confer with Ms. Linnett

1    because there is another defendant involved.

2              THE COURT:  All right.

3        (A conference was held at government counsel table.)

4              MS. O'BRIEN:  Your Honor, I've discussed it with Ms.

5    Linnett, and if we do $614,982, that is an amount we have

6    identifiable victims for right now today for Mr. Northcutt,

7    and Mr. Chandler's counsel is discussing it with Ms. Linnett

8    right now.

9              THE COURT:  All right.  So, Mr. Sangster, you're in

10   agreement with the same thing?

11             MR. WEINBERG:  Your Honor, we do agree to that on

12   behalf of Mr. Northcutt.  We believe the restitution victims

13   may be identifiable to that amount, but we stipulate to that

14   amount and we stipulate that if the government is not able to

15   come up with identifiable victims for that total, the balance

16   can be converted to a fine.

17       We will stipulate to the payment of that amount.

18             THE COURT:  All right.  Mr. Sangster, you agree to

19   the same?

20             MR. SANGSTER:  I have not consulted with my client

21   about sliding any balance over to the fine and would like a

22   moment to do so, but we do stipulate to the amount of the

23   restitution.

24             THE COURT:  All right.  Sliding it over to the fine

25   is one thing.  Having it go by side prey is another thing.  He

1    doesn't get it back.

2           MR. WEINBERG:  Exactly.  We stipulate to that amount.

3           MR. SANGSTER:  Mr. Chandler has stipulated to that

4    amount which exceeds the amount of his profits for this

5    venture.

6           THE COURT:  I don't know about that.  That's the

7    agreement.  So it's no more, no less than $614,982.44 as to

8    each of these defendants; right?

9           MS. LINNETT:  Yes, Your Honor.

10          THE COURT:  Thank you.  Mr. Jackson?

11          MR. HELLER:  Good morning, Your Honor.  Donald H.

12   Heller for Mr. Jackson.  We stipulate to the amount of

13   $20,900.  We have the victims to whom restitution will be made

14   and it will be memorialized in a stipulation.

15          THE COURT:  Correct?

16          MS. LINNETT:  Yes, Your Honor.

17          THE COURT:  That will be completed by when?  Today;

18   right?

19          MS. LINNETT:  That can be completed today.

20          THE COURT:  Good.  Thank you.  Mr. Olmstead?

21          MR. ELLIS:  Alan Ellis for Mr. Olmstead.

22          THE COURT:  What is the government's number for

23   restitution on him?

24          MS. LINNETT:  The government has proposed the number

25   of $29,687.34.

1              THE COURT:  Does Mr. Olmstead agree that is the

2      correct amount of restitution for him to make?

3              MR. ELLIS:  No, Your Honor.  We are about $3,600

4      apart.  We believe it's 26,087.34.

5              THE COURT:  What is the basis for the difference?

6              MR. ELLIS:  A couple of properties we did agree with,

7      but we don't have a list of the victims either.

8              MS. LINNETT:  I have a list of the victims.  The

9      disagreement was to two properties that Mr. Olmstead did admit

10     to receiving a payoff over the course of the investigation,

11     but now says he did not receive the payoff.

12             THE COURT:  Which two properties?

13             MS. LINNETT:  If you give me a minute, I will get you

14     the list.

15             MR. ELLIS:  I don't want to hold things up for

16     $3,600, though, obviously.

17             THE COURT:  True.  That's why we're going to resolve

18     it if we can.

19             MS. LINNETT:  The two properties that are in dispute

20     are 417 Sullivan Court, Mountain House and 470 West Moraga

21     Street in Mountain House.

22             THE COURT:  When did he make these admissions, in an

23     interview?

24             MS. LINNETT:  Yes.

25             THE COURT:  Did you provide Mr. Ellis with the report

1   of the interview?

2              MS. LINNETT:  I did.

3              THE COURT:  Mr. Ellis, did you see that report?

4              MR. ELLIS:  I did, Your Honor, yes.

5              THE COURT:  What is his basis for now disagreeing

6   with his interview?

7              MR. ELLIS:  We have to go back and look at that.

8   We're not very far a part.  I'm sure we can work out something

9   by the end of the day.  At least it will be 26,087.  At most

10  29,687.  We'll be able to knock it out and advise the clerk.

11      Your Honor, I also have a check for $12,000, not in my

12  pocket but back in my office.

13             THE COURT:  What's that for?

14             MR. ELLIS:  Not in my pocket, but, rather, back in my

15  office that will go towards restitution or fine.

16             THE COURT:  Not for the full amount?

17             MR. ELLIS:  Not the full amount, no.

18             THE COURT:  All right.  But by the end of the day, we

19  will know whether it's $26,687.34 or $26,087?

20             MR. ELLIS:  Yes, Your Honor.

21             THE COURT:  So $600 apart?

22             MR. ELLIS:  No, 3,600.  Either --

23             THE COURT:  $3,600 apart.  All right.  I can live

24  with that.  How about the victim's identification?

25             MS. LINNETT:  They've all been identified.

1          THE COURT:  And so when we arrive at the total,

2     you'll be able to plug in which amount goes to which victim?

3          MS. LINNETT:  That's correct.

4          THE COURT:  All right.  Thank you.

5          MR. ELLIS:  Thank you, Your Honor.  Mr. Rose.  What

6     is the government's position with regard to his restitution?

7          MS. O'BRIEN:  Mr. Ramsey and I worked it out

8     previously.  As we indicated in the sentencing memo, we are

9     prepared to jointly recommend the court impose restitution in

10    the amount of $24,128.93.  We can do that as the part of the

11    judgment, Your Honor, and can provide to the clerk of the

12    court today the victim information.

13         MR. RAMSEY:  Yes, we had agreed to that.  The

14    government had approached us with a number slightly higher

15    than the plea agreement and we agreed to the higher number.

16         THE COURT:  Thank you.  Mr. Swanger, what is the

17    government's number for restitution?

18         MS. LINNETT:  Your Honor, the government is not

19    recommending any restitution for Mr. Swanger because any

20    payoffs he received went -- passed through to Mr. Katakis, who

21    he worked for.

22         THE COURT:  All right.  If that's the government

23    position, I assume you don't disagree with that, Mr.

24    Portanova?

25         MR. PORTANOVA:  That's correct, Your Honor.

1          THE COURT:  Thank you.  And then, finally,

2    Mr. Joaquin.  What is the government's position with regard to

3    his restitution?

4          MS. O'BRIEN:  We have reached also a joint

5    recommendation here that the court impose restitution in the

6    amount of $94,154.71, Your Honor, and impose that as part of

7    the judgment.  We have the victim information identifiable by

8    victim, and we have already provided that to probation and can

9    provide it the clerk of the court today.

10          THE COURT:  I understand you had already done that,

11    so that's taken care of.

12      You agree with that, Mr. Johnson?

13          MR. JOHNSON:  Yes, Your Honor.

14          THE COURT:  Now, I have the numbers for restitution

15    that I can consider in determining the sentence.  I will be

16    able to take the amount of restitution into account in

17    determining the fines to be imposed, so I think we've answered

18    most of the questions I raised at the beginning of this

19    hearing that I indicated were common questions and I have as

20    much of your input on those questions as I can get at this

21    time.

22      I think the thing to do now is proceed with the judgments

23    as to the individual defendants.

24      Are there any more general matters that you think we

25    should discuss that pertain to all defendants as opposed to

1  individual defendants?

2          MS. O'BRIEN:  Not from the government, Your Honor.

3          THE COURT:  The order that we proceed on these, would

4  you just like to proceed in the order we have them on the

5  calendar or does the government have a preference to which

6  order?

7          MS. O'BRIEN:  Calendar order, Your Honor.

8          THE COURT:  All right.  Your clients can remain

9  seated.  They're present.

10     With regard to Mr. Ghio, the court has received the final

11  presentence report in this matter made available August 1st,

12  2016, and revised August 22, 2016.

13     Mr. Thorman, have you received a copy of that report?

14          MR. THORMAN:  I have.

15          THE COURT:  And the government has received a copy of

16  that report?

17          MS. LINNETT:  Yes, Your Honor.

18          THE COURT:  Mr. Ghio, would you stand.  Have you

19  received a copy of the final presentence report in this

20  matter?

21          DEFENDANT GHIO:  Yes, Your Honor.

22          THE COURT:  Have you discussed it fully with Mr.

23  Thorman?

24          DEFENDANT GHIO:  Yes, sir.

25          THE COURT:  Mr. Thorman, do you have any objections

```
 1   to the calculations of the sentencing guidelines as set forth
 2   in the presentence report?
 3            MR. THORMAN:  I do.
 4            THE COURT:  I think I have those.  State those for
 5   the record.
 6            MR. THORMAN:  The objections are that there is a
 7   four-level increase under 3B1.1(a) in the presentence report,
 8   and the government and we agreed and the facts support only an
 9   increase under 3B1.3(c).
10            THE COURT:  Of how many points?
11            MR. THORMAN:  Two points.  Which was contained in the
12   plea agreement and discussed in the motion and the filing is
13   appropriate in the case not what is set forth in the PSR.
14            THE COURT:  I understand.  Any other corrections?
15            MR. THORMAN:  The other calculation was the two-level
16   increase above the increase that was already set forth between
17   the government and the defense in the plea agreement for
18   volume of commerce.
19      The basis for that is -- our objection is that the higher
20   volume of commerce stated in the PSR is the function of the
21   information that Mr. Ghio provided to the government and under
22   1B1.8 cannot be considered against him.
23            THE COURT:  Any there any other objections?
24            ATTORNEYRIGHT:  No, those are the two objections.
25            THE COURT:  If your objections are accepted, the
```

1    offense level would be 14 instead of 18?

2          MR. THORMAN:  That's correct.  That is what was set

3    forth in our plea agreement as well.

4          THE COURT:  Does the government join in those

5    objections or do you oppose them?

6          MS. LINNETT:  The government joins those objections,

7    Your Honor.

8          THE COURT:  So you agree that the total offense level

9    is 14 and the criminal history category is I?

10          MS. LINNETT:  Yes, Your Honor.

11          THE COURT:  The court so finds.  That means that the

12    sentencing guideline range is 15 to 21 months; correct?

13          MR. THORMAN:  That is correct.

14          MS. LINNETT:  That is correct, Your Honor.

15          THE COURT:  Mr. Thorman, what would you like to say

16    in support, on behalf of Mr. Ghio before the court pronounces

17    judgment?

18          MR. THORMAN:  The court has before it a motion before

19    the government under 5K1.1.

20          THE COURT:  That's correct.

21          MR. THORMAN:  I think we should discuss that a bit.

22          THE COURT:  Yes, you're right.  Let me find that

23    here.  I have received the government's recommendation, which

24    I read.  It concludes with a recommendation of a sentence of

25    10 months, a $100 special penalty assessment, and a fine which

1    we will get into in due course.

2        What is the government's basis for the ten-month

3    recommendation?  I understand the reasons you want a reduction

4    in sentence, but I think Mr. Thorman thinks it's a meager

5    departure.

6            MS. LINNETT:  Yes, Your Honor.  We did recommend for

7    Mr. Ghio a departure of 30 percent from the guideline

8    calculation bottom level of 15 months.  And the reason for

9    that is to recognize his substantial assistance to the

10   investigation.

11       He was the first one to cooperate and first one to plead

12   guilty and provided, as the court is aware, the spreadsheet

13   that was -- became the blueprint for the investigation,

14   allowed the prosecution to understand the full scope of the

15   conspiracy and be able to calculate some of the payoffs that

16   went to various individuals involved.

17       The 30 percent is looking globally at the entire group of

18   cooperators and also considering the nature of Mr. Ghio's plea

19   as to the bid rigging charges only.  The 30 percent was

20   arrived at as the government's recommendation.

21           THE COURT:  Mr. Ghio, would you like to stand up next

22   to your attorney?

23           DEFENDANT GHIO:  If you would like me to.

24           THE COURT:  What was your plea agreement, your 5K

25   recommendation?  Didn't you say up to 50 percent?

1          MS. LINNETT:  That was not in the plea agreement.

2          THE COURT:  It was not?

3          MS. LINNETT:  No number given.

4          THE COURT:  Then, Mr. Thorman, what would you like to

5     say on behalf of Mr. Ghio?

6          MR. THORMAN:  With regard to, as I think the court

7     put it appropriately, with regard to it being a meager

8     reduction, given what Mr. Ghio did.

9          THE COURT:  You can address that and anything else

10    you would like to address.

11         MR. THORMAN:  Fine.  I think that there was more than

12    substantial cooperation.  I think there was extraordinary

13    cooperation in this case.  The time that Mr. Ghio came forward

14    and the information he presented basically made the

15    government's case.

16        The court had a chance to see and hear his testimony and

17    the explanation that he was able to provide about how the

18    scheme operated and what properties were involved.  That was

19    information that he provided to the government and spent a

20    great deal of time in meetings that he and I were present at

21    explaining it to the government.

22        What he provided in way of writing, I believe, has also

23    formed a template for the Antitrust Division in seeking

24    information in other investigations they've conducted in bid

25    rigging auctions and bid rigging in other counties in the

State of California.

I know from both my experience that both in Alameda County and Contra Costa County as those investigations into similar type of conduct occurred, that participants in the auctions were sent or served with subpoena duces tecums which included precise language of bid rigging sheets, round robins, second auctions, the type of terminology that I believe the government -- I don't know this for a fact -- but the type of information learned because of Mr. Ghio's cooperation.

I also believe that Mr. Ghio's cooperation resulted in other defendants deciding that they were best served by coming forward and entering into agreements.

And, finally, with regard to the amount of the 30 percent, I don't want to take away and don't by this argument mean to suggest that the government's recommendation with regard to other defendants should be changed, but I notice that as to defendants Northcutt and Chandler, there is a 40 percent recommendation in regards to them.

I think that Mr. Ghio's cooperation is at least equal in terms of the value and substantial assistance to that of those other two individuals.

THE COURT:  I don't want to affect the government's recommendation as to other defendants either, particularly since their attorneys, although present, are not participating in this discussion, but what is the basis for not giving him

1    the same percentage of a departure as those two others?

2            MS. LINNETT:  Again, Your Honor, we took into

3    consideration the nature of his plea agreement.

4            THE COURT:  Which is what?

5            MS. LINNETT:  Which is that he pled guilty to the bid

6    rigging only.

7            THE COURT:  So, in other words, elaborate on that.

8    You're thinking he got a better deal because he pled guilty to

9    just the bid rigging so he doesn't need as much of a

10   departure?  Is that what you're saying?

11           MS. LINNETT:  In looking at where the sentence is

12   arrived at, we believe that a ten-month sentence is reasonable

13   and sufficient, but not greater than necessary --

14           THE COURT:  I'm talking about the cooperation now.

15   Are you saying that he gave as much or more cooperation and it

16   was just as helpful to the government, it's just that you

17   think he got a better deal to start with, so you're looking at

18   the end result?  Is that what you're saying?

19           MS. LINNETT:  That is the case, Your Honor.

20           THE COURT:  What else would you like to say on behalf

21   of Mr. Ghio?

22           MR. THORMAN:  Your Honor, we believe there should be

23   a higher percentage and result in a lower number.  One of the

24   interesting things when the government is using the percentage

25   reduction in arriving at a number of months and to the extent

1    that the court is guided here by which zone we fall in, a

2    ten-month sentence could be a Zone C sentence, which is 10 to

3    16 months, but it could also be a Zone B sentence, which is in

4    the range of 6 to 12 months, the offense Level 10, even an

5    offense Level 9, which is 4 to 10 months.

6            THE COURT:  Let me say this for your benefit and for

7    the benefit of other counsel here.  I'm not that concerned

8    about the fine points of the guideline.  I'm looking at all

9    the sentencing factors, including the guidelines, in arriving

10   at what the government has said is correct.  It has to be

11   sufficient but not greater than necessary to accomplish all of

12   the sentencing purposes.

13           MR. THORMAN:  All right.

14           THE COURT:  But I would like you to address the fine.

15   We've arrived at a number here, $214,544.50, which the court

16   must take into consideration in determining the amount of the

17   fine.  I think a greater fine than that is appropriate.  I'm

18   looking at Mr. Ghio's financial statement.  It looks like he

19   has a total net worth of over $3 million.  I need to impose a

20   fine that hurts.

21       Tell me why I shouldn't impose a million dollar fine.

22           MR. THORMAN:  Mr. Ghio, although he has that net

23   worth, his liquid assets at this point are approximately a

24   hundred thousand dollars.

25           THE COURT:  Well, maybe he has to liquidate some of

1    his assets?

2           MR. THORMAN:  He would certainly have to do that.  I

3    don't know how it would affect the operation of his business.

4           THE COURT:  Well, that's a good issue.  Tell me if

5    there's any other reason why the court shouldn't impose a

6    million dollar fine?

7        (A conference was held between Mr. Thorman and defendant

8     Ghio.)

9           MR. THORMAN:  Well, it's going to -- if the court is

10   looking to cause pain, that would certainly do it.

11          THE COURT:  "Pain" may be not the correct word, but I

12   think "hardship" is.  It should hurt, just like a lot of

13   things should hurt to be effective.  It should hurt.

14          MR. THORMAN:  The court understands -- I'm not sure

15   what you're intending in terms of possible incarceration, but

16   his unavailability to do his work and support his family, you

17   can see from the PSR, that he runs a net monthly income of

18   around $16,000 and has about $44 available after his monthly

19   expenses, although, as pointed out in the PSR, some of those

20   are luxury items.

21       I would also -- the court should be aware that with

22   regards to paying this restitution, Mr. Ghio came in with the

23   amount today.  This was something he started planning on six

24   years ago.  He didn't sit back after entering his plea

25   agreement and said, "I'll wait for the other shoe to fall."

1   He started making plans then, so now at this state, he would

2   be ready to pay this amount of money.

3          THE COURT:  Anything else you would like to say on

4   his behalf?

5          MR. THORMAN:  No.  I think he wants to address the

6   court.

7          THE COURT:  Before I hear from Mr. Ghio, anything you

8   would like to say on behalf of the government before the court

9   pronounces judgment?

10         MS. LINNETT:  I would like to just mention as to the

11  fine, the plea agreement calculated a fine based on a

12  $5.9 million volume of commerce.  As we discussed earlier, we

13  believe that that should be the volume of commerce considered

14  for the guideline calculation because of the 1B1.8 credit that

15  Mr. Ghio received, meaning that that was the information we

16  received.

17     We knew prior to his coming in, negotiated by a plea

18  agreement, and the additional volume of commerce was learned

19  through his cooperation.  And so the parties did calculate a

20  fine range based on the volume of commerce of 1 to 5 percent

21  based on that $5.9 million to be 59,000 to 295,000.  That was

22  calculated in the plea agreement.

23         THE COURT:  Those are just numbers.  I don't

24  understand what you're saying.  Based on 5.9 million?  I'm

25  trying to arrive on a fine that is effective.  I don't want to

1    do arithmetic.

2           MS. LINNETT:  I understand, Your Honor.  All I'm

3    pointing out is that is the guideline fine based on 2R1.1 fine

4    calculation, which provides that the court should consider the

5    volume of commerce and a fine for an individual to be 1 to

6    5 percent.

7           THE COURT:  I don't know where the 1 to 5 percent

8    comes from?

9           MS. LINNETT:  That's in 2R 1.1.

10          THE COURT:  How do they come up with that number?

11   What is the basis for it?  What makes sense about it?

12          MS. LINNETT:  I'm not sure how the Sentencing

13   Commission came up with that number.

14          THE COURT:  Okay.  Anything else you want to say on

15   behalf of the government?

16          MS. LINNETT:  No.

17          THE COURT:  Mr. Ghio, what would you like to say on

18   your own behalf?

19          DEFENDANT GHIO:  I would just like to apologize to

20   all the people I hurt during the terrible decisions I made and

21   the illegal activities.  I've worked, in my mind, very hard in

22   the last six years to rebuild my reputation, working with my

23   bank, title companies, working with clients, buying and

24   selling real estate, just to show everybody I can operate

25   above the law and that I am not involved in any illegal

1    activities.

2         I spend a great amount of time every day with my children,

3    Hannah and Max, taking them to school, trying to teach them to

4    be good kids.  They call me every day on practicing what I

5    preach.  I tell them how to behave, what is the responsibility

6    of an adult, what they have to try to live up to.  If they

7    catch me doing something different, they call me on it.

8    They're definitely just the brightest part of my day.

9         I do feel I've done a great job rehabilitating my

10   reputation, getting people to know my honesty and my

11   integrity.  Banks are again willing to loan myself and

12   partnership money, which they were not willing to do for the

13   five years after pleading guilty.

14        I've been involved in over 300 trustee sales since

15   pleading guilty.  There's been no illegal activity in any of

16   those sales.

17        My intent is to continue buying and selling real estate,

18   remodeling, developing real estate with no illegal activities

19   the rest of my life and that I have no plans of ever being

20   back in a court like this again.  This is one of the worst

21   things I've ever had to go through.  The monetary losses, the

22   stress, the anxiety I've gone through.  I just can't say

23   enough.

24        I'm sorry.

25             THE COURT:  What would be involved in liquidating

1    some of your assets if you had to pay a substantial fine?

2          DEFENDANT GHIO:  Most of my assets are held in

3    partnerships, so I would have to liquidate my portion of that

4    partnership.  I do have some that are maybe five or six

5    different pieces of real estate, single family residences.

6          THE COURT:  Income property?

7          DEFENDANT GHIO:  Yes, single-family homes that would

8    have to be either liquidated or try to refinance.  To bring

9    the money in today, I've refinanced properties to make good on

10   the obligation I committed to.

11      Again, I would have to try to sell my portions in those

12   partnerships or in specific houses or I would have to try to

13   refinance if partners are willing to do so.  I would have to

14   continue working to keep paying the bills, because once I

15   borrow the money, I have to repay the money.

16         THE COURT:  I didn't follow the last part of that.

17   You borrow money or you liquidate your interest?

18         DEFENDANT GHIO:  If I liquidated my interest, I would

19   not have to borrow.  If I could find somebody to buy a portion

20   of an interest in a partnership, that would give me the funds

21   to pay the fines with.  If I were to re-mortgage or get

22   additional debt, I would have to pay that back to the lending

23   institutes.

24         THE COURT:  I see.  Hold on a second.  Where in your

25   financial statement are the properties that you're talking

1    about?  How are they described?

2            DEFENDANT GHIO:  Majority of them are described in a

3    partnership interest I'm involved in.

4            THE COURT:  Real estate, is that what you're looking

5    at?

6            DEFENDANT GHIO:  One second, please.

7            MR. THORMAN:  Page 18 of the PSR.

8            THE COURT:  Yes.  What about these IRAs?

9            DEFENDANT GHIO:  I would have to cancel out IRAs.

10   Those are self-directed IRAs.

11           THE COURT:  You'd have to cash out?

12           DEFENDANT GHIO:  Yes, sir.  This breakdown doesn't

13   show the names of the partnerships I'm involved in.  At least

14   I'm not finding it quickly, but on the document that we filled

15   out for you, it listed percentage of the partnerships I may be

16   involved in.

17           THE COURT:  All right.  Anything else you would like

18   to say?

19           DEFENDANT GHIO:  No, sir.

20           MR. THORMAN:  There's one thing I wanted to add.  In

21   my sentencing memorandum, I included a comment about some of

22   the conditions of supervised release or probation.  I don't

23   know if the court noted them.

24           THE COURT:  I noted them.  You want to talk about

25   them?  Which ones --

1           MR. THORMAN:  The main issue was because this is an

2    antitrust violation, under federal law there is no weapons

3    preclusion; in other words, there is an exception for the

4    normal preclusion of owning, using, possessing firearms by one

5    convicted of a felony, but that does not apply to antitrust

6    violations.

7           THE COURT:  Is that right?

8           MS. O'BRIEN:  Your Honor, there is such an exception

9    which, essentially, provides that an antitrust offense is not

10   a predicate offense to a felon in possession; however, the

11   court can impose, as a condition of supervised release, a

12   prohibition against firearm ownership.

13          THE COURT:  Why would I want to do that?

14          MS. O'BRIEN:  There's two reasons.  One is while the

15   exception speaks to federal law, there may be state law

16   prohibitions against the ownership of firearms and we can't --

17          THE COURT:  One of the conditions is that you comply

18   with all state and federal laws.

19          MS. O'BRIEN:  Okay.  Maybe probation could speak to

20   this, but for purposes of probation safety, if requested by

21   probation, courts could also enter it during the time of

22   supervised release.

23          THE COURT:  I don't see that's even listed in what

24   the probation officer wants to impose here.  Did you read that

25   part of the presentence report?  I don't see it.

1              MR. THORMAN:  It is here.

2              THE COURT:  I'm trying to make a very important

3    decision here with regard to the sentence and you're quibbling

4    about the terms of supervised release.  I'm going to get on

5    with the sentence here.

6         I think that Mr. Ghio can pay a fine of $1 million and I'm

7    going to order that he do so.  The sentence that has to be

8    served, of course, is going to have to include a term of

9    incarceration, and I've given a lot of consideration to this.

10        This may be the case with other defendants individually or

11   not, but I see no useful purpose to be served by incarcerating

12   Anthony Ghio for a long period of time.  I think the

13   sentence -- I think the fine that he's going to have to pay

14   will be substantial punishment, especially considered with the

15   restitution that he's going to have to make.

16        To take him away from his family, to take him away from

17   the other work that he's doing in the community for a

18   substantial period of time serves no useful purpose.  It just

19   costs the government money to house him.  There's no reason

20   for the public to be protected from Anthony Ghio.

21        I believe him when he said he has learned his lesson.

22   This particular crime is somewhat unique in that it really

23   does appear that most of the defendants didn't realize what

24   they were doing was a crime.

25        Now that he does, I don't think any court is going to see

him again.  So that's the reason for the court's sentence.  It satisfies all of the conditions of 3553(a) and I believe it's sufficient but not greater than necessary to accomplish all of those purposes.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of five months.

The defendant shall pay a special penalty assessment of $100.  Payment to begin immediately.  The defendant shall pay a fine to the United States in the amount of $1 million. Payment to begin immediately.

It is further ordered that the defendant shall pay restitution in the amount of $214,544.50 to the victims who will be identified and in the amounts that will be set forth in the statement to be filed by the United States Attorney and agreed upon by the defendant.

The restitution shall be sent to the clerk of the court who will forward it to those victims identified in the statement.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of 24 months.

Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which he is released.

1          While on supervised release, the defendant shall not

2     commit another federal, state, or local crime.

3          Shall not possess a firearm, ammunition -- that part of

4     it -- does the probation office need this?

5               PROBATION OFFICER:  It's standard language, Your

6     Honor.

7               THE COURT:  Some people like to protect themselves.

8     Is there some concern?

9               PROBATION OFFICER:  I submit it on what the

10    government said earlier.

11              THE COURT:  I don't see any reason for it.  If the

12    probation officer thought it was necessary for probation

13    officer safety, I would include that, but I just don't see it.

14         He shall cooperation in the collection of DNA as directed

15    by the probation officer and comply with the standard

16    conditions which have been recommended by the United States

17    Sentencing Commission and adopted by this court.

18         Further, he shall refrain from any unlawful use of a

19    controlled substance.

20         He shall submit to one drug test within 15 days of release

21    from imprisonment and at least two periodic drug tests

22    thereafter, not to exceed four drug tests per month.

23         Mr. Thorman, have you gone over the special conditions

24    listed on page 25 of the presentence report with Mr. Ghio?

25              MR. THORMAN:  We have.

1          THE COURT:  I'm going to modify one of those.  Have

2    you read those special conditions, Mr. Ghio?

3          DEFENDANT GHIO:  I have, Your Honor.

4          THE COURT:  I'm going to impose all of the first

5    seven special conditions as conditions of supervised release.

6    With regard to number 8, I would like you to participate in

7    300 hours of community service, and what I'm asking the

8    probation officers to do is to have you do something like

9    Habitat for Humanity or one of those charities where you help

10   people get housing.

11      That's what you do.  You're in that type of business.  I

12   think your services could well be used in a charity like that,

13   and I would like you to spend 300 hours in an organization

14   like that, and the probation officer can work with you.

15      Do you understand?

16          DEFENDANT GHIO:  Yes, sir.

17          THE COURT:  That will be special condition 8,

18   300 hours of community service, and it's the court's intention

19   it be in something like Habitat for Humanity.

20      Did the defendant waive his right to appeal from the

21   sentence?

22          MS. LINNETT:  Yes, Your Honor.

23          MR. THORMAN:  It's in the plea agreement.

24          THE COURT:  Well, I just want to make sure because

25   the court has varied somewhat of the expectations from the

1    parties at the time they entered into the plea agreements, so

2    I want to make sure that we're all in accord that his waiver

3    still is applicable.

4              MS. O'BRIEN:  Just to note for the record, it is a

5    partial waiver of appeal.  It's contained at paragraph 7(b) of

6    the plea agreement.  The appeal part reads that, (Reading:)

7                   The defendant agrees as part of his plea to give up

8                   the right to appeal the conviction, the right to

9                   appeal any aspect of the sentence imposed in this

10                  case so long as his sentence is no longer than the

11                  top of the sentencing guidelines range as determined

12                  by the court.

13             THE COURT:  Well, this is not longer than the top of

14   the sentencing guidelines in either the fine or term of

15   imprisonment.

16             MS. O'BRIEN:  As to the fine, just to note, the

17   statutory maximum is where you are at, but as to the guideline

18   fine range --

19             THE COURT:  That's true as to the guideline fine.  So

20   you have the right to appeal from that portion of the

21   sentence.  If you wish to appeal, you must file written notice

22   of appeal with the clerk of the court within -- what is the

23   notice of time he has to file a notice of appeal?  It keeps

24   changing.

25             MS. O'BRIEN:  Our understanding was 14 days, but we

```
 1   should check the rule.
 2           THE COURT:  If you wish to appeal, you must file
 3   written notice of appeal with the clerk of the court within 14
 4   days from the date of the entry of judgment.
 5       If you cannot afford the cost of an appeal, you'll be
 6   permitted to proceed without payment of cost.  If you cannot
 7   afford counsel, one will be pointed, and if you request it,
 8   the clerk of the court will file a notice of appeal on your
 9   behalf.
10       I must state for the record so that everyone is clear that
11   if the court could not have imposed a sentence of $1 million,
12   the court would have to give serious reconsideration to the
13   rest of the sentence, including the time of incarceration.
14       What about service of the sentence?  Any objection to him
15   turning himself in?
16           MS. LINNETT:  No objection, Your Honor.
17           THE COURT:  How much time do you suggest?
18           MR. THORMAN:  The recommendation in the PSR was by
19   January 9, 2:00 p.m.
20           THE COURT:  All right.  Mr. Ghio, you're ordered to
21   turn yourself into the institution designated by the Bureau of
22   Prisons before 2:00 p.m. on January 9, 2017.  It would be a
23   violation of the terms of your pretrial release if you should
24   fail to turn yourself in and it would be another crime.
25       Keep in touch with your attorney, make sure you know the
```

1    institution, and it's up to you to get yourself there and turn

2    yourself in.

3              DEFENDANT GHIO:  Yes, sir.

4              THE COURT:  Anything else?

5              MR. THORMAN:  No, Your Honor.

6              MS. LINNETT:  No, Your Honor.

7              THE COURT:  Next, unless you have a different

8    suggestion, we will proceed with Mr. Hutz.

9              MS. DALY:  Good morning, Your Honor.

10             THE COURT:  In this matter, the court has received

11   the final presentence report which was made available August

12   the 1st and revised as of August the 18th, 2017.

13        Ms. Daly, have you received a copy of that report?

14             MS. DALY:  I have, Your Honor.

15             THE COURT:  Have you discussed it fully with

16   Mr. Hutz?

17             MS. DALY:  Yes, Your Honor.

18             THE COURT:  And, Mr. Hutz, have you received a copy

19   of the final presentence report?

20             DEFENDANT HUTZ:  Yes.

21             THE COURT:  And have you discussed it fully with Ms.

22   Daly?

23             DEFENDANT HUTZ:  Yes.

24             THE COURT:  Has the government received a copy of

25   this report?

1          MS. O'BRIEN:  Yes, Your Honor.

2          THE COURT:  Ms. Daly, do you have any objections to

3     the sentencing guidelines as set forth in the report?

4          MS. DALY:  No, Your Honor, we have not objected to

5     the guideline calculations.

6          THE COURT:  Does the government have any objections?

7          MS. O'BRIEN:  No, Your Honor.

8          THE COURT:  There being no objections to the findings

9     in the presentence report, the court adopts those findings and

10    determines them to be true and correct; accordingly, the court

11    finds that the applicable offense level is 13 and the criminal

12    history category is I.  That means that the guideline range is

13    12 to 18 months.

14       The 5K motion from the United States Attorney concludes

15    with a recommendation of a sentence of 11 months in prison

16    followed by a term of supervised release and a fine of $20,000

17    plus the special penalty assessment of $100.

18       In this matter, the restitution has been stipulated to

19    $76,670.30.  Would you like to explain the basis for your

20    recommendation in the 5K letter?

21          MS. O'BRIEN:  Yes, Your Honor.  As set forth in the

22    5K letter, the defendant has provided substantial assistance

23    to the government's investigation.  His cooperation was very

24    timely.  He was, in fact, the second defendant to plead guilty

25    and pled guilty to the bid rigging count.

1        He was an early cooperator who sat for interviews and

2    provided information that did advance the investigation,

3    including logs.  He was willing to testify, Your Honor, but

4    was not called by the government to testify, and we value that

5    cooperation to the investigation at 10 percent.

6            THE COURT:  Ms. Daly, what would you like to say on

7    behalf of Mr. Hutz?

8            MS. DALY:  As to the 5K recommendation, we think it's

9    extremely low.  While in fact Mr. Hutz was the second person

10   to plead guilty, we believe he was the first person who

11   cooperated with the investigation.  He was debriefing with the

12   government in 2009.  We were having meetings in this building

13   with Mr. Carlberg and the FBI initially involved in this case.

14       He made no secret about the fact that he was cooperating

15   with the government.  The government received a substantial

16   benefit because word got out on the street that Mr. Hutz was

17   cooperating and he provided charts showing which properties

18   were sold, who was in on them, detailing the round robins, so

19   on and so forth.

20       That in and of itself is worthy of far more than a

21   10 percent reduction.  I've had this discussion with

22   Ms. O'Brien.  It's difficult for us to understand exactly how

23   that recommendation comes out and it is concerning in light of

24   the fact that Mr. Hutz was very clear to the government from

25   his initial debriefs about what he believed Mr. Katakis' role

1  was in this case.

2      Simply put, he believed Mr. Katakis was not involved.  And

3  when contacted by Mr. Katakis' defense counsel, he provided a

4  declaration and testified at Mr. Katakis' motion for a new

5  trial.

6      So in light of the substantial and very early assistance

7  Mr. Hutz provided and the nature of the information that he

8  provided, the arbitrariness of the government's recommendation

9  is somewhat concerning.

10      THE COURT:  Are you suggesting that because he

11  suggested Mr. Katakis was not involved and the government's

12  position was that Mr. Katakis was involved that there was some

13  element of retaliation?

14      MS. DALY:  I was very careful with my words, Your

15  Honor.  I used the word "arbitrary."  I am not suggesting it

16  is retaliatory.

17      THE COURT:  Anything else you would like to say on

18  his behalf?

19      MS. DALY:  In contemplation of determining what the

20  appropriate fine amount is in this case, I would like to point

21  out that Mr. Hutz' net worth is overstated in the PSR.  When

22  interviewed by probation, Mr. Hutz provided probation with

23  information regarding several family trusts that he is the

24  beneficiary of but the individuals controlling those trusts

25  are still alive.

1          Those interests have not vested, and, certainly, we don't

2    anticipate those people to change their future plans, but that

3    said, there's three different trusts listed on page 17 and

4    Mr. Hutz doesn't have access to those monies nor are they

5    vested.  One of them, I'm being told, he is not the

6    beneficiary.  It is his children who are the beneficiary and

7    he is the trustee to administer it.

8       So I would ask the court to keep that information in mind

9    when contemplating what the appropriate fine amount is in this

10   case.  That represents approximately half of the value set

11   forth in those three estates that are referenced on his net

12   worth page.

13      I would also like to point out --

14           THE COURT:  What are the securities then?

15           MS. DALY:  They're not truly a security in the truest

16   sense of the word, Your Honor.  They're trusts.  They're not

17   securities.

18           THE COURT:  I see.

19           MS. DALY:  In the intervening six and a half years,

20   since Mr. Hutz became aware of his investigation, he has found

21   it almost impossible to work.  As the court will note, he has

22   a negative cash flow every months as set forth in the PSR.

23   Banks have been unwilling to maintain his line of credit that

24   was cancelled when this investigation became public.  He had

25   more money sources who are no longer willing to lend him

1    money.

2        He has been essentially unable to work or certainly not

3    able to work at the same level that he worked at prior to this

4    investigation.  That in its own sense has been a form of

5    punishment.

6        Additionally, because he cannot work enough, he's very

7    disturbed by the fact he can't put his children to school in

8    the colleges they wish to attend and doesn't feel like he's

9    living up to his obligations as a father.

10       Lastly, the defense provided, I think, a lot of

11   information to the court providing community service that

12   Mr. Hutz is and has been engaged in over the past 30 years.

13       We would ask the court to take that information into

14   consideration as well.

15           THE COURT:  Is anything you would like to say on

16   behalf of the government?

17           MS. O'BRIEN:  Just to address the 3553(a) factors,

18   Your Honor.  The government's sentence of 11 months is

19   sufficient but not greater than necessary to comply with the

20   purposes of that statute.  We would say that the nature and

21   seriousness of the offense and the need to promote respect for

22   the law and afford adequate deterrence warrants the

23   recommended term of imprisonment.

24       While we note that specific deterrence may not be an issue

25   here with respect to this defendant, there is an important

1   general deterrence purpose that a sentence of imprisonment

2   serves to dissuade others from such anticompetitive conduct.

3           THE COURT:  So your recommendation of time of

4   incarceration for Mr. Hutz is greater than what you

5   recommended for Mr. Ghio; correct?

6           MS. O'BRIEN:  Yes, Your Honor.

7           THE COURT:  Why?  Because of the 10 percent rather

8   than the 30 percent reduction?

9           MS. O'BRIEN:  We use as a starting point, Your Honor,

10  the sentencing guidelines, and when working from there, and

11  applying a percentage 5K off, we did get --

12          THE COURT:  He started off with lower guidelines and

13  he ends up with a higher recommendation.  Is that because you

14  only reduced his 10 percent rather than 30 percent?

15          MS. O'BRIEN:  Mr. Ghio's recommendation was higher

16  for his 5K.  This is a 10 percent recommendation here.

17          THE COURT:  But your recommendation for Mr. Ghio was

18  10 months.  Your recommendation for Mr. Hutz is 11 months.

19          MS. O'BRIEN:  Yes, Your Honor, that's correct.

20          THE COURT:  To make sure I understand, it's because

21  he only got 10 percent reduction rather than 30 percent

22  reduction?

23          MS. O'BRIEN:  Yes, Your Honor.

24          THE COURT:  Mr. Hutz, anything you would like to say

25  on your own behalf?

1            DEFENDANT HUTZ:  I recognize that what happened was

2    inappropriate, that it was wrong, that it was illegal.  I have

3    not engaged in the behavior since it came to light that it was

4    illegal.  I do believe I've fully and timely cooperated with

5    the government in every way and upheld my responsibility to

6    testify openly and clearly about all matters.

7        With that in mind, I felt I was duty bound when asked by

8    another defendant to respond honestly and openly and

9    truthfully in their matter.  I go to work every day, try to

10   earn a living, but without capital, it's hard to earn an

11   income.

12       I supplement my income by selling assets as I go along.

13   The last seven years I've been a 50 percent parent being very

14   involved with my children.  My parents are here today.  They

15   are infirmed and I'm the only one in the area to take care of

16   them.

17       I certainly would not engage in this behavior again.  I do

18   approximately 300 hours a year easy in community service with

19   my specialized training and involvement in 12-step programs in

20   AA to help people recover from drugs and alcohol.  I've been

21   doing this for almost 30 years and at one time possessed

22   active professional licenses.  I've since let them lapse and

23   engage in this behavior for free for the benefit of the people

24   I encounter.

25            THE COURT:  The court makes the same observations

with regards to Mr. Hutz as I did with regard to Mr. Ghio with
respect to the need for incarceration.  In order to serve as a
deterrent, there needs to be some incarceration, but I don't
believe there's any need to protect society from Mr. Hutz.

I believe the sentence that I'm going to impose is fair,
reasonable, and sufficient, but not greater than necessary to
accomplish all of the relevant sentencing purposes.

I think, Mr. Hutz, you can pay a fine of $250,000.  If you
can't, you're going to have to work toward doing it.  If I
couldn't give you that kind of a fine, the only thing I know
that I could do is to impose a greater sentence, and I don't
want to do that, of incarceration.

Pursuant to the Sentencing Reform Act of 1984, it is the
judgment of the court that the defendant, Theodore B. Hutz, is
hereby committed to the custody of the Bureau of Prisons to be
imprisoned for a term of five months.

The defendant shall pay a penalty assessment of $100.
Payment to begin immediately.  The defendant shall pay a fine
to the United States in the amount of $250,000.  Payment to
begin immediately.

It is further ordered that the defendant shall pay
restitution in the amount of $76,670.30.  That shall be paid
to the victims that will be identified in the statement to be
filed by the United States Attorney and agreed upon by defense
counsel in the amounts set forth in the statement.

1          Upon release from imprisonment, the defendant shall be

2    placed on supervised release for a term of 24 months.  Within

3    24 hours of release from the custody of the Bureau of Prisons,

4    the defendant shall report in person to the probation office

5    in the district to which he is released.

6          While on supervised release, the defendant shall not

7    commit another federal, state, or local crime.

8          Shall cooperate in the collection of DNA as directed by

9    the probation officer and comply with the standard conditions

10   recommended by the United States Sentencing Commission and

11   adopted by his court.

12         The defendant shall further refrain from any unlawful use

13   of a controlled substance.  He shall submit to -- do we need

14   that?  Does he have a drug problem?

15             MS. DALY:  Your Honor, he's been an active member of

16   AA for 28 years.

17             THE COURT:  All right.  Well, we're going to do this

18   then just to make sure.  Submit to one drug test within 15

19   days of release from imprisonment and at least two periodic

20   drug tests thereafter, not to exceed four drug tests per

21   month.  That includes alcohol.

22         Let me look at these again.

23             PROBATION OFFICER:  Can I ask that the court waive

24   interest in the fine and restitution amount as recommended in

25   the pre-sentence report?

1           THE COURT:  You want me do the same thing with regard
2    to Mr. Ghio?
3           PROBATION OFFICER:  I would ask that of the court,
4    yes.
5           THE COURT:  And the reason is?
6           PROBATION OFFICER:  It's standard that the PS
7    reflects that interest be waived because they're paying a
8    significant amount.
9           THE COURT:  All right.  It's probably better for just
10   administrative purposes that we not have to calculate interest
11   along with the other calculations.
12      So the court with regard to Mr. Ghio and Mr. Hutz will
13   order that the interest on the fine and restitution be waived.
14   What about the --
15          PROBATION OFFICER:  Can I ask one more thing.  If
16   incarcerated, payment of restitution and fine is due at the
17   rate of not less than --
18          THE COURT:  They're going to be incarcerated for
19   five months.  That's more arithmetic you don't need to have to
20   do.
21      What about this condition number six?  Why is that in
22   there?
23          PROBATION OFFICER:  Your Honor, the defendant was
24   eligible for a split sentence --
25          THE COURT:  No, we're not going to do that.

1    Conditions 1 through 5, Ms. Daly, have you gone over those

2    with Mr. Hutz, special conditions 1 through 5?

3              MS. DALY:  I understand that, Your Honor.  I wanted

4    to ask about one of the standard conditions, which is that

5    there be no association with known felons, which poses two

6    problems for Mr. Hutz.

7         One, attendance at AA meetings becomes difficult --

8              THE COURT:  They're not known felons because they

9    don't know each other's names.

10             MS. DALY:  That's not true.  The specific term is

11   escaping me -- he sponsors a number of people.  Some of them

12   are known felons, and, additionally, he really would like to

13   go back to work.  It's impossible for him to attend auctions

14   on the steps of the courthouse in San Joaquin County if he

15   can't associate with known felons.

16             THE COURT:  I don't know about that.

17             MS. DALY:  Your Honor, the San Joaquin real estate

18   market is in the courtroom.  None of them can go to an auction

19   if they can't --

20             THE COURT:  Look.  You go into courtrooms.  You don't

21   associate with known felons by walking into the courtroom.

22             PROBATION OFFICER:  The probation officer supervisor

23   for Mr. Hutz can grant permission for him to --

24             THE COURT:  I want him to be able to associate with

25   anybody who might be in one of the programs he works with.

1              PROBATION OFFICER:  The probation officer can grant

2       that request.

3              THE COURT:  Okay.  So not associate with known felons

4       other than approved by the probation officer.  The probation

5       officer will approve that, and I don't think you have to worry

6       about walking into court.

7          Am I associating with known felons today?

8              MS. DALY:  I don't think you stand on the courthouse

9       steps and chat with people, Your Honor.

10             THE COURT:  Sometimes I do.  I don't think you need

11      to worry about that.  You shouldn't be chatting with the wrong

12      type of people anyway.

13         The court imposes special conditions numbers 1 through 5

14      of the recommendations on page 23 of the presentence report as

15      special conditions of supervised release.  The court also

16      imposes special condition number 7.  It's going to be

17      300 hours, but that should be no problem for Mr. Hutz because

18      he already does more than that.

19             Yes?

20             DEFENDANT HUTZ:  May I do that and help the people

21      I'm qualified to help in 12-step programs?

22             THE COURT:  Yes.  The probation officer will take a

23      look at it and make sure it's qualified.  You might consider

24      something like Habitat for Humanity because that's one of the

25      things you're pretty good at too.

1          DEFENDANT HUTZ:  I'm specially trained to help people

2     and there's very few of us, Your Honor.

3          THE COURT:  All right.  The defendant shall complete

4     300 hours of unpaid community service as directed by the

5     probation officer, and that will completed during the term of

6     supervised release.

7        Now, does he have a right to appeal?

8          MS. O'BRIEN:  He has the same language of waiver of

9     appeal and this plea at paragraph 7(b).

10          THE COURT:  Was the fine within the --

11          MS. O'BRIEN:  Your Honor, as we calculated it, it

12     would be 60,000 to $300,000, so, yes, Your Honor's fine would

13     be within that range.

14          THE COURT:  He's waived his right to appeal.  Do you

15     agree?

16          MS. DALY:  I agree.

17          THE COURT:  Any objection to him turning himself in

18     by January 9?

19          MS. DALY:  No objection.  We ask for a recommendation

20     to Taft.

21          THE COURT:  Why Taft?

22          MS. DALY:  It's the closest camp to where he lives.

23     Our anticipation is that's where he will score at.

24          THE COURT:  The court will recommend that Mr. Hutz be

25     incarcerated at the institution at Taft, insofar as that

1    accords with security classification and space availability.

2            Mr. Hutz, you're ordered to turn yourself in to the

3    institution designated.  It may be Taft; it may not be Taft.

4    Whatever they designate, you turn yourself in to that

5    institution by 2:00 o'clock, January 9th.  It will be a

6    violation of pretrial release and another crime if should fail

7    to do that.

8            DEFENDANT HUTZ:  Does it have to be that day or if I

9    turn myself in earlier is that okay?

10            THE COURT:  You have to check with the institution

11    because they may have a date that they're expecting you, but

12    that's a good point.  That's the reason we're proceeding

13    early.  You know, if you can get these things out of the way,

14    it's just a load off your shoulders.  If he wants to turn

15    himself in earlier, I think we all ought to encourage it.

16        Are you thinking of that, Mr. Hutz, thinking of turning

17    yourself in earlier?

18            DEFENDANT HUTZ:  As soon as I get my affairs in

19    order, Your Honor, as soon as there's a space available, I

20    would like to do that.

21            THE COURT:  How do we do that?

22            PROBATION OFFICER:  As soon as space availability by

23    BOP.

24            THE COURT:  Can we put that in the order then?  Any

25    objection?

 1              MS. O'BRIEN:  No objection.

 2              THE COURT:  Turn himself by January 9th or such

 3    earlier date as may be arranged if space is available.

 4              MS. O'BRIEN:  Yes.

 5              THE COURT:  Anything else?

 6              MS. DALY:  Yes, Your Honor.  I'm not finding it and I

 7    don't think it's there, but would the court make the same

 8    order it did as to Mr. Ghio regarding the possession of guns

 9    and ammunition?

10              THE COURT:  I left it off here.  When I got to that

11    point, I didn't impose that condition.

12              MS. DALY:  Thank you, Your Honor.

13              THE COURT:  I think we can probably take one more

14    before noon on the calendar.  Mr. Vanzetti?

15              MR. WING:  Christopher Wing on behalf of Mr. Vanzetti

16    who is present.

17              MS. LINNETT:  Kelsey Linnett on behalf of the United

18    States.

19              THE COURT:  The court has received the final

20    presentence report with respect to Mr. Vanzetti dated

21    August 1st and revised August 22, 2016.

22         Mr. Wing, have you received a copy of that report?

23              MR. WING:  I have.

24              THE COURT:  Has the government received a copy of

25    that report?

```
 1              MS. LINNETT:  Yes, Your Honor.

 2              THE COURT:  With respect to the calculation of the

 3   sentencing guidelines, Mr. Wing, do you have any objections to

 4   the findings in the presentence report?

 5              MR. WING:  I do.

 6              THE COURT:  And would you state your objections.

 7              MR. WING:  The objection is basically the increase of

 8   two points in 2R1.4 -- I'm sorry -- 2R1.1(b)(2)(B) because

 9   it's a violation of U.S. Sentencing Guidelines 1B.1.8, just

10   the same as with Mr. Ghio.

11              THE COURT:  All right.  Any other objections to the

12   findings in the report?

13              MR. WING:  No, Your Honor.

14              THE COURT:  Does the government agree with Mr. Wing's

15   objection or oppose it?

16              MS. LINNETT:  Agrees, Your Honor.

17              THE COURT:  Then are we in agreement that the total

18   offense is 12 rather than 14?

19              MS. LINNETT:  It's 13, because of the acceptance of

20   responsibility.

21              MR. WING:  13 rather than 14.

22              THE COURT:  Yes.  Yes.

23              MR. WING:  He gets one less.

24              THE COURT:  Right.  So what is it now?

25              MS. LINNETT:  13.
```

1              THE COURT:  Is that correct, Mr. Wing?

2              MR. WING:  It is correct at the moment, yes.

3              THE COURT:  All right.  Then the court so finds the

4    total offense level is 13, criminal history category is I.

5    That means that the guideline range is 12 to 18 months.

6         The court has received the government's motion under

7    Section 5K.1.1 of the sentencing guidelines concluding with a

8    recommendation of 11 months incarceration, a $100 special

9    penalty assessment, and a fine and restitution.

10        What would you like to say on behalf of the government?

11             MS. LINNETT:  Mr. Vanzetti's cooperation was timely

12   and did advance the government's investigation.  He was

13   willing to testify at trial but was not called on to testify;

14   therefore, in recognition of his substantial assistance, the

15   government believes a 10 percent departure is appropriate in

16   his case.

17             THE COURT:  What's the basis of the distinction

18   between the defendants we've seen so far, 20, 10 and

19   30 percent?  Why is this defendant at 20 percent?

20             MR. WING:  He's at 10.

21             THE COURT:  Oh, 10.  I thought you said 20 percent.

22   Then that explains it.

23        Mr. Wing, what would you like to say on behalf of Mr.

24   Vanzetti?

25             MR. WING:  To begin with, Your Honor, we've somewhat

1    settled the issue of the 1B1.8, but we really haven't because

2    as a result of the probation department utilizing that higher

3    level, it's really foreclosed them from looking at other

4    issues with Mr. Vanzetti.  Mr. Vanzetti was clearly one of the

5    least involved people in this case as far as physically doing

6    things and physically purchasing things.

7           THE COURT:  Why do you say they've been foreclosed

8    from considering that?

9           MR. WING:  Because basically they put him in an

10   automatic system.  They had him in a Zone D when he should

11   have been in a Zone C.  I asked them to do that in my informal

12   objections.  I said, look.  This is a Zone C case at worse.

13   See what you can do, because we've all been not allowed to

14   argue 3B.  Everybody in the plea agreements has basically said

15   you can't argue that.

16       What I would like to do -- what I tried to do was argue

17   under the guidelines under 3553 what Mr. Vanzetti actually

18   did, what he participated in.

19          THE COURT:  I can understand that and I can

20   understand that the guidelines may be different, but why is

21   the probation officer's determination, why does that preclude

22   them from considering what you're about to say?

23          MR. WING:  They didn't listen to what I had to say.

24   You can.  In other words, the problem is you start out with a

25   certain number, which number is not the right number.  That's

1    the whole reason for 1B1.8.

2           THE COURT:  Numbers are not my primary concern at

3    this point.

4           MR. WING:  I understand that, Judge, so let me tell

5    you Mr. Vanzetti's involvement.  Mr. Vanzetti was actually at

6    these auctions for 12 days.  He actually purchased six

7    properties, less than almost everybody.  I think the smallest

8    number of purchases was five by Mr. Jackson.  Mr. Vanzetti

9    basically purchased six.  He was not there.  He was not

10   involved.

11      As a result, he's been kind of looked at just to the side,

12   but he gave the government just as much information as

13   Mr. Ghio about what he knew about, which was the times that he

14   was there.  That I think deserves more than a 10 percent kick,

15   and I also think the court really needs to look and see what

16   Mr. Vanzetti was involved in here.

17      I mean, he made a lot of money.  There's no doubt about

18   it.  Everybody made a lot of money, but it's what did he do?

19   His is really amongst the least amount of actual participation

20   in anything.  The first house he bought was basically just a

21   wild call at 4:00 o'clock in the afternoon as he was driving

22   home and was told to go to a gas station and purchase a piece

23   of property with the cryer, Mr. Longley.  He did that.

24   Mr. Ghio instructed him what to do.

25      After that, during the 12 days he was there, he ends up

1   buying a property every two days.

2          THE COURT:  To me it's not so important how many

3   properties he bought or how much he paid for them.  It's the

4   extent of his participation in the process.  This was whether

5   charged as a conspiracy or not, a conspiracy.

6          MR. WING:  True.

7          THE COURT:  And all of the participants who sat

8   around that table or figuratively joined in the round robins

9   are participating to the same extent.  They just may not end

10  up purchasing as much of the properties.  They are bidding and

11  may lose a bid.  Their involvement is very much the same as

12  others involved in that process.

13     The important thing is how much was he involved in this

14  process?  You're saying he was only there 12 days.  That's the

15  important thing.  I'm familiar with the process.

16          MR. WING:  He was there 12 days.  The final

17  determination wasn't made in these knockout bids until

18  Mr. Ghio got back.  Clearly he's involved.  He's got

19  responsibility, as much responsibility as anybody as far as

20  being joined in this conspiracy, but he's a person who was so

21  far removed from what's going on, I think that fact needs to

22  be noted.

23     I think that clearly he should be eligible for at least

24  some kind of a departure downward of two or three points to

25  make him eligible for a split sentence, which he is now or

1    even just basically a sentence where he can do it at home

2    detention.

3         The reason I ask that, I know the court is going to add,

4    basically, community service.  We've already been involved in

5    with Habitat for Humanity for months.

6              THE COURT:  He has?

7              MR. WING:  Absolutely.  It's a perfect fit for

8    someone who had a contractor's license before this, had a real

9    estate license before this, and he can go back and he can

10   really help in that area.  He's done that and he continues.

11   As long as he's around, he will do it, or when he's out, he

12   will continue to do it.

13        I would ask the court to seriously consider giving him

14   home detention on his case for a period of six months,

15   eight months.  That way he would not only be able to continue

16   to do this work with Habitat for Humanity, he would be able to

17   basically continue his business, which I think the court is

18   going to take a good chunk of.

19        That's the basic argument I have to make to the court.

20   This is not a guy there 24-7.  This is not a guy that got

21   actively involved.  This is not a guy who intimidated anybody.

22   This is guy who his partner wasn't there so he went.  Whenever

23   he was on vacation, he did not even get one.  He said go ahead

24   and take it.

25        It's a different situation with him and he gets lost in

1   the shuffle because, really, he was such a non-entity in this

2   whole situation.

3         THE COURT:  Tell me why he can't pay a fine of a

4   million dollars.

5         MR. WING:  He can pay a fine of a million dollars,

6   but whether he should pay a fine of million dollars, you and I

7   can disagree.  You said something earlier, I think we were

8   having a round table discussion when the government was

9   talking about how they all of a sudden came up with his

10  language and notes under the bid rigging in 2R.

11      You brought up the old concept that I think you and I and

12  Mr. Ellis may be the only ones that remember.  Heartland.

13  That's what it was.  Basically, that's how they started the

14  guidelines.  This is what happens throughout the United

15  States.  These are the averages and we're going to work on it

16  and that's what we'll base this on.

17        THE COURT:  Apparently they didn't do that here.

18        MR. WING:  They went nuts.  They --

19        THE COURT:  There's some reason for it.  There's some

20  thinking about behind it.

21        MR. WING:  Well, if you're going to give credit to

22  it, and there may have been some, but then I think equally you

23  should say, okay.  What they also have done, they've said we

24  basically are going to put a 5 percent lid on whatever the

25  volume of commerce is.

1        Now, that's not an insubstantial number.  A 5 percent lid

2   on the volume of commerce involving Mr. Vanzetti would be

3   300,000 bucks, $270,000 of restitution.  I think that's a fair

4   amount.  He can pay a million, but I think that's a fair

5   amount.

6            THE COURT:  Mr. Vanzetti, is there anything you would

7   like to say on your own behalf?

8            DEFENDANT VANZETTI:  Yes.  I will try to get this out

9   as clear as possible.  First of all, and I'm not trying to

10  snow you, I really appreciate you're trying to handle this, it

11  seems really efficient, but what I had to say more than

12  anything I will prepared to do whatever the consequences

13  require me to do.

14       What bothers me the most is that these consequences are

15  also going to be shared by my family.  To them I apologize.  I

16  apologize to my daughter and her family, my son and his family

17  and especially my wife.  It's just -- I can never make it up

18  to her.

19       I'm so glad that this day has come and we can move on in

20  whatever manner we have to.

21       Thank you.

22            THE COURT:  A couple of observations.  It's always

23  the families that suffer when the court has to impose a

24  sentence on someone, and in many senses, it shouldn't be that.

25  What you can say with your head held high is that although

1    your family may have to suffer the consequences of the

2    negative aspects of what you've done, your family is also

3    benefited from having you and all the positive things you've

4    done in your lifetime.

5              DEFENDANT VANZETTI:  I have a hard time weighing that

6    out.

7              THE COURT:  If they're still with you, that's great.

8              DEFENDANT VANZETTI:  They're with me now.

9              THE COURT:  That's good.  You have gathered from what

10   I've said in the process of sentencing those that have gone

11   before you that the amount of the fine can't be separated from

12   the amount of the incarceration.

13       If I were not imposing the fine that I'm going to impose,

14   the incarceration would have to be greater because we have to,

15   among other things, send out a message to others that might

16   think about doing the same thing, it doesn't pay.  They can't

17   do it.

18             DEFENDANT VANZETTI:  I understand that.

19             THE COURT:  You are getting the benefit of that and

20   you're going to have to pay the consequences.  The court

21   believes the sentence --

22             MS. LINNETT:  May the government be heard on one

23   point?

24             THE COURT:  Yes.

25             MS. LINNETT:  I want to echo what Your Honor has said

1   about the importance of general deterrence in imposing a term

2   of incarceration.  I want to speak a little bit to

3   Mr. Vanzetti's role because while the government doesn't

4   dispute the 12 days that he was actually involved in the

5   rounds, I think it mischaracterizes his role to say he was a

6   non-entity.

7      While he was not in the rounds, his partner Mr. Ghio was

8   standing in for his interest and he was fully aware of the

9   nature of what was going on and what the payoffs were for.

10   That's why when he stepped in for those 12 days

11   intermittently, he could just assume the responsibility that

12   Mr. Ghio had been taking for the benefit of their partnership.

13      So I think his participation is bigger than just looking

14   at those 12 days that he was physically present.

15        THE COURT:  It's a good point and I take it into

16   consideration.  It's part of the reason why I don't think the

17   sentence with regard to Mr. Vanzetti should be substantially

18   different than the sentence with regard to Mr. Ghio.

19      Pursuant to the Sentencing Reform Act of 1984, it the

20   judgment of the court that the defendant, John Vanzetti, is

21   hereby committed to the custody of the Bureau of Prisons to be

22   imprisoned for a term of five months.

23      The defendant shall pay a special assessment of $100.

24   Payment to begin immediately.  The defendant shall pay a fine

25   to the United States in the amount of $1 million.  Payment to

1    begin immediately.

2         It is further ordered that the defendant shall pay

3    restitution in the amount of $271,454.44 to be sent to the

4    clerk of the court who will forward it to the victims who will

5    be identified in the statement to be filed by the United

6    States Attorney and in the sums set forth in that statement as

7    agreed to by the defendant.

8         Upon release from imprisonment, the defendant shall not

9    commit another federal, state, or local crime while he's on

10   supervised release and shall cooperate in the collection of

11   DNA as directed by the probation officer and shall comply with

12   the standard conditions which have been recommended by the

13   United States Sentencing Commission and adopted by this court.

14        Did I state the term of supervised release?

15             THE CLERK:  No.

16             THE COURT:  Upon release from the prison for a term

17   of 24 months.  Within 72 hours of release from the custody of

18   Bureau of Prisons, the defendant shall report in person to the

19   probation office in the district to which he is released.

20        Mr. Wing, have you gone over the six special conditions

21   listed on page 23 and 24 of the presentence report with Mr.

22   Vanzetti?

23             MR. WING:  One second, Your Honor.

24        (A conference was held between Mr. Wing and defendant

25    Vanzetti.)

1          MR. WING:  Yes, we have gone over these.  The concern

2     that Mr. Vanzetti had is now we're both felons with Mr. Ghio.

3     How can we still be partners?  I told him probation will deal

4     with that issue.

5          THE COURT:  Right.  That's a good point, because in

6     some circumstances the court might not want him to associate

7     with the persons he was associating with when he got into

8     trouble.

9        I might want to say that, but I don't in this case because

10    I'm satisfied that both Mr. Ghio and Mr. Vanzetti have been

11    rehabilitated to the extent that they will not adversely

12    influence the other, so I'm not going to restrict him from

13    associating with Mr. Ghio or vis-a-versa.

14        Now, you went over the special conditions?

15          MR. WING:  Yes.

16          THE COURT:  I'm going to impose the six special

17    conditions of 300 hours of unpaid community service as

18    directed by the probation officer, and it's my hope that it

19    will be something like Habitat for Humanity.

20          MR. WING:  It will be.

21          THE COURT:  Maybe you're already doing 300 hours

22    already.

23          MR. WING:  I don't think he's up to that number yet.

24          THE COURT:  But if you get into it and you want to do

25    more, it's rewarding.

1          MR. WING:  He has a skill set for it, which is great.

2          THE COURT:  They all do.  They all do.

3          Is the sentence imposed consistent with the plea

4     agreement with regard to appeal?

5          MS. LINNETT:  Your Honor, the same language applies

6     in Section 7(b).  It's a limited waiver.  The defendant gives

7     up the right to appeal the conviction and appeal any aspect of

8     the sentence imposed in this case so long as his sentence is

9     no longer than the top of the sentencing guidelines range

10    determined by the court.

11       In this case his fine guideline range tops at 295,000.

12         THE COURT:  So he would have a right to appeal that

13    portion of the sentence that imposes the fine.

14       Again, I must tell you, to be perfectly candid, that if I

15    were required to impose a lesser fine, in good conscience, I

16    would feel required to impose a greater term in prison.

17         MR. WING:  You've made yourself clear, Judge.

18         THE COURT:  It's not a threat.  It's just my thought

19    process.  You have a right to appeal from your conviction

20    insofar as the fine is concerned.  If you wish to appeal, you

21    must file a written notice of appeal with the clerk of the

22    court within 14 days from the entry of judgment.

23       If you cannot afford the cost of an appeal, you'll be

24    permitted to proceed without the payment of cost.  If you

25    cannot afford counsel, one will be appointed to represent you,

1    and if you request it, the clerk of the court will prepare and

2    file a notice of appeal on your behalf.

3        I'll order that you turn yourself into the institution

4    designated by the Bureau of Prisons by 2:00 p.m. by January

5    the 9th.  If you are inclined to turn yourself in early, I

6    would certainly urge you to do so and make arrangements with

7    the Bureau of Prisons to turn yourself in earlier.

8            MR. WING:  Your Honor, that's a great option, but in

9    my experience, they don't do a designation until three or four

10   days before the sentence is due, but maybe they can pull off a

11   miracle, but we appreciate that option.

12           THE COURT:  All right.  Another factor with

13   January 9th is it's after the holidays.

14       Anything else?

15           MR. WING:  Yes.  Two requests.  One, I have the check

16   for the restitution.  Can I basically either take it down --

17   the clerk's office won't accept it because there's no order

18   yet.  My suggestion was to give it to the government.

19           THE COURT:  Any of you can do anything you want with

20   respect to how you pay the restitution as long as you make

21   sure it's paid.

22           MR. WING:  Oh, excuse me.  The clerk's office took

23   the check, so we're good.  And the other thing is a

24   designation in Northern California.

25           THE COURT:  The court will recommend that Mr.

1   Vanzetti incarcerated at an institution in Northern

2   California.  I'm not so sure.  Maybe Oregon --

3           MR. WING:  Well, why don't we just say California.

4           THE COURT:  Close to Northern California insofar as

5   that recommendation accords with security classification and

6   space availability.

7           MR. WING:  Thank you, Judge.

8           THE COURT:  Now, I think we need to take a noon

9   recess and reconvene at 1:30 p.m.

10      The court will waive interest on the fine and restitution

11   for all defendants and that will be in the orders to follow.

12      (The luncheon break was taken at 12:05 p.m.)

13                          ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

1    SACRAMENTO, CALIFORNIA, MONDAY, SEPTEMBER 12, 2016; 1:30 P.M.

2                              ---o0o---

3              THE COURT:  We'll take Mr. Northcutt next.

4         In this matter the court has reviewed the final pretrial

5    report made August the 1st and revised August the 22nd.

6         Mr. Weinberg, have you received a copy of that report?

7              MR. WEINBERG:  I have.

8              THE COURT:  You have discussed it fully with Mr.

9    Northcutt?

10             MR. WEINBERG:  Yes.

11             THE COURT:  Mr. Northcutt, have you received a copy

12   of the final presentence report in your case?

13             DEFENDANT NORTHCUTT:  Yes.

14             THE COURT:  And have you discussed it fully with Mr.

15   Weinberg?

16             DEFENDANT NORTHCUTT:  Yes.

17             THE COURT:  You have some objection to the

18   calculation of the sentencing guidelines; is that correct?

19             MR. WEINBERG:  That is correct.

20             THE COURT:  Would you like to state them, please, for

21   the record?

22             MR. WEINBERG:  Yes, Your Honor.  As the court is

23   aware, Mr. Northcutt is the first of the defendants to come

24   before you today who entered pleas or a plea to the mail fraud

25   count in addition to bid rigging.  That was at the

1    government's insistence.

2         Mr. Northcutt actually approached the government before

3    the end of 2009, very, very shortly after becoming aware of

4    the government's investigation and asked to meet with the

5    government and resolve this matter, offered to cooperate,

6    et cetera, but was told the government was not ready to speak

7    with him at that point.

8         And it wasn't until a year later that the government got

9    back in touch and said that policy of the division, Antitrust

10   Division had changed, and Mr. Northcutt was going to have to

11   plead to mail fraud as well as bid rigging.

12        For a variety of reasons, including the fact he did not

13   want to litigate, he wanted to accept his responsibility and

14   move forward and also because he wanted to accept

15   responsibility under the guidelines as well as to offer to

16   cooperate, he decided that he had no choice but to accept the

17   government's offer, so he pled to mail fraud.

18        That puts him theoretically, at least, at the outset from

19   that of the three defendants you've previously sentenced.

20   Because we're dealing with a fraud charge, there are guideline

21   calculations which are different from what have previously

22   been discussed.  One is the issue of loss amount, which in the

23   case of the other defendants, was relevant to restitution, but

24   not relevant to the sentencing.

25        In the case of the fraud, the loss amount is a guideline

1    IV setting the offense level.  We made a plea agreement with

2    the government in 2011, January of 2011, and agreed at that

3    point that the government's calculations of $349,000 of loss

4    was correct.  We had no reason to dispute it.

5        On that basis, we entered into agreement with that loss

6    figure.  The guideline level would have been enhanced 12

7    levels.  It now turns out that the government believes the

8    figure of 614,000, and on that basis, the enhancement or

9    adjustment that would be 14 levels, a two-level difference.

10       I suggest a couple of things.  One is that the whole issue

11   of loss amount is relevant to only fraud as a sentencing

12   factor and that the importation of that into what is

13   essentially a bid rigging case is excessive.

14       I also suggest to you that $614,000 is a very small amount

15   over the threshold between 12 and 14.  It's less than

16   7 percent of the entirety of level 14, so by barely getting

17   over that threshold, he would get two entire levels added to

18   his sentence.  We think that is inappropriate and unnecessary.

19       It also may turn out to be that the actual restitution is

20   $536,000, which, if we are correct, we have already agreed to

21   pay the entire amount, no matter whatever, and the rest to be

22   treated as a fine or whatever, but he could be being sentenced

23   on an erroneous basis.

24       So with all those considerations and the request that the

25   court honor the plea agreement, we would object to the 14 as

1   opposed to 12 level adjustment and the offense level based on

2   the loss amount.

3          THE COURT:  Did you have any other objections to the

4   calculation of the guidelines?

5          MR. WEINBERG:  We do.  We have objection to the

6   aggravating role.  Again, that is something that is different

7   than what we agreed to.  The parties agreed Mr. Northcutt

8   played a supervisory and managerial role, not an organizer or

9   leader.

10     These were experienced businessmen, adults acting of their

11  own free will who were acting for their own personal benefit.

12  They were not under Mr. Northcutt's control.  They were not

13  under his influence.  He did not get a greater share.  He

14  didn't tell them what to do.

15     What the probation report points out is that he kept books

16  and made accounts.  Well, that's what managers and supervisors

17  do.  It's not what leaders and organizers do, so we object to

18  the additional level of --

19         THE COURT:  If you're familiar with the circumstances

20  of this case, who would you say is an organizer and leader or

21  does this group have no organization and no leadership?

22         MR. WEINBERG:  Frankly, Your Honor, I think that's

23  true.  A bunch of people who for years had been going to the

24  steps of the courthouse personally bidding on a few desultory

25  items that were available every day, found themselves suddenly

1    in 2008 overwhelmed with dozens and dozens of houses available

2    with every single day with very, very low minimum bids, which

3    is what the banks were doing, putting them out at very low

4    prices to attract whatever money they could.

5        The gentlemen looked at each other and said, why should we

6    give the banks more money than they're asking for.  Let's just

7    figure it out between ourselves.  This is not a leadership.

8    This is not a creation of an organization.  This was a number

9    of people acting equally coming together and saying, okay.

10   Let's do this.

11       THE COURT:  When you say, "let's do this," what they

12   were doing was not rocket science but relatively

13   sophisticated, and to say that it was disorganized and had no

14   leader, I think, would probably be going too far.  Somebody

15   conceived this idea.

16       Now, I don't tell you that it's Mr. Northcutt, but I'm

17   asking you to suggest to me who it might have been.

18       MR. WEINBERG:  Well, if you look at the guideline

19   definition, the factors to look at to decide who is the leader

20   and organizer, those factors don't fit anybody in this case.

21       THE COURT:  What are they?

22       MR. WEINBERG:  They have to do with controlling other

23   people, getting a bigger share, having more say, more

24   influence.  Nobody had that.  These were equals.  They were

25   working together.  Not every group working together has a

 1    leader.

 2          THE COURT:  It may be an academic question because I

 3    think the government may agree with you since they entered

 4    into this plea agreement, but it might be an academic issue of

 5    discussion.

 6       Did you have any other objections to the calculation of

 7    the guidelines?

 8          MR. WEINBERG:  Forgive me, I do.  On the question of

 9    the number of victims, enhancement for the number of victims,

10    that's again something we did not agree on in the plea

11    agreement and I believe the government does not advocate that

12    the two points, the two levels be added.

13       And, again, as I've argued in the sentencing memorandum,

14    that's really a consideration that's appropriate for a true

15    fraud.  In all honesty and all candor, Your Honor, this is not

16    a true fraud but a true bid rigging.

17          THE COURT:  It says 74 victims.  What is the cutoff

18    before you get an enhancement?

19          MR. WEINBERG:  Ten, I believe.

20          THE COURT:  How many victims would you say there are?

21          MR. WEINBERG:  Bid rigging doesn't have victims.  Bid

22    rigging --

23          THE COURT:  This is mail fraud.  We have to calculate

24    the guidelines first and then we can talk about what other

25    factors might be considered.

1          MR. WEINBERG:  My suggestion to the court is that if

2     this were a true fraud and we are operating under fraud

3     guidelines, the enhancement would be appropriate, although we

4     are talking about pretty small amounts of money from fairly

5     large institutions.  It's not like vulnerable individuals, you

6     know, subjects of predatory action taking money from this.

7          THE COURT:  It's not like that, but if we were to say

8     how many bank victims there are, wouldn't you have to agree

9     that there are at least ten?

10          MR. WEINBERG:  I would have to agree that there is

11     ten.  The question is:  Should the court sentence on that

12     basis?  And we in the plea agreement came to the conclusion

13     that it should not and I would ask the court not to use that

14     basis.

15          THE COURT:  I'll see what the government has to say

16     about that.  Did you have any other objections to the

17     guidelines?

18          MR. WEINBERG:  No objections, Your Honor.

19          THE COURT:  What is the government's position on each

20     of these three objections?

21          MS. O'BRIEN:  Your Honor, I think we're in relatively

22     substantial agreement with the defendant.  As we outlined in

23     our sentencing submission, obviously here, through a number of

24     circumstances, the numbers in the plea agreement are quite

25     different from what is in the presentence report.

1          The plea, bottom line after acceptance, is an offense

2     level 19 where the PSR at paragraph 61 is at an offense

3     level 24, and there are basically three reasons that Mr.

4     Weinberg has gone over.

5          On the first, we have provided to the court, to probation

6     there was a clerical error, which immediately upon identifying

7     it, we did provide that information to the counsel for the

8     defendant as well as probation.  So, essentially, our

9     guideline calculations in our plea are based on a clerical

10    error number.  And we --

11               THE COURT:  That's with respect to the loss amount?

12               MS. O'BRIEN:  Correct, Your Honor.  So the correct

13    amount should be $614,982.  That's our position.  That is the

14    same number we had with respect to restitution.

15               THE COURT:  That's the same number that the probation

16    officer used to get to 14?

17               MS. O'BRIEN:  Correct.  That is the same number.  Our

18    position is that we -- while we made this clerical error, that

19    we are bound to stand by those calculations in the plea

20    agreement on that number, but we made the court aware as soon

21    as this information was discovered.

22         So we are pointing the disparity between the plea

23    agreement and the PSR, not quibbling of the PSR's calculation

24    using those numbers.

25               THE COURT:  All right.  To cut to the chase here.

1    You agree with Mr. Weinberg's objection and you are asking

2    that's the court find the offense level to be 19 instead of

3    24?

4              MS. O'BRIEN:  Correct.

5              THE COURT:  That's what you're asking for as well?

6              MR. WEINBERG:  Yes.

7              THE COURT:  So the court is clear, I believe the

8    probation officer is correct in each of these assessments, but

9    since the government agrees with Mr. Weinberg, I'm going to

10   adopt the stipulated offense level and the court finds the

11   total offense level is 19 and the criminal history category is

12   I.  That means under the guidelines, the sentence would be 30

13   to 37 months.

14      Now, we have the 5K letter or motion from the government

15   in which the government asked the court to adjust downward

16   just two levels and asks for a sentence in the range of 24 to

17   30 months, specifically at the low end of the guidelines,

18   24 months; correct?

19             MR. WEINBERG:  No, Your Honor.

20             MS. O'BRIEN:  We went on percentages, so 40 percent

21   level reduction from the bottom of the guidelines range of

22   30 months.  We took off 12 months in our recommendation

23   getting it down to a 18-month recommendation.

24             MR. WEINBERG:  What the court might be referring to

25   Your Honor, we made arguments under 3553 that even though

1    this --

2             THE COURT:  Oh, yes.

3             MR. WEINBERG:  -- even though this was pled as a

4    fraud, it was in actuality the equivalent of a bid rigging,

5    and in terms of the nature and circumstances of the offense,

6    it should be looked at as a bid rigging rather than a fraud;

7    therefore, it should start at a level -- two levels lower at a

8    guideline range of 24 to 30, not 30 to 37.

9             THE COURT:  All right.  You're right.  I was looking

10   at your recommendation rather than the government's.

11            MR. WEINBERG:  Well, I appreciate that, Your Honor.

12            THE COURT:  But I misstated it, so I actually made it

13   worse for you.  The government's recommendation is for a term

14   of 18 months followed by a term of supervised release and a

15   fine and special penalty assessment.

16       Let's start in this matter with the government.  What is

17   the basis for your recommendation both in the 5K and

18   generally?

19            MS. O'BRIEN:  Yes, Your Honor.  As outlined in our

20   sentencing memorandum and 5K motion, we value defendant

21   Northcutt's cooperation to warrant a 40 percent reduction,

22   which is the highest in the categories of reductions you're

23   going to see today based on his substantial assistance to the

24   investigation.

25       He was the fourth defendant to plead guilty in this matter

1    and the first defendant to plead guilty to both bid rigging

2    and fraud.  He sat for extensive interviews and provided

3    extensive information that advanced the investigation.

4        In addition, because of Mr. Northcutt's role keeping track

5    of finances and payments owed among conspirators, that was

6    particularly valuable, and he provided ledgers and round

7    sheets that helped to identify -- had the knowledge of how

8    complicated, how the rounds worked, identifying the payoffs on

9    particular rigged properties and who got how much.  He was a

10   key trial witness on the stand for two days and his ledger was

11   an important trial exhibit.

12       That's the basis of our motion for a substantial

13   assistance departure of 40 percent.

14           THE COURT:  Can you elaborate on why it was that you

15   insisted Mr. Northcutt plead to the mail fraud count and the

16   others were allowed to plead to the other bid rigging count?

17           MS. O'BRIEN:  I think in it's most simple nature,

18   something that you've probably seen before, that when we had

19   the first early cooperators, the ones that Your Honor

20   sentenced this morning, they were charged with only Title 15

21   charges, the antitrust count, based on the evidence we had at

22   that time.

23       They helped to establish the parameters of the conspiracy

24   and establish sufficient evidence to charge subsequent

25   defendants with Title 18 offenses.

1          THE COURT:  I'm not sure I understand that.  To me

2     the whole theory of the bid rigging charge would justify a

3     mail fraud.  All you have to add to it was that the mail was

4     used and it didn't take you any effort to discover in any sale

5     of real estate the mail was used.

6        So I don't understand what you're saying.

7          MS. O'BRIEN:  I do agree with you on that.  Tying a

8     specific payoff to which properties and which conspirators

9     went to which, I think, is relevant to the loss determination

10    here.  We've talked about in establishing mail fraud, not just

11    for the unreasonable doubt proof purposes but for sentencing

12    purposes, we were in a different position when we engaged in

13    negotiations with Mr. Northcutt.

14          THE COURT:  It's not that you had evidence that there

15    was a mail fraud violation.  It was that you wanted to treat

16    it differently.

17          MS. O'BRIEN:  I don't think so, Your Honor.  I think

18    based on the evidence we had at that time, we did our best to

19    evaluate the charges we could prove beyond a reasonable doubt

20    without cooperation at that time.

21          THE COURT:  I just don't understand why you think you

22    could prove bid rigging beyond a reasonable doubt but couldn't

23    prove mail fraud to any count to any defendant.

24          MS. O'BRIEN:  Perhaps in hindsight, we would have

25    made those decisions differently.  We were progressing in

1   these matters around the country in different matters and we

2   were making overall charging decisions that did come into

3   play, but at bottom, Your Honor, it's about the proof we had.

4   I understand your point and we don't disagree.

5       In hindsight, perhaps we would have charged those

6   differently, and I think Your Honor could appropriately take

7   those into consideration as equities.

8           THE COURT:  So I'll ask you this question.  I don't

9   know if you can answer it.  If the only charge here were bid

10  rigging with regard to Mr. Northcutt, would your

11  recommendation be the same or different?

12          MS. O'BRIEN:  If we break down the guidelines, the

13  plea agreement does contain the break down as to both and

14  there's a two-point difference.  We are working off of the

15  fraud guideline and we do think that is appropriate.

16          THE COURT:  See, this is an example of why we have

17  Booker.  The facts and the defendant are exactly the same,

18  whether he's charged with a mail fraud count or a bid rigging

19  count, but yet you're telling me somehow because the

20  guidelines are different, your recommendation as to the

21  sentence might be different, and I can't really agree with

22  that.

23          MS. O'BRIEN:  I agree, Your Honor.  Here I don't

24  think they would be different and here's a few reasons why.

25          THE COURT:  Okay.  That's what I want you to tell me.

1              MS. O'BRIEN:  There are a few reasons why that are

2      particularly present in Mr. Northcutt's case.  The victim

3      adjustment, for instance, under 2B1.1, we did not put that in

4      our plea agreement and that would not have been at play in the

5      antitrust calculation.

6              THE COURT:  Would the guidelines, if this had been an

7      antitrust charge, be the same or different than what you came

8      out with after you agreed with Mr. Weinberg on all these

9      objections?

10             MR. WEINBERG:  May I interrupt, Your Honor?

11             THE COURT:  She knows.

12             MS. O'BRIEN:  The guideline range before acceptance

13     and before the 5k on the antitrust would have put us at a

14     level 17, which is 24 months above what we're recommending,

15     and I don't think it would have changed our recommendation as

16     we stand here today.

17             THE COURT:  What about the 5K?

18             MS. O'BRIEN:  That's the level before that.  We can

19     work off of there.

20             THE COURT:  That's the point.  So you're telling me

21     if it was just a bid rigging count, before the 5K, it would be

22     17, offense level 17; right?

23             MS. O'BRIEN:  Correct, Your Honor.

24             THE COURT:  So if you made a 5K motion after that,

25     don't you think it would have been lower?

1              MS. O'BRIEN:  The levels that we're at, we're still

2     at 24 to 30 months.  He would get -- that's before his points

3     for acceptance of responsibility also, which in the plea

4     agreement we had a minus 3, so he actually would have been at

5     a 14.

6              THE COURT:  Instead of 18.

7              MS. O'BRIEN:  Which is 15 to 21 months.

8              THE COURT:  So he would have been at 14 instead of a

9     18; is that what you're saying?

10             MS. O'BRIEN:  Instead of a 17, yes, Your Honor.

11             THE COURT:  I'm not sure I still understand.  Where

12    would you be with the 5K if this had been charged as a bid

13    rigging and not a mail fraud?

14             MS. O'BRIEN:  We still would have moved for the

15    percentage 5K.  I think that that's 40 percent.

16             THE COURT:  What would be 40 percent off the bottom

17    of the guidelines on a mail fraud?

18             MR. WEINBERG:  Bid rigging?

19             THE COURT:  I'm sorry.  Bid rigging.

20             MS. O'BRIEN:  Taking into account acceptance of

21    responsibility and a 40 percent 5K, I do think we potentially

22    could have been lower here.  I do think Mr. Weinberg has done

23    a good job in putting that into context of the 3553 factors,

24    Your Honor.

25             THE COURT:  So tell me what you would have been at.

1           MS. O'BRIEN:  I think we would be closer to ten.  I'm

2     doing this on the fly, but if we took six levels off the

3     bottom of a 14, it could have been as low as nine.

4           THE COURT:  Nine what?

5           MS. O'BRIEN:  Nine months.

6           THE COURT:  Nine months.

7           MS. O'BRIEN:  But I do think it's slightly different.

8     I'm not sure -- I do think where we are right now, there is --

9     I'm not sure if I was put in that position and he were only

10    charged with the antitrust, as you've heard this morning, Your

11    Honor, that has the plea to both and the testimony that he

12    provided based on the charges to both, and what he could flesh

13    out with respect to both does have value to it.

14          THE COURT:  Right.

15          MS. O'BRIEN:  I'm not sure with respect to the 5K if

16    we would be in the same position.  We based our 40 percent 5K

17    on where we are now.  I would have to have re-evaluated that,

18    as you heard from the first three defendants.  So I do think

19    there's some interplay of the issues, Your Honor.

20          THE COURT:  All right.  Anything else you wanted to

21    say?

22          MS. O'BRIEN:  Not on the guideline calculations, Your

23    Honor.

24          THE COURT:  What about the sentence?  What would you

25    like to say in regard to the sentence?

1          MS. O'BRIEN:  Our recommendation of a term of

2    imprisonment of 18 months in taking into account the 3553

3    factors, we do focus here --

4          THE COURT:  You're saying -- I want to make sure I

5    understood that.  You're saying I might have to reevaluate

6    this, but as you're thinking about it now, if he had been

7    charged strictly with bid rigging, your recommendation would

8    have been nine months?

9          MS. O'BRIEN:  It may have been, but I do think

10   there's a different scenario with the charges we face in our

11   evaluation of the 40 percent for the cooperation.  The

12   cooperation that he provided included his testimony on the

13   stand.

14         THE COURT:  I know, but other defendants, though, not

15   his own conduct.  We already had his conviction.  He could

16   talk about how other defendants committed mail fraud without

17   having plead to it himself.

18         MS. O'BRIEN:  He absolutely could, Your Honor, but

19   his substantial assistance is with respect to the prosecution

20   of others.  As he sat there and provided that testimony, I'm

21   sure Your Honor would have heard cross-examination only on the

22   charge of the antitrust count if that's all he had pled to.

23         THE COURT:  I'm not sure of that.  It depends on what

24   other were changed with who he was testifying against.

25         MS. O'BRIEN:  Correct, Your Honor.  I'm dealing with

1    the facts we have here.  I understand you're trying to get

2    down to what our recommendation would have been, but I do

3    think --

4          THE COURT:  That's not the bottom line, but it's

5    certainly something that is of interest to the court.  This is

6    not a numbers game.  I don't think anything that I've asked so

7    far suggests that I'm going to be relying exclusively on the

8    guidelines.  I'm going to be looking to all these other

9    factors.

10       Go ahead.

11         MS. O'BRIEN:  As you should, Your Honor, and that's

12   what I would like to address, the 3553 factors.  We are at

13   guidelines range now that is based on a clerical error, we

14   both agree that's appropriate and fair, you are still to look

15   at the scope of conduct of what the defendant here did and we

16   do think these are serious offenses with serious monetary

17   consequences to others and there was monetary benefit to the

18   defendant, and the nature and seriousness of the offense and

19   the need to promote respect for the law and afford adequate

20   general deterrence.

21      We're not alleging there's a need for specific deterrence

22   with respect to Mr. Northcutt, but there's an important

23   general deterrence to dissuade others from engaging in this

24   anticompetitive conduct.

25         THE COURT:  All right.  Mr. Weinberg?

1        MR. WEINBERG:  Thank you, Your Honor.  With regard to

2   the question of what difference did it make that he had to

3   plead to fraud, the Antitrust Division made a decision that

4   was universal.  It wasn't for this case.  It wasn't based on

5   the difference between Mr. Ghio and Mr. Northcutt.

6        Sometime in the fall or winter of 2009-2010, the Antitrust

7   Division decided from here on out, we are going to require

8   fraud pleas in all these bid rigging cases at the courthouse

9   steps and we're going to require defendants to stipulate to

10  the application of mail fraud guidelines.

11       Mr. Northcutt could have pled to mail fraud and testified

12  valuably as a defendant who pled to mail fraud and still been

13  sentenced under the bid rigging guidelines because under --

14       THE COURT:  I don't think you even have to go that

15  far.  I think he could have pled to bid rigging and testified

16  to other defendants that were charged with mail fraud just as

17  effectively as if he pled to mail fraud himself, because those

18  12 people in the box aren't sophisticated enough to understand

19  the difference and they didn't understand the difference when

20  it went to trial.

21       MR. WEINBERG:  Let me make another point about that

22  the requirement of a stipulation to fraud guidelines.  The

23  Guideline 2B1.1(c)(3) specifically says and said at the time

24  that if a fraud or falsehood is submitted and the conduct set

25  forth in the conviction establishes an offense specifically

1    covered by another guideline in Chapter Two, apply that other

2    guideline.

3         So if Mr. Northcutt on this information, which

4    incorporates the bid rigging allegations into the mail fraud,

5    if he had pled to that without stipulating to the mail fraud

6    guidelines 2B1.1(c)(3) would have required that he be

7    sentenced under bid rigging only.

8         The government added the requirement that he had to also

9    stipulate to mail fraud guidelines.  That's why we're arguing

10   under 3553.  We wouldn't have to if the government had simply

11   allowed him to plead to mail fraud and then he could have

12   said, well, Your Honor, 2B1.1(c)(3) says treat him as bid

13   rigging because that's all he really is.

14        The fraud was intended to the crime of bid rigging.  So

15   under 35353 and 2B1.1, if it were available to us, which it is

16   technically not because we plead to the information and the

17   plea agreement we were given, he really stands before this

18   court as somebody convicted of bid rigging.

19        His guidelines are 24 to 30.  The government then makes as

20   a 5K.1, which based on their evaluation is minus 40 percent,

21   and there is no reason to change that just because all of a

22   sudden they learn their guidelines are two levels less, and

23   that's where we fairly and realistically should be.

24             THE COURT:  But you are still asking the court to

25   impose a lesser sentence than what would have applied under

1    the guidelines with a 5K.1.1 motion had the charge been

2    strictly bid rigging.

3           MR. WEINBERG:  I am asking the court because of the

4    other 3553 factors, not just the nature and circumstances of

5    the offense, which this is really bid rigging.  You look at

6    Mr. Northcutt who has been in business and real estate since

7    1979.  This is the only blemish on his record.

8        For a period of less than a year, he and other people saw

9    an opportunity to make a little extra money, not by stealing

10   anything, but by keeping the banks from making money that they

11   could have made.

12       Just as the court observed, most of the these people,

13   including Mr. Northcutt, didn't think of it as a crime.  They

14   thought of it a scheme, opportunity.  Look what we can do

15   here.  They are stunned to find out that they committed a

16   federal level crime by saying, let's only give the banks what

17   they're asking for and no more.

18       But given his history, his absolutely unblemished career

19   otherwise, you have letters of recommendation from the

20   understanding members of the community.  He's created a viable

21   family having come from the most dysfunctional family

22   background.  I think you read about it.  I don't need to

23   repeat it, but he could not have come from a more challenging

24   childhood and family relationship and has created a loving and

25   sustaining family and a legitimate business.

1          Most of what he's earned and most of what is in his net

2    worth has come totally independent of the $614,000 he may have

3    made in this instance, so in looking at the history and

4    characteristics of the defendant, I would suggest that some

5    accommodation is appropriate.

6          And then on the question of disparity of sentencing,

7    Mr. Ghio, frankly, is not in a much different position than

8    Mr. Northcutt.  Mr. Ghio was in this from the very beginning.

9    He was the official note taker and record keeper.  He was the

10   first person to run in and talk to the government, but this

11   should not be a significant disparity between Mr. Ghio and Mr.

12   Northcutt.

13         They were in it from the beginning.  Mr. Ghio was there

14   every single day.  Mr. Northcutt and his partner were a little

15   more active in the bidding.

16             THE COURT:  A lot more active in the bidding.  I

17   think Mr. Northcutt could probably afford a fine of more than

18   a million dollars, don't you?

19             MR. WEINBERG:  Your Honor, first of all, what looks

20   like liquidity and looks like assets are not often

21   translatable, but it's also what's fair.  He's already been

22   asked to stipulate to $614,000 restitution.  It was a question

23   about whether restitution could or should or would have been

24   demanded.  If it had only been bid rigging he agreed to it.

25         On top of it now, the court is talking about fining him a

1    very large amount of money, which to get a million dollars, I

2    would think you would have to looking at fraud, which allows a

3    maximum of a million dollars fine, but this isn't really

4    fraud, or you would be looking at bid rigging, and, if so, you

5    would be exceeding the guidelines if you impose a fine of a

6    million dollars because his guidelines at 5 percent at the

7    volume of commerce --

8            THE COURT:  No doubt I'm exceeding the guidelines.  I

9    will tell you that the way they calculate those guidelines for

10   fines is unintelligible to me.  Arbitrary.

11       But the statutory maximum for him is $2 million; am I

12   right?

13           MR. WEINBERG:  You mean for both counts?

14           THE COURT:  For the counts he pled to.

15           MR. WEINBERG:  I understand.  I'm saying that is the

16   statutory maximum, but it would be well beyond his level of

17   culpability and criminality and well beyond what the offense

18   deserves.  He made, at most, $614,000.  He's paying that back.

19   A fine above that of a million, let alone two million is

20   unduly punitive.  It's disproportionate to his conduct, and we

21   ask you not to impose it.

22           MS. O'BRIEN:  If I might correct.  I apologize, but

23   my previous math on the fly was off.  I had forgotten when we

24   discussed before the role in the offense adjustment as

25   recommended in the plea agreement is three levels, which would

1   apply to either a bid rigging or fraud context.

2       So taking that into account, he would have been at a

3   higher level, a level 18, and our recommendation would have

4   been more, around 11 months, just for purposes of clarity of

5   the record.

6           THE COURT:  That clarifies a lot.  I just couldn't

7   understand why you would be telling me you would be down to

8   nine months based upon strictly the difference between bid

9   rigging and wire fraud.

10          MS. O'BRIEN:  My apologies on that.

11          THE COURT:  All right.  Mr. Northcutt, anything would

12  you like to say before the court pronounces judgment?

13          DEFENDANT NORTHCUTT:  Your Honor, I've obviously

14  learned very many things over the last seven years.  I

15  absolutely realize this is probably the largest mistake I've

16  ever made in my life.

17          THE COURT:  I would say so.

18          DEFENDANT NORTHCUTT:  Since then I have tried every

19  day to be a better person and to support many, many things in

20  my community as well as keep a loving relationship with my

21  wife, Louise, and most importantly set a role model for my son

22  Maxwell.  I am very, very sorry I got into this situation.

23  I'm sorry to take the court's time.  I only hope you will take

24  all of this into consideration.

25          THE COURT:  First, I'm satisfied you can afford a

1    fine of $1 million, and perhaps that's too low for the

2    circumstances.

3        Second, I think that you and Mr. Chandler were more

4    involved in this matter than the defendants I've sentenced so

5    far.  Just how much more, I don't want to characterize in

6    terms that are used by the guidelines because I don't want to

7    use a technical term wrong, but I think you were really the

8    moving forces in this scheme.  If the two of you had decided

9    not to be involved, I don't think it would have happened.

10        So the question is:  How much more does that require in

11    terms of punishment compared to the other defendants?

12        The sentence that I'm going to impose, I believe, reflects

13    that, not excessively, but I think sufficiently to send out

14    the message.

15        Pursuant to the Sentencing Reform Act of 1984, it is

16    therefore for the judgment of the court that the defendant,

17    Robert Northcutt, is committed to the custody of the Bureau of

18    Prisons for a term of seven months on each of Counts One and

19    Two to be served concurrent to each other for a total term of

20    seven months.

21        The defendant shall pay a special penalty assessment of

22    $200.  Payment to begin immediately.

23        The defendant shall pay a fine to the United States in the

24    amount of $1 million.  Payment to begin immediately.

25        It is further ordered that the defendant pay restitution

1   in the amount of $614,982.44.  That is to be sent to the clerk

2   of the court who will forward it to the victims to be

3   identified in the statement which will be filed by the

4   government and stipulated by the defendant in the amounts set

5   forth in that stipulation.

6       Upon release from imprisonment, the defendant shall be

7   placed on supervised release for a term of 24 months on each

8   of Counts One and Two to be served concurrently to each other

9   for a total term of 24 months.

10      Within 72 hours of release from the custody of Bureau of

11  Prisons, the defendant shall report in person to the probation

12  office in the district to which he is released.

13      While on supervised release, the defendant shall not

14  commit another state, federal, or local crime and shall

15  cooperate in the collection of DNA as directed by the

16  probation officer and shall comply with the standard

17  conditions which have been recommended by United States

18  Sentencing Commission and adopted by this court.

19      Is there any indication of any alcohol or drug problem

20  with this defendant?

21          PROBATION OFFICER:  No drug problem.

22          THE COURT:  I won't impose any special conditions

23  with that.

24      Mr. Weinberg, have you gone over the six special

25  conditions set forth on page 22 of the presentence report?

1           MR. WEINBERG:  I have, Your Honor.  I don't know if

2     the other probation reports had this, but we don't have

3     anything about staying away from convicted felons, and Mr.

4     Northcutt has ongoing business with Mr. Swanger and

5     Mr. Chandler and occasionally with other people, so I think

6     that would be an unreasonable condition.

7        It's been six and a half years that he has been involved

8     in some business with each of them, totally legal, totally

9     known to the government, totally upfront.

10          THE COURT:  All right.  It's a little bit different

11    than Mr. Ghio and Mr. Vanzetti because they are two partners

12    working together.  Now you're saying it's all these other

13    individuals.

14          MR. WEINBERG:  Just two.  Ken Swanger and sometimes

15    Wiley Chandler.  That's all.  Mr. Swanger and Mr. Northcutt

16    have ongoing business dealings.

17          THE COURT:  And they also have an ongoing lawsuit

18    with Mr. Katakis.  I don't want to intermeddle in that thing

19    because I'm the judge in it.

20        Any objection to the court allowing them to associate with

21    each other?

22          PROBATION OFFICER:  Your Honor, I don't think so.

23    Business relations would be okay anyway.

24          THE COURT:  All right.  So you can associate with

25    those individuals.  I am going -- so he is familiar with --

1   the court adopts the special conditions recommended by the

2   probation officer on page 22 of the presentence report,

3   imposes those all as special conditions with the modification

4   that the unpaid community service will be 300 hours.

5         You're already doing that type of thing, which is

6   commendable.  That will be completed during the term of

7   supervised release.

8         With regard to the fine, I assume that he has the right to

9   appeal; correct?

10          MS. O'BRIEN:  He does.

11          THE COURT:  You have a right to appeal from your

12  sentence insofar as it relates to the fine.  Again, I must

13  tell you that in determining the amount of the fine, I was

14  guided by the amount of the incarceration, and if the court

15  were not allowed to impose that fine, I would have to look

16  very hard again at the length of incarceration because it

17  might have been greater, would have been greater.

18          MS. O'BRIEN:  Just for purposes of clarity of the

19  record, based on the numbers in the plea agreement, the fine

20  range, according to the antitrust guideline under our

21  calculations would have 117,000 to 585,000.

22          THE COURT:  All right.  So that's less than the

23  sentence.

24          MS. O'BRIEN:  No, it's not.  Did Your Honor impose a

25  million dollars?

1              THE COURT:  Yes.

2              MS. O'BRIEN:  So the amount of the guideline range is

3    less than the what Your Honor imposed.  Just for purposes of

4    the appellate waiver, he would maintain the right to appeal.

5              THE COURT:  That's what I just said.  You must have

6    been reading something.

7              DEFENDANT NORTHCUTT:  May I start my community

8    service now and start getting credit for the 300 hours?

9              THE COURT:  Yes, sir.  That would be commendable.

10             PROBATION OFFICER:  Unfortunately, Your Honor, the

11   fees are not applicable until he starts supervision.

12             DEFENDANT NORTHCUTT:  You can supervise me now.

13             THE COURT:  See what we have to deal with?  It

14   becomes almost arbitrary.  Here's a man that wants to do his

15   community service and --

16             MR. WEINBERG:  Would the court consider allowing Mr.

17   Northcutt to serve this sentence in alternative confinement or

18   split sentence?

19             THE COURT:  No.  Anything else?

20             MS. O'BRIEN:  No.

21             THE COURT:  You want me to put it off to January 9?

22             DEFENDANT NORTHCUTT:  Yes.

23             THE COURT:  All right.  You are ordered to turn

24   yourself in to the institution selected by the Bureau of

25   Prisons by 2:00 p.m. on January 9th.  Keep in touch with your

1   attorney and the probation officer.  Make sure you know what

2   prison or institution has been selected.

3           DEFENDANT NORTHCUTT:  Not to take any more of the

4   court's time, I did read online that if the judge recommends

5   somewhere close to my residence, and if you could do that,

6   please.

7           THE COURT:  All right.  What is the request,

8   Mr. Weinberg?

9           MR. WEINBERG:  If appropriate, as near as possible to

10  Northern California.

11          THE COURT:  The court will recommend that Mr.

12  Northcutt be incarcerated at an institution as close to

13  Northern California as is consistent with security

14  classification and space availability.

15      Good luck.

16      We will take Mr. Jackson next.  The court has read the

17  presentence report in this matter from the probation officer

18  dated August 1st, 2016, and revised August 22nd, 2016.

19      Mr. Heller, have you received a copy of that report?

20          MR. HELLER:  I have, Your Honor.

21          THE COURT:  Have you discussed it fully with Mr.

22  Jackson?

23          MR. HELLER:  I have.

24          THE COURT:  Mr. Jackson, have you received a copy of

25  the final presentence report?

1              DEFENDANT JACKSON:  Yes.

2              THE COURT:  Have you discussed it fully with Mr.

3    Heller?

4              DEFENDANT JACKSON:  I have.

5              THE COURT:  Has the government received a copy of

6    this report?

7              MS. LINNETT:  Yes.

8              THE COURT:  Do you have any objections to the

9    findings in the presentence report with respect to the

10   sentencing guidelines?

11             MR. HELLER:  No objection.

12             THE COURT:  Does the government have any objections?

13             MS. LINNETT:  No, Your Honor.

14             THE COURT:  There being no objections to the findings

15   in the presentence report with respect to the sentencing

16   guidelines, the court adopts those findings and determines

17   them to be true and correct.

18        Accordingly, the court finds the applicable offense level

19   is 9 and the criminal history level is I.  That means the

20   guidelines are four to ten months.

21        The court has received the government's sentencing

22   memorandum and request for downward departure under 5K1.1 of

23   the sentencing guidelines.  The government asks for a sentence

24   of three months, special penalty assessment and criminal fine.

25        What would you like to say on behalf the government?

1          MS. LINNETT:  The government believes that a three

2     month sentence is sufficient but not greater than necessary to

3     comply with the purposes set forth in 18 U.S.C. 3553.  The

4     three months represents a 10 percent departure from the bottom

5     of the guideline range as calculated by the probation office

6     offense level 9 and that is for Mr. Jackson coming in and

7     cooperating in a timely manner and he did advance the

8     government's investigation.  He was willing to testify but was

9     not called upon to do so.

10          THE COURT:  The probation officer actually

11     recommended a one month sentence.

12          MS. LINNETT:  We believe that a three month sentence

13     is appropriate for some of the reasons that we've described

14     before, that some type of incarceration is an important

15     general deterrent for this type of crime.

16          THE COURT:  Do you really think once you get down to

17     this level that a sentence of one month in prison is much more

18     of a deterrent than a sentence of probation or do you think

19     three months is much more of a deterrent than one month?

20          MS. LINNETT:  Yes.  I think more has a more -- the

21     value of the deterrent depends on the amount of prison time,

22     so more is always going to be a greater deterrent.

23          THE COURT:  Well, I'm not sure of that.

24       Mr. Heller, would what you like to say on behalf of Mr.

25     Jackson?

1          MR. HELLER:  Several things.  The court was pondering

2     the 2R guidelines.  I had my thoughts about that and I did

3     some research a long, long time ago about the 2R guidelines.

4     When you read the advisory notes, I think it really

5     contemplated a prosecution of a corporation for bid rigging, a

6     real corporation, publicly-held corporation, than individuals

7     within the corporation.

8          That makes sense to me.  When I read the court shouldn't

9     consider community service, the court should always consider

10    imprisonment, when these guidelines were adopted in '87, prior

11    to that time -- and this goes back to when you look at the

12    Sherman Act and you think about its origin and what it

13    attempted to do as these major trusts that were controlling

14    every legislature, pretty much every legislature in

15    Pennsylvania and Texas.  The railroads controlled California,

16    it was attempted -- the purpose of it was to go at these big,

17    big conglomerates, and it proved fairly effective.

18         When the members of the Sentencing Commission tried to

19    craft something that made sense like with other areas where

20    they tried to craft mandatory guidelines, it really didn't

21    make sense to people that actually walked into a courtroom

22    representing either the government or representing defendants.

23    So I think that's the origin of it.

24         I think the fine rationale and -- I've listened to what

25    Your Honor has done with four people who are clearly far more

1    culpable than Mr. Jackson.  Mr. Jackson is on the bottom rung.

2    His profit was $20,000.

3        He cooperated early in 2010.  He stopped doing -- he had

4    five properties.  He stopped participating with this group

5    well before -- some months before he was ever interviewed by

6    the FBI, and he only got involved, as the government well

7    knows, because he was, essentially, economically extorted.

8        He was in the construction business when the bottom fell

9    out of the economy in 2008.  The home business just pretty

10   much evaporated.  New home business evaporated.  So he decided

11   to start buying foreclosed property, rehabbing it, and earning

12   money to support his family.

13       He got caught up in this because he was being forced out

14   of bidding at the courthouse in Stockton, because unless you

15   joined, you were out.  They kept up-bidding when he bid it.

16   Finally, he made a serious error in judgment and joined in,

17   and he didn't like the feel of that at all, and he bailed, and

18   then when the FBI visited him, he fully cooperated.  When the

19   government Antitrust Division sought to interview him, he

20   fully cooperated.

21       I have a different view of when the mail fraud was added

22   into this.  It seemed to be when the original prosecutor and

23   the U.S. Attorney's Office in this district was replaced by

24   Russell Carlberg.  Who was involved in this case --

25               THE COURT:  The U.S. Attorneys Office was never

1   involved in this prosecution.

2              MR. HELLER:  Yes, they were.

3              THE COURT:  Not when I've been in this case.

4              MR. HELLER:  In front of Judge Garcia.

5              THE COURT:  I didn't know this history.  Go ahead.

6              MR. HELLER:  Okay.  So Russell Carlberg, who I just

7   had the highest regard for as a prosecutor, was very adept in

8   mail fraud prosecutions, particularly in mail fraud case.  I

9   think his involvement brought mail fraud into these cases.  I

10  was thinking of the ham sandwich and conspiracy and federal

11  grand jury, but I think a mail fraud case is almost as broad

12  as a conspiracy charge in its scope.

13      This is kind of a reverse bid rigging because the whole

14  purpose of Sherman was protecting consumers.  I guess banks --

15  I don't believe banks are consumers, but they were the victim

16  of bid rigging in this case.  I don't think there's a dispute

17  about that, but the purpose of the statute was really to

18  protect consumers, where bid rigging raised the price of

19  consumer goods.

20      So we have a statute being used and now it's becoming more

21  of a flavor of the month because I'm involved in other bid

22  rigging cases in contract cases.  It's being used beyond its

23  purpose very much the way money laundering was going off drug

24  traffickers and now it's used for everyone and their sister.

25  That's been calmed down somewhat, but it rears its head.

1          THE COURT:  You're right.  They use mail fraud in

2    these mortgage cases when they could simply charge it under

3    another statute that had half the elements necessary to prove,

4    but for some reason they insist upon prosecuting them as mail

5    fraud or wire fraud case.

6          MR. HELLER:  I'm an old dog doing this.  I've seen a

7    lot in my 47 years.  This case, in my view, probation saw this

8    case from the evidence and we've had meetings with or a single

9    meeting with Probation Officer Moore and she recommended the

10   two level or minimal role and recommended a month on each

11   count concurrently.  This has caused him to lose his

12   contractor's license.

13         THE COURT:  What caused him to lose his contractor's

14   license?

15         MR. HELLER:  This offense.

16         THE COURT:  Not the probation officer's

17   recommendation?

18         MR. HELLER:  No.  Probation -- she did a wonderful

19   job in this case.  Some of the consequences of this are

20   tremendous for someone like Mr. Jackson.  So we have someone

21   who got forced into this, he went into it and committed a

22   criminal act.  He's forever going to regret getting involved

23   in this at the courthouse steps in San Joaquin County.

24       He wrote a letter to the court, which is attached, and I

25   quoted copiously from it in my sentencing memorandum because

1   when someone speaks in front of the court, sometimes they get

2   tongue tied with the enormity of all of this.

3       I'm not going to restate what is in my sentencing

4   memorandum because I think this is the kind of case after six

5   years, after being subject to continuing the case and

6   continuing the case with the possibility he may testify, and

7   for one reason or another it went on for a long time, he's

8   learned a lot, but more than that, he suffered a lot.

9       In terms of where he sits with a proportionality argument,

10  Your Honor, a sentence of probation is fair or the one month

11  on home detention, and then as the fine, he's been very

12  successful since he renewed his life when he first became

13  involved.  He's been very successful building homes and

14  remodeling homes.  His assets are substantial.

15      I could tell you I've had some shivers when the court's

16  comments regarding fines were presented, and our plea

17  agreement gives this court total, as the law gives the court,

18  control over everything.

19      We have a contract with the government.  The contract

20  doesn't bind the court.  Doesn't bind probation.  If we want

21  to be -- if we want to put the fine in proportion, his profit

22  was $20,000.

23      You've used factors of four times the profit.  I think the

24  last one was 1.6 to profit, approximately 1.6.  Math is not my

25  strong suit, but fine is recommended at 20, and then probation

1    used a .25 modifier, which put the fine at $20,800 or so in

2    the report.

3         To put things in proportion, I think if the court goes

4    four times the loss, that puts it around $80,000.  He could

5    certainly pay that fine.  I fully understand the court's view

6    about this, because for the longest time -- and I've not had a

7    mortgage fraud case in front of you, but I've had it in front

8    of every other judge in this district.

9         For some reason, I haven't been in front of you with

10   mortgage fraud, but in every single mortgage fraud case I've

11   seen prosecuted in every district that represented a

12   defendant, the big boys at the top never did a day in jail.

13   It was always the little people.

14            THE COURT:  What's your point?

15            MR. HELLER:  My point is I understand where you're

16   coming from.  If you want to propose a fine, I think it should

17   be in proportion to his amount of profit.

18            THE COURT:  Mr. Jackson, anything you would like to

19   say on your own behalf before the court pronounces judgment?

20            DEFENDANT JACKSON:  The letter -- I'm nervous.  The

21   letter I wrote the court which I'm assuming you had a chance

22   to read.

23            THE COURT:  I did, but there were so many of these,

24   let me make sure I refresh my recollection.

25            MR. HELLER:  It's Exhibit A, I believe, Your Honor.

1        THE COURT:  Yes, the one with the large front.  Yes,

2  I remember.

3        DEFENDANT JACKSON:  That was written from my heart

4  and I spent a lot of time with that.  To say that nervously

5  would be real difficult.  That's how I feel about the bad

6  decisions I made.

7        THE COURT:  Reading the presentence report and

8  listening to counsel and considered the dispositions in the

9  other cases, Mr. Jackson appears clearly to be the least

10  culpable of those defendants before the court today.

11     The guidelines come out the lowest and indeed the

12  recommendation of the probation officer is lowest.  As a

13  matter of fact, the probation officer recommends one month on

14  each count to be served concurrently.

15     In the court's view, one month, arguably, is not as great

16  a deterrent as a sentence of probation.  Everybody understands

17  that probation means that you walk a fine line for a period of

18  time, and if you violate the conditions of that probation, you

19  can be placed in prison for terms that people don't really

20  know until it happens.

21     A sentence of one month sounds like something one might

22  serve on a traffic charge.  So when you consider the

23  difference and what is to be gained by someone having to serve

24  a time in jail or prison, I do not favor a sentence of one

25  month over a sentence of probation, and so I am persuaded by

1    the probation officer's recommendation, but I am going to opt

2    for a different approach.

3        As I sit here, I'm considering the appropriate fine to

4    impose.  It's sufficient, I think, but not too excessive.  In

5    considering the community service together with it, I think it

6    is a fair, just sentence considering all of the necessary

7    factors.  For the reasons I've stated, probation is available

8    and I think we all now agree.

9        Pursuant to the Sentencing Reform Act of 1984, it is the

10   judgment of the court that the defendant, Gregory Jackson, is

11   placed on probation, and I'm going to ask the probation

12   officer, because I haven't previously, to recommend a term of

13   probation.

14        PROBATION OFFICER:  Your Honor, we'll submit it on

15   the recommendation of 24 months on each count to run

16   concurrent.

17        THE COURT:  I'm going to make it longer than that

18   because I want him to serve some community service.  I'm going

19   to make it three years, probation for a term of three years.

20        He shall pay a special penalty assessment of $200 to begin

21   immediately and the fine is going to be $150,000.  That's to

22   be paid immediately.

23        It is also ordered that the defendant pay restitution, and

24   the amount of restitution in this matter shall be $20,900.

25   That shall be paid to the clerk of the court who will forward

1    it to the victims or victim to be described in the statement

2    to be filed by the United States Attorney pursuant to

3    stipulation with defense counsel.

4         The conditions of probation will be those that were set

5    forth in the presentence report, including the standard

6    conditions of release recommended by the United States

7    Sentencing Commission and adopted by this court, and the

8    condition that he not commit another federal, state, or local

9    crime.

10        The condition that he cooperate in the collection of DNA

11   as directed by the probation officer, and conditions 1 through

12   6 of the special conditions on pages 22 and 23 of the

13   presentence report.

14        Mr. Heller, have you gone over those with Mr. Jackson?

15             MR. HELLER:  Yes.

16             THE COURT:  The modification is that I want him to

17   complete 500 hours of community service.

18        Now, Mr. Jackson, this is the kind of thing you do when

19   we're talking about rehabbing houses and that type of thing;

20   right?

21             DEFENDANT JACKSON:  Yes.

22             THE COURT:  I want you to do more.  You're not going

23   to be in prison or jail for any time.  In exchange for that,

24   in addition to paying the fine, I want you to do some more

25   good for the community.  When you're out there, if you think

1    it's a little bit longer than you should have had to work for

2    community service, just think it's a lot better than being in

3    jail.

4         Now, is there anything else?

5              MS. LINNETT:  The fine that you've imposed is above

6    the guidelines fine range, which has the maximum at $44,050,

7    so under the plea agreement, Mr. Jackson can appeal that

8    aspect of the sentence.

9              THE COURT:  You want to waive your right to appeal or

10   do you want me advise him of his right to appeal?

11             MR. HELLER:  Waive the right to appeal.

12             THE COURT:  All right.  Anything else?

13             MS. LINNETT:  Nothing further.

14             MR. HELLER:  Thank you, Your Honor.

15             THE COURT:  Maybe we should take a 10 to 15 minute

16   recess before we take the next case.

17        (A break was taken at 2:40 p.m.)

18        (On the record. 2:55 p.m.)

19             THE COURT:  We will proceed next with Mr. Olmstead.

20   The court has received the presentence report made available

21   August 1st and revised August 22nd, 2016.

22        Mr. Ellis, have you received a copy of this report?

23             MR. ELLIS:  I have, Your Honor.

24             THE COURT:  Have you discussed it fully with

25   Mr. Olmstead?

1                    MR. ELLIS:  I have, Your Honor.

2                    THE COURT:  Mr. Olmstead, have you received a copy of

3      this report?

4                    DEFENDANT OLMSTEAD:  Yes, Your Honor.

5                    THE COURT:  Have you discussed it fully with Mr.

6      Ellis?

7                    DEFENDANT OLMSTEAD:  Yes, Your honor.

8                    THE COURT:  Has the government received a copy of

9      this report?

10                   MS. LINNETT:  Yes, Your Honor.

11                   THE COURT:  I have received your memorandum in aid of

12     sentencing, Mr. Ellis.  With respect to the calculation of the

13     guidelines, do you have any objections to the findings in the

14     presentence report?

15                   MR. ELLIS:  To the guidelines, no.

16                   THE COURT:  Does the government have any objection to

17     the calculation of the guidelines?

18                   MS. LINNETT:  No, Your Honor.  I agree with the

19     calculations.

20                   THE COURT:  All right.  There being no objections to

21     the findings in the presentence report with respect to the

22     sentencing guidelines, the court adopts those findings and

23     determines them to be true and correct.

24          Accordingly, the courts finds the applicable offense level

25     is 3 and the criminal history category is VI.  Now, that

1  places the guidelines between 24 and 30 months.  I'd like when

2  you address the court to address the criminal history category

3  as well as whatever else you want to say.

4      The court has received the government's sentencing

5  memorandum and motion for downward departure which recommends

6  that the court sentence Mr. Olmstead to a sentence of

7  21 months in prison plus a special penalty assessment and

8  fine.

9      What would you like to say on behalf of the government?

10      MS. LINNETT:  Yes, Your Honor.  The government does

11  make a motion for a 5K departure based on Mr. Olmstead's

12  substantial assistance to the government's investigation.  His

13  cooperation was timely and it did advance the government's

14  investigation.  He was willing to testify, but was not called

15  upon to do so.

16      Therefore, the government recommends a 10 percent discount

17  off the bottom the guideline range 13, criminal category VI,

18  which is the 24 months Your Honor cited, and that leads to a

19  21 month sentence.  We understand that that is more than has

20  been imposed so far.

21      The defendants -- but a contributing factor is the

22  criminal history, and the government can't negate the effect

23  of that criminal history.  The eight points that probation

24  calculated do not overstate the seriousness of repeatedly

25  driving under the influence.

1          He committed the current offense while on probation from

2     one of those offenses, and he drove again under the influence

3     after pleading guilty in this case.  That exhibits a lack of

4     respect for the law and puts the community at risk.

5                    THE COURT:  It does.  I'm curious here, the

6     dispositions of these DUI don't seem to get much worse as time

7     goes on.  It looks like the last one he only got five years

8     probation and one year in jail suspended.

9          Does that mean straight probation?

10                   MR. ELLIS:  It was conditioned on successful

11    completion of the Henry Ohloff long-term one-year inpatient

12    rehab treatment.

13                   THE COURT:  Inpatient?

14                   DEFENDANT OLMSTEAD:  Yeah, I went to a program.

15                   MR. ELLIS:  Yes.

16                   THE COURT:  One year in a hospital?

17                   MR. ELLIS:  It's the Henry Ohloff Rehabilitation

18    Center in San Francisco, one of the leading programs in the

19    city.  It's an intensive long-term program one year long which

20    Mr. Olmstead completed.

21                   THE COURT:  Is it outpatient or inpatient?

22                   MR. ELLIS:  Inpatient.

23                   THE COURT:  So it does appear that at least the

24    treatment of this has gotten more aggressive as time went on.

25    Is that primarily the criminal history category for the reason

1   for your recommendation which is more than the other

2   defendants?

3          MS. LINNETT:  Yes, Your Honor.  It's based on the

4   criminal history category.

5          THE COURT:  Mr. Ellis, what would you like to say on

6   behalf of the Mr. Olmstead?

7          MR. ELLIS:  Well, first, Your Honor, regarding

8   culpability.  Mr. Olmstead appears to be more culpable than

9   Mr. Jackson but less than Mr. Rose, who will be coming up

10  shortly for sentencing, in that he profited from his offense

11  somewhere between $26,000 plus and $29,000 plus.

12     He was, according to the government, and I agree, a

13  reluctant participant.  He was essentially strong-armed by

14  Northcutt and Chandler to get involved.  In fact, one of the

15  people mentions in the FBI reports that he told Mr. Olmstead

16  he was surprised he was not found in a ditch by this time

17  because at first he was so reluctant to get involved.

18     He succumbed to the strong-arm tactics and got involved.

19  To his credit, he got out before anybody else, before he knew

20  he was under investigation in July of '09, and in October of

21  '09, he was immediately contacted by the FBI and he

22  immediately started cooperating and sat through three

23  debriefings about 30 pages of total FBI reports, and yet

24  Mr. Chandler gets a two level downward adjustment for minor

25  role.

```
 1              THE COURT:  Mr. Chandler?
 2              MR. ELLIS:  Your Honor.  Mr. Jackson.  I apologize.
 3    The same for Mr. Rose, and yet Mr. Rose gained more from than
 4    this than Mr.  Olmstead did.  We agreed in the plea
 5    agreement --
 6              THE COURT:  I don't know that Mr. Rose gained more
 7    than Mr. Olmstead.  As far as I can tell, Mr. Olmstead gained
 8    some $32,000 and Mr. Rose some $24,000.
 9              MR. ELLIS:  I have Rose 46,000 is the figure I have.
10              MS. LINNETT:  It's 24,000.
11              MR. ELLIS:  Jackson is 20,000, Rose is 24,000, and
12    Olmstead is somewhere between 26 and 29.
13              THE COURT:  32.  What did he profit?
14              MS. LINNETT:  Well, now we've calculated it to be 29.
15    That's the government's position.
16              THE COURT:  29 instead of 32?
17              MS. LINNETT:  That's correct.
18              MR. ELLIS:  In that same range.  That's why we're
19    seeking a two level variance in his offense level.
20              THE COURT:  He is even going to be able to make
21    restitution?
22              MR. ELLIS:  Well, I've got a check for $12,000 back
23    at my office.
24              THE COURT:  I heard about that, but that's not
25    $29,000.
```

1          MR. ELLIS:  He's not in the best of shape and I have

2     attached to my reply memorandum a current financial net worth

3     statement showing he is a negative net worth at this point.

4          THE COURT:  So where is the punishment then if I give

5     him a sentence of even close to what I gave Mr. Jackson?  He's

6     profited some $29,000.  He's going to pay back 12 of it.  He

7     makes a profit and he doesn't have to pay for it.

8          MR. ELLIS:  I'm not arguing for the same sentence as

9     Mr. Jackson.  I'm asking the court to impose a split sentence

10    of five months incarceration, followed by supervised release,

11    with the condition of five months home confinement, but, in

12    particular, intensive supervision regarding his alcohol

13    problem, which has never happened before.

14         THE COURT:  You mean the one year inpatient treatment

15    didn't cure his alcohol problem?

16         MR. ELLIS:  It did not.  Your Honor, as the court is

17    well aware, it's a vicious disease, relapse, unfortunately, is

18    part of it.  It's not like he's not done anything.  He's been

19    in two treatment programs.

20         THE COURT:  But it's not this court's business to

21    provide medical care.  His alcoholism didn't have anything to

22    do with this offense, did it?

23         MR. ELLIS:  To a certain extent he succumbed because

24    his judgment was clouded because of his use of alcohol, yes.

25    I can't say but for, but it certainly contributed, yes, which

1   is why we're asking for a sentence under 5C1.1 note 6, which

2   is a penal and therapeutic sentence.  Let's make sure that

3   he's kept on a straight leash.

4          THE COURT:  I don't know what this court could or

5   should give him by way of treatment that he hasn't already

6   received in the course of all of these sentences he received

7   for driving under the influence of alcohol.

8          MR. ELLIS:  Frankly, Your Honor, some of these

9   sentences in state court were Mickey Mouse sentences.

10          THE COURT:  Not a year in inpatient treatment.

11   That's not Mickey Mouse.

12          MR. ELLIS:  No, it is not, but nothing like being

13   under the supervision of U.S. Probation to make sure that

14   you...

15          THE COURT:  Do what?

16          MR. ELLIS:  Stay clean and sober.  He's been in

17   treatment with a psychiatrist 24 months.  Every month.  I

18   realize the court is not -- can't do much about his

19   alcoholism, but a sentence that I'm suggesting with strict

20   supervision, testing -- Your Honor, we have an acceptance from

21   the SCRAM Intercept Program, which will put an ankle bracelet

22   on him that will monitor any alcohol in his system whatsoever

23   including after shave lotion.

24      I'm suggesting along with his continued treatment, it's a

25   program with supervision by U.S. Probation hopefully will

1    work.

2              MS. LINNETT:  May I be heard?

3              THE COURT:  Yes.  I would like to hear what you have

4    to say.

5              MS. LINNETT:  I'm a little confused about the assets

6    that Mr. Olmstead did report in the one-page filing.  He

7    combines his personal assets with what appear to be business

8    assets.  He seems like he personally owns an apartment complex

9    in Arizona.

10      And in his statement of net worth in this one page, he

11   reports his assets combined with the business, the business

12   has money in the bank, but it appears to have an outstanding

13   loan to Mr. Olmstead's mother, who, there is a question, did

14   Mr. Olmstead personally guarantee this loan.

15      There's no mention of income or revenue as to the business

16   and it's just hard to untangle what actual money there is.

17             THE COURT:  All I know is what I can read in the

18   presentence report which doesn't give me a lot of information

19   and, frankly, doesn't even give me the information that you

20   just described.

21             MR. ELLIS:  And recommends against a fine.  Right

22   now, as I understand it, he's working on rehabbing a house,

23   buildings in the city, San Francisco, in the Mission area, and

24   when completed, it should turn a modest profit of about

25   $300,000, affordable housing.

1          MS. LINNETT:  It's the defendant's burden to prove

2     not only inability pay a fine right now but inability to pay a

3     fine in the future.  So if Mr. Olmstead has this potential to

4     have access or income in the future, then a fine would be

5     appropriate.

6          THE COURT:  Is that what you're saying?

7          MR. ELLIS:  I can't argue with that, Your Honor.  In

8     all fairness, we're talking about the government's recommended

9     a $20,000, almost 30,000 restitution, and on top of that a 21

10    month sentence.  That seems a bit much when compared to the

11    other people sentenced today.

12         THE COURT:  I haven't heard anything about any other

13    defendant having a drug or alcohol problem that requires

14    treatment and that you want the court to address.  That's the

15    difference.

16         MR. ELLIS:  Yes.  I'm saying it could be addressed

17    through supervised release.  There should be some punishment

18    and I think five months imprisonment would be sufficient, but

19    a long-term period of supervised release with stringent

20    conditions.

21         THE COURT:  All right.  Mr. Olmstead, anything you

22    would like to say on your own behalf?

23         DEFENDANT OLMSTEAD:  Yes, I would, Your Honor.  This

24    has been an absolute devastating experience for my family --

25         THE COURT:  What has?

 1              DEFENDANT OLMSTEAD:  Being -- the offense that I

 2    committed.

 3              THE COURT:  Why is it more devastating than all of

 4    these DUI convictions and going away for a year for inpatient

 5    treatment?  Why is this more devastating than that?

 6              DEFENDANT OLMSTEAD:  That's part of the problem of

 7    what I think is evidence of how devastating it was simply

 8    because my family has had an impeccable reputation.  I come

 9    from a small town originally, and the shame and how I

10    besmirched my family's name --

11              THE COURT:  Which is more shameful for your family,

12    all these DUI convictions or an antitrust charge?

13              DEFENDANT OLMSTEAD:  It's the shame I feel, Your

14    Honor.

15              THE COURT:  Which is more?

16              DEFENDANT OLMSTEAD:  It's equal.  When this case came

17    upon me, I -- handling it by drinking is not appropriate and

18    driving.  I was absolutely overwhelmed.  My father died during

19    this period.  It caused my mother great pain and what it's

20    done to taking from society and succumbing to a scheme that I

21    shouldn't have.  I should have been stronger.

22        That's the lesson I get out of this is that, you know,

23    when one develops a business model and then succumbs to what

24    everyone else is doing, that's weak.  It's weak and no

25    different than the DUIs.  That's what I've learned from this,

1  and I'm hopeful that that will be taken into consideration

2  that I've learned from this.

3      It will never happen again.  I realize that if I'm going

4  to be -- at any point if I'm given the opportunity to continue

5  in business, which is why primarily -- it's what I do.  It's

6  all I've known.  That I will have learned that I need to

7  follow what my family has taught me and not deviate from the

8  value system that was instilled within me and just fall into

9  line with the crowd just to get along.

10         MR. ELLIS:  Your Honor, at the beginning of all the

11  proceedings you talked about justice delayed is not justice

12  and the anxiety of the defendant is very important to the

13  court.  I have a witness, Mr. MacNutty, a long-term friend --

14  he's an attorney -- who can tell the court about the anxiety

15  and the triggers of why it caused Mr. Olmstead to continue to

16  drink during these six years waiting for this thing to

17  resolve.

18         THE COURT:  I'll hear anything you want to present.

19  I have no doubt, though, that the weight in this case caused

20  anxiety to Mr. Olmstead just as I have no doubt that it caused

21  as much anxiety to the other defendants in the case.  He's had

22  this drinking problem, as far as I can tell, before he was

23  charged in this case.

24         MR. ELLIS:  20 years.

25         THE COURT:  It's a question of what causes what.  He

1    would suggest to the court the fact that he was drinking had

2    an influence on the commission of this crime and now your

3    witness is going to suggest that the fact that he was charged

4    with this crime had an influence on his drinking.  It's just a

5    question of cause and effect.

6        I don't know what you want your witness to say, that being

7    charged with this offense had a very hard effect on him?

8             MR. ELLIS:  I think that and the six years that it

9    went on and on and on.  We thought we would be facing

10   sentencing two years ago and it got postponed because of the

11   Katakis Parker case.

12       Every time something happens in the case, like the

13   issuance of the draft presentence report, it triggers his

14   drinking.  That's why I'm suggesting the sentence I do with

15   the stringent supervised release period.

16            THE COURT:  So the probation officer recommends

17   supervised release for 36 months.  You're saying longer?  Five

18   years?

19            MR. ELLIS:  Why not.  Let's see if we can't -- yeah.

20   Certainly protect the public for a longer period of time if

21   he's wearing that bracelet and continuing treatment.

22            THE COURT:  Anything else that anybody else would

23   like to say?

24            MS. LINNETT:  No, Your Honor.

25            THE COURT:  The probation officer recommends that no

1   fine be imposed and I'm inclined to adopt that recommendation,

2   not for the reason that Mr. Olmstead should not be required to

3   pay a fine, but for the reason it doesn't appear he's able to

4   pay a fine.  What he anticipates in the future is somewhat

5   speculative and I don't want to burden the government and the

6   probation officer with trying to collect money that isn't

7   there.

8        With regard to the length of time, it's not the court's

9   responsibility to treat his alcoholism.  Experts have

10  attempted to do so, and, apparently, with mixed or no results.

11  It is the court's function to make sure that society is

12  protected from Mr. Olmstead while he's on supervised release

13  or other supervision of the court and I'm going to do that.

14       But in order to impose a sentence that serves as a

15  deterrent to others without a fine, the court feels compelled

16  to see that he is in a jail or prison for a period of time

17  while society is being protected from him.

18       Therefore, pursuant to the Sentencing Reform Act of 1984,

19  it is the judgment of the court that the defendant, Walter

20  Daniel Olmstead, is hereby committed to the custody of the

21  Bureau of Prisons to be imprisoned for a term of eight months

22  on each of Counts One and Two to be served concurrently to

23  each other for a total term of eight months.

24       The defendant shall pay a special penalty assessment of

25  $200.  Payment to begin immediately.

1      It is further ordered that the defendant shall pay

2    restitution in the amount of 29 -- it's going to be determined

3    in a short period of time, I assume?

4            MR. ELLIS:  By the end of the week.

5            THE COURT:  By the end of the week.  I have to

6    include it in the judgment though because we're not going to

7    have a separate hearing.

8            MR. ELLIS:  I would ask the court to hold off the

9    issuance of the judgment until we get Your Honor the

10   agreed-upon figure, and also at that time I ask the court to

11   make a recommendation to the BOP as a place of confinement.

12           THE COURT:  Any reason I can't hold off filing of the

13   judgment until the end of the week?  I can impose it today.

14           MS. LINNETT:  No, Your Honor.  I would say -- we've

15   previewed the disputes over the value of his admission, and if

16   we were to proceed to restitution hearing, that would be,

17   essentially, the evidence as to those payments being received

18   in addition to other round notes and things.

19           THE COURT:  But this puts everybody in a difficult

20   position legally.  I either have to impose the restitution now

21   or later.  If I impose it now, I've got to impose it either in

22   the $26,000 amount or the $29,000 amount that each of you have

23   suggested.

24      If I want to impose it later, I don't know that I can

25   pronounce judgment today and then have a paper judgment that

1   adds anything or takes something away from it.

2          MS. LINNETT:  We could issue judgment now and

3   continue restitution for 90 days under the statute.

4          THE COURT:  I'm not doing that for anybody else.

5          MR. ELLIS:  We can get it done by Friday.

6          THE COURT:  Do you want to come back Friday and be

7   sentenced?

8          MR. ELLIS:  No.  Give Your Honor a restitution figure

9   by Friday.

10          THE COURT:  Is it worth $3,000 for you to do all

11   this?

12          MR. ELLIS:  No, Your Honor, it's not.  If Your Honor

13   wants to make it the government's figure I have no objection

14   to that.

15          THE COURT:  That's what I'm going to do then.  Since

16   there's no objection, the defendant shall pay restitution in

17   the amount of $29,687.34 to be paid immediately.  It will be

18   sent to the clerk of the court who will forward it to the

19   victims identified in the victim statement which will be filed

20   by the government in the amount set forth in that statement.

21          MR. ELLIS:  Could I ask the court just to refrain

22   from issuing the judgment until tomorrow so I could get back

23   for requested recommendation to the bureau?

24          THE COURT:  Yes.  I won't issue the written judgment

25   until tomorrow, but I'm pronouncing judgment today.

1              MR. ELLIS:  Thank you, Your Honor.

2              THE COURT:  The restitution is due during the term of

3     imprisonment at a rate of not less than $25 per quarter and

4     shall be paid through the Bureau of Prisons Inmate Financial

5     Responsibility Program.  The interest on the restitution is

6     waived.

7         Upon release from imprisonment, the defendant shall be

8     placed on supervised release for a term of five years on each

9     of -- five years on Count Two and three years on Count One.

10             PROBATION OFFICER:  Correct, Your Honor.

11             THE COURT:  To be served concurrently for a total

12    term of five years.  Within 72 hours of release from the

13    custody of the Bureau of Prisons, the defendant shall report

14    in person to the probation office in the district to which he

15    is released.

16        While on supervised release, the defendant shall not

17    commit another federal, state or local crime.

18        The defendant shall not possess a firearm, ammunition,

19    destructive device, or any other dangerous weapon, and shall

20    not illegally possess controlled substances.  I'm imposing

21    that condition which I did not impose on the others because of

22    his drinking problem.

23        The defendant shall cooperate in the collection of DNA as

24    directed by the probation officer and shall comply with the

25    standard conditions recommended by the United States

1   Sentencing Commission and adopted by this court.

2       Further, he shall refrain from any unlawful use of a

3   controlled substance.  He shall submit to one drug test within

4   15 days of release from imprisonment and at least two periodic

5   drug tests thereafter, not to exceed four drug tests per

6   month.

7       Mr. Ellis, have you gone over all of the 11 special

8   conditions listed on page 23 of the presentence report with

9   Mr. Olmstead?

10          MR. ELLIS:  Yes, Your Honor.

11          THE COURT:  The court adopts the 11 conditions

12  recommended by the probation officer on page 23 of the

13  presentence report and I point out to you that condition

14  number 7 is that, (Reading:)

15          As directed by the probation officer, the defendant

16          shall participate in a program of testing, breath,

17          urine, sweat patch, to determine if he's reverted to

18          the use of drugs or alcohol.

19      Condition number 8 is that, (Reading:)

20          He shall abstain from the use of alcoholic beverages

21          and shall not frequent those places where alcohol is

22          the chief item of sale.

23      "Abstain" means total abstention.

24      The court will recommend that Mr. Olmstead be incarcerated

25  at an institution in California as far as that recommendation

1   accords with security classification and space availability.

2      What about appeal?  Did he waive his right to appeal or

3   should I advise him?

4         MS. LINNETT:  He did waive his right to appeal with

5   that same limited language, but here there's no fine, so

6   there's no issue there.

7         THE COURT:  Anything else, Mr. Ellis?

8         MR. ELLIS:  Can I come back tomorrow with a

9   recommendation request?

10        THE COURT:  Recommendation of what.

11        MR. ELLIS:  A place of confinement to the Bureau of

12   Prisons.

13        THE COURT:  I did.

14        MR. ELLIS:  If I can give you by tomorrow a

15   particular facility.

16        THE COURT:  In Northern California?

17        MR. ELLIS:  In California, yes.

18        THE COURT:  I already recommended Northern

19   California, but if you want to be more specific, I can put

20   that in the judgment.

21        MR. ELLIS:  Yes.  I'll do that tomorrow.

22        THE COURT:  How about the date to turn himself in?

23   January 9th?

24        MR. ELLIS:  Your Honor, he's financing up this

25   project.  If it's not finished by the 9th, can we come back to

1    the court and advise the court and ask for a further extension

2    to surrender?

3              THE COURT:  You know, there's some case law I don't

4    necessarily -- I was going to say "understand."  Maybe why I

5    should say "agree with," where the United States Attorney's

6    Office in this district has taken the position that the court

7    loses jurisdiction and cannot extent the time for a defendant

8    to self-surrender.

9       I don't want to get into the situation where I've told you

10   I can do something and then have the government come back and

11   tell me I can't do it.

12             MR. ELLIS:  Can we make it April?

13             THE COURT:  April?  What is your position with regard

14   to that?

15             MS. LINNETT:  Well, standing here right now, my

16   position is it should be January.

17             THE COURT:  You have to tell me more.  What are these

18   projects?

19             MR. ELLIS:  Your Honor, can Mr. Olmstead address the

20   court?

21             THE COURT:  Yes.

22             DEFENDANT OLMSTEAD:  Your Honor, referring to the

23   spreadsheet, the exhibit that Mr. Ellis submitted, these are

24   the projects -- this is the project in San Francisco.  I

25   don't -- I have final inspections set up for the 20th of

1    September.  I should have the project completely ready on the

2    market for October, but I have no guarantee when it will sell.

3    It's a part of this balance sheet here of paying back my loan.

4           THE COURT:  That doesn't make a lot of sense to put

5    it over to April.  You're going to start trying to sell it in

6    October?

7           DEFENDANT OLMSTEAD:  Correct.

8           THE COURT:  And I'm saying you start to serve your

9    sentence three months after that.  That gives you a lot of

10   time to sell that property.

11          DEFENDANT OLMSTEAD:  I would hope that it can be sold

12   within that time period.

13          THE COURT:  Then that works out fine.  I'm ordering

14   that you --

15          DEFENDANT OLMSTEAD:  I don't know if I can.

16          THE COURT:  Well, nothing is certain in this world,

17   but I'm going to order that you turn yourself in to the

18   institution designated by the Bureau of Prisons by 2:00 p.m.

19   on January the 9th, and that is certain.

20      Anything else?

21          MS. LINNETT:  No, Your Honor.

22          MR. ELLIS:  No, Your Honor.

23          THE COURT:  Thank you.  We'll proceed with the

24   hearing on Mr. Rose.

25      The court has received the final presentence report made

1    available August 1st and revised August 22, 2016.  Mr. Ramsey,

2    have you received a copy of this report?

3              MR. RAMSEY:  Yes, I have, Your Honor.

4              THE COURT:  Have you discussed it fully with

5    Mr. Rose?

6              MR. RAMSEY:  Yes, I have, Your Honor.

7              THE COURT:  Mr. Rose, have you received a copy of the

8    final presentence report in your case?

9              DEFENDANT ROSE:  Yes, Your Honor.

10             THE COURT:  Have you discussed it fully with

11   Mr. Ramsey?

12             DEFENDANT ROSE:  Yes, sir.

13             THE COURT:  Now, Mr. Ramsey, I've received your

14   sentencing memorandum.  With respect to the sentencing

15   guidelines, do you have any objections to the findings in the

16   presentence report?

17             MR. RAMSEY:  Not with respect to the guidelines.  We

18   have two corrections with respect to other issues.

19             THE COURT:  What are those?

20             MR. RAMSEY:  First, Your Honor, has to do -- these

21   are minor -- at paragraph 76 and 85, there are two typos.  At

22   paragraph 76 in the second sentence, it reflects that Mr.

23   Rose moved to a particular city at 28 years old when it should

24   read 38.

25             THE COURT:  All right.

1          MR. RAMSEY:  And then with respect to paragraph 85,

2     it said that he has been a real estate broker and investor

3     since 1989.  I think those numbers were transposed.  It should

4     have been 1998.

5        And then -- those are the two minor corrections.

6          THE COURT:  That shows you've read the presentence

7     report.

8          MR. RAMSEY:  Yes, Your Honor, we try.  Then the other

9     correction -- it's not actually a correction, it's in addition

10    and this falls to me.  With respect to his net worth and his

11    income, we got our net worth paperwork to the pretrial

12    services a little bit late, so I apologize for that, but I

13    think it left out several liabilities.

14        To give it to you in the 36,000-foot level, it includes

15    the value of four homes that he has, but it leaves out the

16    cost of the mortgages, the liabilities of the mortgage.  So if

17    you see on page 16, Your Honor, about halfway, there are three

18    rental residences.

19        I'll wait for the court to get there.

20          THE COURT:  I see.

21          MR. RAMSEY:  There's three rental residences and a

22    primary residence under total assets.  With respect to

23    totality liabilities, they're not the equivalent mortgages.  I

24    can tell the court what those are.  We also set forward

25    those --

1          THE COURT:  Give me a couple of numbers so I can

2   compare them.

3          MR. RAMSEY:  The asset numbers are correct.  The

4   mortgages with respect to the four rental properties, the

5   one -- I'm sorry -- three rental properties.  With respect to

6   Harmonica Way in Boise, the remaining mortgage is $127,900.40.

7      With respect to the Canyon Ranch Street property in

8   Meridian, Idaho, it is $148,598.

9      With respect to the Mardia Street property in Boise,

10  Idaho, the remaining amount is $143,184.

11         THE COURT:  That would reduce the net worth by about

12  500,000?

13         MR. RAMSEY:  Plus he had an additional $922,000 on

14  his primary residence, so the total reduction would leave his

15  net worth actually $1.56 million.  That's the proper net

16  worth.

17         THE COURT:  All right.  Do you have any reason to

18  think that's incorrect?

19         MS. O'BRIEN:  I have no information to the contrary,

20  Your Honor.

21         MR. RAMSEY:  And the final correction -- I apologize,

22  Your Honor -- the annual income $300,000 a year.  That was his

23  annual income before this case.  His tax returns shows over

24  the past five years since this case has been going on, his

25  average income is $136,500.

 1          THE COURT:  All right.  Any reason to question that?

 2          MS. O'BRIEN:  No, Your Honor.

 3          THE COURT:  Then I will make those corrections.  And

 4   with those corrections, the court adopts the findings in the

 5   presentence report and determines that the offense level is 11

 6   and the criminal history category is I, which means that the

 7   guidelines are 8 to 14 months.

 8      The court has received the government's sentencing

 9   memorandum and motion for downward departure in which the

10   government recommends a sentence of seven months plus a fine

11   and special assessment.  The probation officer has recommended

12   a sentence of four months.

13      What would you like to say on behalf of the government?

14          MS. O'BRIEN:  Yes, Your Honor.  Our 5K motion did

15   outline our reasons for assessing the substantial assistance

16   at a 10 percent departure off the bottom of the guideline

17   range as determined by probation, which gets us down to seven

18   months.  We believe that departure is appropriate in this case

19   and so move.

20      Based on Mr. Rose and the order we have gone today, you

21   can see he's the eighth individual to plead.  He certainly

22   provided an interview and was willing to testify, but was not

23   called to do so.

24          THE COURT:  What was the government's reason for not

25   charging them all sooner?  You say he was the eighth person to

1    plead.  He was charged somewhere around a year later than some

2    of the earlier ones.

3          MS. O'BRIEN:  I cannot speak directly to being

4    involved in those negotiations.  We were dealing with people

5    in the order they came.  The eighth shows the order that they

6    came in to us.  Perhaps Mr. Ramsey could speak to that more.

7    I was not on the case at the time.

8          MR. RAMSEY:  I think as was discussed earlier by Mr.

9    Heller, there were some things that changed.  I don't know

10   exactly where, but we came fairly early in terms of attorney

11   proffers what information Mr. Rose had, because I think

12   everyone would agree at the bottom of the ladder and didn't

13   have the lengthy involvement that other folks did.

14      In this scheme, the information that he had available to

15   offer I think was less and then there became discussions about

16   this mail fraud count and whether he would have to plead to

17   that.  I think that was protracted, but in terms of the

18   information that he provided, it was definitely done in

19   multiple attorney proffers, some in person and some

20   telephonically very early on.

21      His date of plea may have been slightly later, but I think

22   Mr. Rose made himself available to cooperate and provide

23   information, not just with respect to San Joaquin County but

24   also with respect to the bits of information he had about

25   other counties immediately, and we conveyed that information,

1    but I think the actual plea date was later.

2        The discussions around the mail fraud count for Mr. Rose

3    has greater implications than I think for other defendants.

4    As I mentioned to the court earlier this morning, he has a

5    real estate license that's affected by that and that may have

6    dragged that out, but I think it was just a question of when

7    he was going to enter a plea, not a question of if.

8        As I said, he provided all the information that could help

9    the government's information that he had up front and early.

10            THE COURT:  How does the government compare the level

11   of culpability on the part of Mr. Rose to that of Mr. Jackson?

12            MS. O'BRIEN:  Your Honor, I think as we tried to

13   clarify in a prior proceeding, the loss amount we're looking

14   at here, which does equate to the stipulated restitution

15   amount, is just over $24,000.

16            THE COURT:  And just about $22,000 for Mr. Jackson;

17   right?

18            MS. O'BRIEN:  Just over 20,000.  I would say in terms

19   of relative culpability -- and I will point out the guidelines

20   here are based on the antitrust guideline which does base on

21   volume of commerce.  He has a smaller amount of home, five

22   homes valued at $1.13 million --

23            THE COURT:  Did he actually have fewer homes than

24   Jackson?

25            MS. O'BRIEN:  On the homes, he has five homes that he

1    purchased through the rigged process.  On the receipt of

2    payoffs, there are ten rigged auctions that he received

3    payoffs and the amounts of the payoffs are 24,000, so it's a

4    product of the amounts as well as the number.

5              THE COURT:  But with regard to the number of

6    purchases and the number that he received kickbacks from, how

7    does he compare to Jackson?

8              MS. O'BRIEN:  Let me check my notes, Your Honor.

9              MR. RAMSEY:  I believe he's the same, Your Honor.

10             THE COURT:  They look pretty close.  I just want to

11   see what the actual numbers are.

12             MS. O'BRIEN:  We're pretty close on the number of

13   homes that he purchased.  Jackson would have been at five, the

14   same as Mr. Rose.  On the number of properties where he

15   received payoffs, we have -- Mr. Rose is slightly higher at

16   ten versus Mr. Jackson.  We're not going to mince about that

17   and say they are relatively close.

18             THE COURT:  Anything else you wanted to say?

19             MR. RAMSEY:  Yes, Your Honor, a couple of things.

20   One, we really do see Mr. Rose's conduct itself being

21   equivalent of Mr. Jackson's.  I think the description that Mr.

22   Heller gave of Mr. Jackson's involvement in the scheme very

23   much mirrors Mr. Rose's.

24       Mr. Rose came to the courthouse steps intending to do

25   business legitimately.  He started to do business legitimately

1    and actually bid for homes on his own against the group.  When

2    he was doing that, the group coordinated bids against him, as

3    Mr. Heller said, to up-bid him.  Just like Mr. Jackson was

4    up-bid, Mr. Rose was up-bid.  He was physically surrounded and

5    told, essentially, bring your properties to us or go

6    elsewhere.

7         Unfortunately, he made the poor decision, the bad

8    decision, eventually, to participate.  He did participate.  He

9    participated for a limited period, a couple of months, never

10   felt good about himself, just like Mr. Jackson, and he

11   eventually removed himself from the scheme and told others

12   that he would not be participating any more.

13        And that happened just slightly before, I think, the

14   overall conspiracy ended, but he did have that confrontation I

15   know specifically with Mr. Marifat, and when he was told he

16   needed to pay out certain individuals, he was surrounded and

17   told this was going to be the last time.

18        The real point on that is he was pressured to join, he was

19   up-bid, he did join, he never felt comfortable, and did remove

20   himself.  Why he has a higher guideline range than Mr. Jackson

21   is really just the value of the five homes that he purchased.

22   They were slightly higher.

23        I think it was the same number, but placed him above

24   $1 million, which gave the two point adjustment under 2R1.1.

25   That range goes from one million to ten million.  He was at

1.1 million, and I believe Mr. Jackson was just below that.

An issue that I did want to raise with the court, but I won't belabor -- I think the court has seen our papers.  It has to do with Mr. Rose's expectation of the recommendation for a sentence.  He was -- the plea agreement said the government would recommend that he would be sentenced to the bottom of the guidelines.

There's a difference of -- about what constitutes the bottom of the guidelines.  We did believe that that includes all the ranges that would not require a variance or adjustment -- variance or departure, so we did believe that the seven months should be -- the government should recommend that be served in home confinement if it was that.

But we think a sentence that is more appropriate in line with Mr. Jackson.  If you want to address the actual conduct that is here, I think they are similar.  He has unique collateral consequences from having to plead to the mail fraud count.  As I mentioned, his real estate license is pretty much sure to be lost.

In addition to that, we understand the court's admonition of making sure people don't profit from their crimes. Mr. Rose, before we came to court today, did agree to a restitution amount.  We were not going to object to that.  We had an amount in the plea agreement that was actually smaller than the full restitution that was determined.

1          The government asked us if we would agree to it.  It's

2     only a couple hundred dollars, and we readily did agree to pay

3     that higher number of restitution.  It does disgorge him of

4     those amounts.

5          And with respect to fine, I know the government is

6     recommending $20,000, but given what the court has advised

7     previously, we, like Mr. Heller and Mr. Jackson, have looked

8     at the proportion.  I know several of the fines have been four

9     times the amount of restitution.

10         I know it was higher than that with respect to Mr.

11    Jackson.  I think Mr. Jackson's net worth is considerably

12    higher than Mr. Rose's.  Mr. Jackson's net worth, my

13    understanding was $5 million, where Mr. Rose is 1.56 --

14              THE COURT:  I don't think that is what it was.  Let

15    me look here.  I don't know where you're getting that.

16              MR. RAMSEY:  I spoke briefly to counsel --

17              PROBATION OFFICER:  5.4 million.

18              THE COURT:  Right.

19              MR. RAMSEY:  So his net worth is 5.4 million.

20    Mr. Rose is 1.4 million, obviously a third of that.  Several

21    of Mr. Rose's assets, you will see the IRAs to a tune of I

22    think about $450,000 are actually in IRAs.  There is a large

23    portion, about $600,000, which is with his primary family

24    residence.

25         So the availability of liquid funds that wouldn't sustain,

either affect his primary residence or sustain in addition to

the payments itself severe tax penalties for early withdrawals

are more limited.  That being said, a fine of four times his

restitution amount surely would send the message and exact

some pain to show that crime doesn't pay.

     We think that combined with probation, given at least the

understanding of what Mr. Rose believed would be the

recommendation and the probation officer's finding that

Mr. Rose, essentially, is inline with Mr. Jackson, I think

they're the only two defendants that probation found a minor

role adjustment for.

     So given their similarity in conduct, we think that -- a

sentence of probation, three years probation with that fine

would be sufficient and not more than necessary.

          THE COURT:  What about the community service?

          MR. RAMSEY:  He has done much community service so

that may very well be an area the court would want to assign

more.  150 hours of community service is recommended by

probation.  That may be an area where, as you said with Mr.

Jackson, Mr. Rose can think about while he's doing those extra

hours that it's a lot better than being in custody.

     I would also point out a unique family situation.  His

wife, who is in court today, has been in ongoing battle with

cancer.  We point out she's doing well, but she has some

physical conditions, sometimes on a daily basis, that make it

1    difficult for her to do day-to-day routine events.

2        They do have one 15 year old child, and so we don't expect

3    it will flare up.  We hope that won't flare, but there's a

4    unique situation that would make it a consideration that he be

5    available, so if the court was inclined to provide -- to give

6    some time, we would ask it be imposed in home confinement.

7        We do think probation is sufficient.  Also, home

8    confinement, we believe, was at least consistent with the

9    government's plea agreement that they recommend a sentence to

10   the bottom of the guidelines range and he is in a zone where

11   that was available.

12           THE COURT:  Mr. Rose, is there anything you would

13   like to say on your own behalf?

14           MR. RAMSEY:  He suffers from great anxiety, and

15   through this whole process, he worked hard on his letter to

16   the court to say -- he did express his remorse and his regret

17   at what he's done.

18       I wouldn't point the court to docket number 49-1.  It's

19   the exhibits to our sentencing memo.  It's page 3 to 4 of 47.

20           THE COURT:  Yes, Exhibit 4.

21           MR. RAMSEY:  Those are Mr. Rose's words.  He

22   expresses great remorse and how he regrets and he should have

23   been stronger and thought more about the decision he made

24   before it happened and not to have gotten engaged in this.

25       There are several other letters we pointed to that are

1   from friends of Mr. Rose where he has communicated openly with

2   friends about what he's done, about the mistake he made and

3   his regret from it.  He's not shied from it.  It's not

4   something he's tried to keep from friends or family.  He's not

5   only ashamed, but apologizes both to this court and his family

6   and his wife, in particular, who is here.

7       He has two friends who stayed through the lunch break who

8   both had submitted letters.  Unfortunately, they were not able

9   to stay, but they speak to the level of support and they

10  understand his level of remorse.

11          THE COURT:  There are a number of letters here.  Is

12  that right, Mr. Rose, you're going to submit it on the letter?

13          DEFENDANT ROSE:  Yes, sir, I have.

14          THE COURT:  Thank you.

15          MS. O'BRIEN:  Your Honor, if I might be able to

16  address the 3553 factors for just one moment.  We talked about

17  numbers of properties and the values of those properties, but

18  we do think that the guidelines do accurately reflect those

19  components in the guidelines.

20      While the defendant purchased less than five homes at the

21  rigged auctions and took less payoffs than the other

22  conspirators, those are reflected in the guidelines, as is his

23  minor role adjustment in the offense level that Your Honor

24  found, so we do stand behind that recommendation and point out

25  that those do already come into account.

1         As to the collateral consequences, we have discussed his

2    with Mr. Ramsey and we're willing to provide a letter stating

3    he's accepted responsibility and cooperated with the

4    investigation, and then it really is up to another body, so

5    I'm not sure that's a collateral consequence on his real

6    estate license.

7         Lastly, you have heard this a couple of times today, Your

8    Honor, but on the coercion or pressure to join the group,

9    that's been brought up so I feel I have to address it.  These

10   defendants made a clear choice to join.  Other people at

11   auctions did not.  There were other properties they could have

12   bid on.

13        I think what happened, they're calling it coercion, so it

14   really is, "if you can't beat them, join them" mentality to

15   make more money, and I think that should be reflected in the

16   seriousness of the offense.

17             THE COURT:  I have no doubt that the guidelines are

18   calculated correctly.  One of the defendants in his brief

19   discussed other court's remarks about the effect of loss

20   amount on the sentences and the undue influence or weight the

21   loss amounts have on the guidelines.  I don't need to

22   reiterate that.

23        The guidelines are accurately reflected, but the other is

24   sentencing factors have to be considered.  I don't have any

25   reason to vary substantially from the sentence imposed on Mr.

1    Jackson with a couple of minor differences.

2        Mr. Rose is in the same or similar situation Mr. Jackson

3    was, and many of the things I said with regard to his sentence

4    would apply here.  He doesn't have the same net worth as Mr.

5    Jackson and I'm taking that into account, but, otherwise, I

6    think they're very similar situations.

7        Pursuant to the Sentencing Reform Act of 1984, it is the

8    judgment of the court that the defendant, Robert Rose, is

9    hereby committed to the custody of the Bureau of Prisons to be

10   imprisoned for a term of -- excuse me.  He is hereby placed on

11   probation for a term of three years on each of Counts One and

12   Two to be served concurrently for a total term of probation of

13   three years.

14       He shall pay a special penalty assessment of $200.

15   Payment to begin immediately.

16       He shall a pay a fine to the United States in the sum of

17   $100,000.  That will begin immediately.

18       He shall pay restitution in the amount of $24,128.93.

19   Payment to begin immediately.  That will be sent to the clerk

20   of the court to the victims identified in the statement which

21   will be filed with the court and agreed by counsel in the

22   amounts agreed upon and set forth in the statement.

23       The terms of probation will be the same as those that were

24   set forth in the presentence report and recommended as

25   conditions of supervised release.

1    He shall not commit another federal, state, or local

2  crime.  He shall cooperate in the collection of DNA and comply

3  with the standard conditions which have been recommended by

4  the United States Sentencing Commission and adopted by this

5  court.

6    The mandatory drug testing condition is suspended based

7  upon the court's finding that Mr. Rose poses a low risk of

8  future substance abuse.

9    Mr. Ramsey, have you gone over special conditions 1

10  through 6 listed on page 24 of the presentence report with

11  Mr. Rose?

12         MR. RAMSEY:  I have, Your Honor, and I would have one

13  comment.

14         THE COURT:  All right.

15         MR. RAMSEY:  Yes.  With respect to community service

16  on special condition 6, we just ask that he be allowed to

17  serve that in Contra Costa where he lives.  There had been an

18  indication in San Joaquin, but we were going to ask --

19         THE COURT:  Do we have something like that in Contra

20  Costa County?

21         MR. RAMSEY:  We were thinking perhaps of Habitat for

22  Humanity there.

23         PROBATION OFFICER:  I'm sure there's a Habitat for

24  Humanity.

25         THE COURT:  I'm going to leave that to the probation

1   officer because I know they've done a lot of work identifying

2   appropriate organizations that these defendants could work for

3   and I don't know that we have as much information about Contra

4   Costa County, but I am going to order the 500 hours during the

5   three-year term of probation unpaid community service as

6   directed by the probation officer, and I'm hoping it will be

7   Habitat for Humanity or something like it and I'm hoping in

8   Contra Costa County.

9       If for any reason it can't, then I'm going to leave it to

10  the probation officer to set the specific terms of the

11  community service.

12          MR. RAMSEY:  Your Honor, one comment about the

13  standard conditions.  The standard conditions indicate that he

14  should not leave this judicial district without permission of

15  the court or probation.  I would ask that he be allowed to

16  travel to the Northern District.

17          THE COURT:  Yes, he will.  That will be part of the

18  conditions.

19          MR. RAMSEY:  Thank you, Your Honor.

20          THE COURT:  Has he waived his right to appeal?

21          MS. O'BRIEN:  Again, a partial waiver of appeal at

22  paragraph 7(b) in the plea agreement with a guideline fine

23  range of 20,000 to 56,600.  Your Honor's fine does go above

24  that, so he has a limited right to appeal the fine.

25          MR. RAMSEY:  Your Honor, I've spoken to Mr. Rose, and

1    he's willing to waive his right to appeal.

2              THE COURT:  Understood.  Anything else you want the

3    court to cover?

4              MR. RAMSEY:  No, Your Honor.

5              PROBATION OFFICER:  We are not recommending home

6    confinement; correct?

7              THE COURT:  No, no home confinement.  I said 1

8    through 6.

9              PROBATION OFFICER:  Thank you, Your Honor.

10             THE COURT:  Mr. Swanger now.

11             MR. PORTANOVA:  Yes, Your Honor.  William Portanova

12   representing Mr. Swanger, who is present.

13             THE COURT:  The court has received the final

14   presentence report in this matter available as of August 1st,

15   2016.  I don't believe it was revised after that.

16        Have you received a copy of that report, Mr. Portanova?

17             MR. PORTANOVA:  Yes, Your Honor.

18             THE COURT:  Have you discussed it fully with

19   Mr. Swanger?

20             MR. PORTANOVA:  Yes, Your Honor.

21             THE COURT:  Mr. Swanger, have you received a copy of

22   that report?

23             DEFENDANT SWANGER:  Yes.

24             THE COURT:  And have you discussed it fully with Mr.

25   Portanova?

1          DEFENDANT SWANGER:  Yes, Your Honor.

2          THE COURT:  Do you have any objection to the

3    calculation of the guidelines set forth in the presentence

4    report?

5          MR. PORTANOVA:  No, Your Honor.

6          THE COURT:  Does the government have any objections?

7          MS. LINNETT:  No, Your Honor.  I would like to point

8    out the presentence report that I have was filed on the 22nd

9    of August.

10          THE COURT:  All the others were, so I would think

11    that was true here, but I don't see.

12          MS. LINNETT:  It's document 42 in this case.

13          THE COURT:  I don't know what the number of it is.

14    Was it revised?

15          PROBATION OFFICER:  No.

16          THE COURT:  That's correct.  It was not revised.

17    There being no objections to the findings in the presentence

18    report with respect to the sentencing guidelines, the court

19    adopts those findings and determines them to be true and

20    correct.

21      Accordingly, the court finds that the applicable offense

22    level is 16 and the criminal history category is I.

23      Now, the court has received the government sentencing

24    memorandum and motion for downward departure in the conclusion

25    of which the government recommends that the defendant be

1    sentenced to a term of 12 months incarceration with a special

2    penalty assessment and fine.

3        What else would you like to say on behalf of the

4    government?

5            MS. LINNETT:  The government does move under 5K for a

6    reduction of 40 percent from the bottom of the guidelines

7    range for offense level 16, so that is a reduction from

8    21 months to a recommendation of 12 months.

9        Mr. Swanger did cooperate in a timely manner, sat for

10   interviews that advanced the investigation, and he was a key

11   witness at trial, on the stand for two days.  For this reason,

12   the government thinks that a 40 percent reduction is

13   appropriate.

14           THE COURT:  Mr. Portanova, what you would like to say

15   on behalf of Mr. Swanger?

16           MR. PORTANOVA:  Your Honor, we have something to add

17   to the statement of liabilities on the financial pages, pages

18   18 and 19 of the presentence report.  Some information we got

19   late to Probation Officer Linda Moore.  On his statement of

20   net worth, it neglected to include a mortgage that he has

21   responsibility for, which is $391,624.34.

22           THE COURT:  So Mr. Swanger is unique among the other

23   defendants before the court today in that he claims that he

24   received nothing from the round robins and that he was working

25   for Mr. Katakis, and, furthermore, he's unable to respond to a

1    judgment of a fine; correct?

2         MR. PORTANOVA:  Well, nobody is completely unable to

3    respond to a judgment of a fine, Your Honor.  We, of course,

4    urge the court to recognize his meager financial condition.

5    He does have a negative worth and cash flow, but, at the same

6    time, Mr. Swanger knows there are a lot of people that don't

7    have a lot of money that are forced to pay fines to the court

8    and he doesn't expect the court to grant him any special

9    dispensation in that regard.

10         THE COURT:  Well, in fact, there are not that many

11   defendants who are unable to pay a fine who received a fine.

12   Most of the time if it is determined to the satisfaction of

13   the court if the defendant can't pay a fine the court waives

14   the fine.  So it's unusual that the court would order a fine

15   be paid by a defendant who cannot and with reasonable

16   expectation would not be able in the future to pay a fine.

17      Are you saying he is able to fine or he might be able to

18   pay a fine?

19         MR. PORTANOVA:  Mr. Swanger has a job and he has

20   income.  The government and I have discussed a fine of

21   $20,000.  When we spoke with probation, we saw that probation

22   had recommended no fine, and, today, based on new information

23   I was able to share with the government, specifically

24   including that mortgage that was not reflected in the

25   probation report to show his true net worth, the government

1    and I talked about a fine of $5,000 as a possibility, but I

2    would ask the court to impose something between five and

3    $20,000.

4        Obviously given the time he has to make the payments on

5    it, he will make the payments.  For example, at the moment he

6    has a $6,500 a month alimony and child support payment and he

7    will make that payment and all the payments the court orders.

8        I don't believe anybody is truly judgment proof.

9            THE COURT:  How does the government see Mr. Swanger

10   in relation to the other defendants that have been sentenced

11   so far today in terms of culpability?

12           MS. LINNETT:  Well, Your Honor is correct.

13   Mr. Swanger is in a unique position.  Of the defendants today,

14   he was the only one doing his job appearing in the rounds on

15   behalf of somebody else and he didn't personally receive the

16   payoffs directly, although he did stand to profit from the

17   scheme ultimately because his compensation was based on a

18   percentage of profit once the houses purchased through the

19   rigged auctions were ultimately flipped.

20           THE COURT:  So it's unique, but not extraordinarily

21   unique, because there are others, for example, Mr. Ghio and

22   Mr. Vanzetti, who appeared on behalf of a partnership.  And,

23   as a matter of fact, even Chandler and Northcutt were there on

24   behalf of a partnership.  He was there on behalf of an

25   employer, but he got some financial remuneration in a

1    successful transaction.

2           MS. LINNETT:  Some, but not as much as some of the

3    partnerships that we've seen, where there was a more even

4    split of the partnership.

5           THE COURT:  Do you have any numbers for how much you

6    think his compensation was affected?

7           MS. LINNETT:  I believe it was under 5 percent of the

8    total profit.  Ultimately, once the houses were flipped and

9    compensation taken out that it was something between 2 and

10   5 percent.

11          THE COURT:  Of what?

12          MS. LINNETT:  Of the net profit.

13          THE COURT:  What was the net profit?

14          MS. LINNETT:  Well, for the Katakis organization,

15   ultimately I think it was in the millions.

16          THE COURT:  So?  Tell me what 2 and 5 percent of it

17   was?

18          MS. LINNETT:  I'm not sure what Mr. Swanger's

19   particular cut was because I'm not sure which ones he

20   participated in.

21          THE COURT:  Well, you're the one that would know.  In

22   other words, it's not so that he received no profit from these

23   deals.  He did receive a percentage.  You're saying it's a

24   percentage of millions.  So what is 5 percent of one million?

25          MS. LINNETT:  I don't want to represent that's what

1    his profit was because I don't actually know that figure.

2            THE COURT:  Why not?  He's a cooperating witness.

3    All you had to do is ask him.

4            MS. LINNETT:  Standing here right now, I do not have

5    that figure.

6            THE COURT:  Maybe Mr. Portanova can tell me.  I'm

7    trying to compare apples and oranges here, admittedly, because

8    I do have other people who profited directly, but when I have

9    somebody who profited indirectly, the best I can do is get

10   some sort of estimate of what that profit was.

11           MR. PORTANOVA:  May I speak for just 30 seconds?

12           THE COURT:  Yes.

13      (A conference was held between Mr. Portanova and Ms.

14    Linnett.)

15           MS. LINNETT:  So in speaking to Mr. Portanova, the

16   amount is 4 percent of about $350,000.

17           THE COURT:  Why did you say it was millions?

18           MS. LINNETT:  I was talking about the entire Katakis

19   organization profits.

20           THE COURT:  So 4 percent of what?

21           MS. LINNETT:  350,000.

22           THE COURT:  Which is not much.

23           MS. LINNETT:  I calculate that to be $14,000.

24           THE COURT:  Go back and finish what you were telling

25   me.  How do you see Mr. Swanger in terms of culpability

1    compared to the other defendants?

2           MS. LINNETT:  Well, he was involved in more rounds

3    than some of the defendants we've seen here today.  It was

4    closer to, I believe, 85 rounds.  The level of his involvement

5    in terms of actual physical presence was greater, but, as we

6    discussed, he was hired to do this job.

7       His culpability is also more indirect in that he was told

8    to be there and he participated willingly, knew what it was

9    about, but it wasn't as volitional as some of the other

10   defendants that you've seen here today who made that conscious

11   decision to partake in this behavior to get along for their

12   more direct profit.

13          THE COURT:  Katakis' theory in his motion for new

14   trial is that Mr. Swanger was doing this on his own and that

15   he was in collaboration with Chandler and Northcutt.

16      How do you know that isn't true?

17          MS. LINNETT:  I understand that's his theory.  The

18   government's position is that the evidence shows to the

19   contrary, that Mr. Swanger was doing a job for Katakis and

20   that the payoffs did get passed through.

21      At trial, there was testimony from a forensic accountant

22   that showed how that passthrough happened and it matched up

23   with Northcutt's ledgers of who was keeping track of the

24   payoffs owed and due from Katakis.

25          So that money did not stay with Mr. Swanger or even with

1    Mr. Northcutt and Mr. Chandler.  It did in the end pass

2    through to Mr. Katakis' organization.

3              THE COURT:  Do you think Mr. Swanger's sentence

4    should be greater or less -- I'm not asking you to agree or

5    disagree with sentences I've imposed -- but greater or lesser

6    than the sentences of Olmstead and Hutz, for example?

7              MS. LINNETT:  I do stand by my recommendation.

8              THE COURT:  I'm not asking you to agree with my

9    judgments, but in terms of ranking their culpability, who is

10   more culpable?

11             MS. LINNETT:  Depends on how you look at culpability.

12   I think he's more culpable in terms of time spent in the

13   rounds and in terms of volume of commerce affected and payoffs

14   that transmitted through this participation, but whether in

15   terms of culpability had the same direct motivation to be

16   involved in the activity, then I think he's less culpable.

17             THE COURT:  Anything else you would like to say on

18   behalf of Mr. Swanger?

19             MR. PORTANOVA:  Only that, Your Honor, he has worked

20   hard in the drug recovery community since he became clean and

21   sober in 2006 after having suffered himself through years of

22   addiction and he has been working very hard in the recovery

23   area ever since.  We have letters of support from the people

24   in the church and the recovery community attesting to how

25   hardworking he has been in that area and how effective he's

1    been.

2         In terms of Mr. Swanger's acceptance of responsibility of

3    what happened here.  He was hired to do a job, which was to go

4    to these round robins, which he did, and then when he was

5    asked about it by anybody, he told the truth about it since

6    the first time the question was asked of him many, many years

7    ago.

8         He testified at length at trial, as the government points

9    out for two days, and recently was asked to testify yet again.

10   Even though he has four or five civil lawsuits against him

11   right now because of his participation in the government's

12   prosecution and related events, he still chose to come to this

13   court and testify at a motion for a hearing on a new trial.

14        He could have taken the Fifth.  He could have avoided

15   testifying.  He was called, essentially, as a hostile witness

16   by Mr. Katakis' attorneys, and he took the stand and continued

17   to tell the truth.

18        He came into this case through a side door.  He had a job.

19   He got paid indirectly as the properties were later sold.  I

20   believe his culpability is lower and I believe his commitment

21   to his rehabilitation and the opportunity for him to do more

22   of that in the form of community service, whether in the drug

23   recovery community or Habitat for Humanity, I think Mr.

24   Swanger has a lot of work he can do to help the community.

25        I do not believe incarceration is warranted at this point,

1   again, in light of the amount of work he has put into helping

2   the government in this case.

3           THE COURT:  Mr. Swanger, anything you would like to

4   say on your own behalf before the court pronounces judgment?

5           DEFENDANT SWANGER:  Your Honor, I'm just so sorry for

6   my actions in 2009.  I am grateful because at that point in

7   time it brought me to my knees and I accepted Jesus Christ in

8   my life and from there I started a program called Celebrate

9   Recovery and I've been a minister leader for five year.

10      It's helped hundreds of people come through the doors to

11  work on themselves.  I am thankful for the path that God has

12  led me.  I'm truly sorry for my actions in 2009 and the harm

13  it has caused.

14          THE COURT:  Well, unfortunately, I don't think Mr.

15  Swanger is deserving of a sentence of probation.  Whether he

16  was working entirely for Mr. Katakis at Mr. Katakis' command

17  or whether was working in part for himself, it doesn't make

18  that much difference.

19      Even at the very least, he was making a percentage of the

20  profits that he acquired from Mr. Katakis in these deals and

21  he was involved in it, as the government points out, more than

22  several of the other defendants were.

23      The court is faced with an additional consideration here

24  that Mr. Swanger, through no fault of his own, cannot afford

25  to pay a fine of the magnitude that the other defendants have

1  been ordered to pay.  I'm not going to sentence him to any

2  more time because he can't pay the fine, but given those

3  considerations, I think a term of incarceration similar to

4  that imposed upon some of the other defendants is appropriate.

5        Pursuant to the Sentencing Reform Act of 1984, it is the

6  judgment of the court that the defendant, Kenneth Swanger, is

7  hereby committed to the custody of the Bureau of Prisons to be

8  imprisoned for a term of five months on each of Counts One and

9  Two to be served concurrently to each other for a total term

10  of five months.

11        The defendant shall pay a special penalty assessment of

12  $200.  The court believes that Mr. Swanger can and will be

13  able to pay a fine in the future, and, therefore, the court

14  will order that he pay a fine of $5,000 to the United States.

15        Upon release from imprisonment, the defendant shall be

16  placed on supervised release for a term of 24 months on each

17  of Counts One and Two to be served concurrently to each other

18  for a total term of 24 months.

19        Within 72 hours of release from the custody of the Bureau

20  of Prisons, the defendant shall report in person to the

21  probation office in the district to which he is released.

22  While on supervised release, the defendant shall not commit

23  another federal, state, or local crime.

24        Shall not possess a firearm, ammunition, destructive

25  device or any other dangerous weapon, and shall not illegally

1    possess controlled substances.

2         He shall cooperate in the collection of DNA as directed by

3    the probation officer and comply with the standard conditions

4    recommended by the United States Sentencing Commission and

5    adopted by this court.

6         Further, he shall refrain from any unlawful use of a

7    controlled substance.  He shall submit to one drug test within

8    15 days of release from imprisonment and at least two periodic

9    drug tests thereafter, not to exceed four drug tests per

10   month.

11        Mr. Portanova, have you gone over the special conditions

12   listed on page 24 and page 25 of the presentence report with

13   Mr. Swanger?

14             MR. PORTANOVA:  Yes, Your Honor.

15             THE COURT:  Mr. Swanger, have you read those and do

16   you understand them?

17             DEFENDANT SWANGER:  Yes, Your Honor.

18             THE COURT:  What is your occupation now?

19             DEFENDANT SWANGER:  Vice-president of Northern

20   California Investments.

21             THE COURT:  I'm going to order that he complete the

22   community service, but only 150 hours as recommended by the

23   probation officer.

24        The court imposes all of the special conditions listed on

25   those two pages as special conditions of supervised release.

1      Now, would you like the court to recommend an institution

2   in California, Northern California?

3           DEFENDANT SWANGER:  Northern California or

4   California, sure.

5           MR. PORTANOVA:  California.

6           THE COURT:  The court will recommend that Mr. Swanger

7   be incarcerated at an institution in California, but only

8   insofar as the recommendation accords with security

9   classification and space availability.

10     Has he waived his right to appeal?

11          MS. LINNETT:  There's the same limited waiver

12  provision, but it does not affect the fine.  The fine is

13  within the range.

14          THE COURT:  All right.  Is there anything else, Mr.

15  Portanova?

16          MR. PORTANOVA:  No, Your Honor.

17          THE COURT:  You're ordered to turn yourself into the

18  institution selected by the Bureau of Prisons by 2:00 p.m. on

19  January the 9th of 2017.  It would be a violation of your

20  pretrial release and also a separate crime if you should fail

21  to turn yourself in at that time in accordance with this

22  order.

23          MR. PORTANOVA:  Thank you, Your Honor.

24          THE COURT:  I will take Mr. Chandler.

25          MR. SANGSTER:  Edward Sangster for Wiley Chandler.

1          THE COURT:  Thank you for sitting through these other

2     matters.  The court has received the final presentence report

3     in Mr. Chandler's case made available August 1st, revised as

4     of August 22.

5        Have you received a copy of that report?

6          MR. SANGSTER:  Yes.

7          THE COURT:  Have you discussed it with Mr. Chandler?

8          MR. SANGSTER:  Yes, I have, Your Honor.  I will note

9     I did not provide him a copy of the report in light of his

10    difficulties reading, but I did discuss it exhaustively with

11    him and the court can confirm that with Mr. Chandler.

12         THE COURT:  And for all practical purposes read it to

13    him?

14         MR. SANGSTER:  Yes, Your Honor.

15         THE COURT:  Mr. Chandler, I understand you're unable

16    to read; is that correct?

17         DEFENDANT CHANDLER:  Yes.

18         THE COURT:  Did you have an opportunity to discuss

19    the presentence report fully with your attorney?

20         DEFENDANT CHANDLER:  Yes, sir, multiple times.

21         THE COURT:  You understand the contents of the

22    presentence report?

23         DEFENDANT CHANDLER:  Yes.

24         THE COURT:  Mr. Sangster, do you have any objections

25    to any of the findings in the presentence report with respect

1   to the calculation of the guidelines with respect to Mr.

2   Chandler?

3          MR. SANGSTER:  Yes, Your Honor.  We objected to the

4   four-level increase for his role in the offense as stated in

5   the objections filed with the court.

6          THE COURT:  Did you agree to the two level?

7          MR. SANGSTER:  We agreed to the three level in the

8   plea agreement and my understanding is the government abides

9   by that.  I objected to the recommended fine, but that's a

10  different subject and I'll deal with that later.

11         THE COURT:  Any other objections to the calculation

12  of the guidelines?

13         MR. SANGSTER:  No, Your Honor.

14         THE COURT:  So does the government agree or oppose

15  the objections?

16         MS. LINNETT:  We agree with the objections to role in

17  the offense.

18         THE COURT:  Very well.  With that modification, the

19  court will adopt the findings of the presentence report,

20  determines them to be true and correct, and finds that the

21  total offense level is 23 and the criminal history category is

22  I; is that correct?

23         MS. LINNETT:  Yes, Your Honor.

24         THE COURT:  Mr. Sangster, is that correct?

25         MR. SANGSTER:  Yes, Your Honor.

1           THE COURT:  That means that the guideline range is 46

2      to 57 months.  The court has received the government's

3      sentencing memorandum and request for downward departure in

4      which the government recommends a sentence of 27 months, a

5      special penalty assessment of $200 and $20,000 fine.

6         Would you like to say anything else on behalf of the

7      government in support of this motion or with regard to the

8      sentencing factors?

9           MS. LINNETT:  Yes, Your Honor.  In regards to the 5K

10     motion, the government does think that a 40 percent reduction

11     is warranted for Mr. Chandler's substantial assistance.  Even

12     though he came in relatively later post indictment, he had

13     particular information, particularly as to defendant Katakis.

14     He provided also the tape that Your Honor heard in trial as to

15     Mr. Longley.

16          THE COURT:  Mr. Longley was acquitted.

17          MS. LINNETT:  But it was an important piece of

18     evidence in that case at trial and Mr. Chandler himself was a

19     key trial witness for two days on the stand.

20          THE COURT:  You were not present at trial, were you?

21          MS. LINNETT:  I was present.

22          THE COURT:  How effective, how helpful do you think

23     Mr. Chandler was to you?  Do you think he was a good witness?

24          MS. LINNETT:  The government's position is that he

25     was a key trial witness.  He provided some unique information,

1   particularly as to the conversations he had on the phone with

2   Mr. Katakis, who was not physically present at the auctions,

3   and that was something that no other witness could testify to.

4           THE COURT:  Do you think the jury believed

5   Mr. Chandler?

6           MS. LINNETT:  I can't get into the minds of the jury,

7   but they did sustain a conviction.

8           THE COURT:  Well, do you think that was based on his

9   testimony or the other evidence in the case which was pretty

10  strong?

11          MS. LINNETT:  I can't answer that, Your Honor.  I do

12  think that also as to the defendant Mr. Parker, when

13  Mr. Parker testified, he pointed to -- at one point in his

14  testimony, he said, "You'll have to ask Mr. Chandler."

15      I think the jury did credit that particular statement when

16  Mr. Parker said, "You'll have to ask Mr. Chandler about the

17  reasons for why these payoffs were taking place."

18          THE COURT:  Well, that was not because he thought

19  Mr. Chandler was particularly credible.  That was because he

20  was blaming Mr. Chandler.

21          MS. LINNETT:  Be that as it may, I think it was

22  important to hear -- Mr. Chandler was a specter throughout the

23  trial, and I think it was important for the jury to be able to

24  hear from Mr. Chandler himself his view of the operations and

25  it was corroborated by other testimony at trial and by

1    documents submitted at trial.

2         THE COURT:  All right.  Mr. Sangster, is there

3    anything you would like to say on behalf of Mr. Chandler?

4         MR. SANGSTER:  Yes, Your Honor, a number of things.

5    In many respects, they echo Mr. Weinberg's comments from

6    earlier this morning as to Mr. Northcutt and it really has to

7    do with first and foremost whether or not he should be

8    sentenced for his bid rigging conduct or the mail fraud

9    conduct.

10        I briefed that extensively in my sentencing memorandum and

11   I don't want to cover it again.

12        THE COURT:  I just want to make sure that I'm not

13   missing something in your argument.  The court is familiar

14   with the case.  The facts that go to support the bid rigging

15   counts are exactly the same facts as go to support the mail

16   fraud counts with such minor exceptions of whether a letter

17   was sent that really don't have any impact on the culpability

18   of the defendant.

19        Other than technical aspects of how the guidelines are

20   calculated, do you think it makes as difference or am I

21   missing something?

22        MR. SANGSTER:  I don't think it makes a difference.

23   It is at its core a bid rigging case.  Maybe I didn't

24   understand the court's question.

25        THE COURT:  Maybe I went over this with Mr. Weinberg

1    and I'm going over it again with you, but tell me what you

2    think the guidelines would have been if it were charged purely

3    as a bid rigging count.

4              MR. SANGSTER:  24 months, under the stipulations

5    that -- 24 to 30 months.

6              THE COURT:  What would the government's

7    recommendation be if it was 24 to 30 months before the 5K

8    motion?

9              MS. LINNETT:  40 percent discount would be 14 months.

10             THE COURT:  Your present recommendation is, what,

11   12 months?

12             MS. LINNETT:  The present recommendation is

13   27 months.

14             THE COURT:  I'm sorry.  You're right.  Now, I'm not

15   going through these cases and arbitrarily taking a percentage

16   of what the government recommends and imposing that as a

17   sentence.  If you think I'm doing that, you're wrong.  I'm

18   looking at this independently.  I'm not bound by the

19   government's recommendation.

20        I am bound to accept their motion under Section 5K.1.1,

21   but I'm not bound with how much to depart.  I'm looking at the

22   factors.  To me, other than the calculation of the guidelines,

23   the factors are virtually no different, whether it was charged

24   as a mail fraud or bid rigging case.

25        You're coming here asking for something less than the

1    27 months that they're recommending.  Are you asking for

2    14 months?

3              MR. SANGSTER:  Your Honor, I think that would be in

4    accordance how the court has sentenced the other defendants.

5    That would be, in fact, be one of the longest sentences given

6    today, and I still think that one of the factors the court has

7    to consider is to avoid a disparity in sentences among people.

8              THE COURT:  But you're still asking for 14 months.

9              MR. SANGSTER:  That is correct, Your Honor.

10             THE COURT:  It doesn't make any difference how it

11   should be charged.  You shouldn't be so concentrated on how

12   this was charged.  You should be addressing all of the

13   sentencing factors that you think are relevant.

14             MR. SANGSTER:  So I would like to turn to those.  I

15   perhaps started with the wrong one.  Here we have a man who

16   has overcome an extraordinary disintegration of his family

17   life at really a key point when he was growing up.  He was

18   essentially abandoned and left to fend for himself through his

19   teenage years, which he did, but he not only had to fend for

20   himself, he had to fend for himself while dealing with what

21   could have been a debilitating learning disability.

22        He had some early brushes with the law, but since then has

23   led a pretty extraordinary life in terms of raising a family,

24   in terms of founding a business, building the business, having

25   a record of stellar employment.

1          Your Honor saw the letters from numerous people about his

2     charitable giving, his willingness to send one employee

3     overseas for medical treatment, his provision for food of

4     people who don't have it.  That was a theme that repeated

5     itself in the letters, which this is a guy who throughout his

6     life has kind of always taken care of or taken people under

7     his wings who needed it.  Here was a guy who certainly had a

8     grave departure from what his life had been.

9          He was not a guy who was a professional real estate

10    investor.  He didn't have a license.  He hadn't had any

11    training.  He got involved in something that he probably

12    should never have gotten involved in, and not only that, he,

13    along with others, steered it towards an unlawful path.

14          THE COURT:  But I think it's not giving him enough

15    credit, if you will, to say he did not have any training and

16    he shouldn't have been in this area.  He had more knowledge of

17    the market for homes in that area than any of the other

18    defendants.

19          MR. SANGSTER:  That's true.  He gained that during

20    this process.

21          THE COURT:  That's right.  And so just because he

22    didn't have any schooling, doesn't mean he shouldn't have been

23    in that area.  It's the fact that he went about this scheme

24    that brought him here, not that he got into this area of

25    practice.

1        But the testimony that I heard of all of these other

2   witnesses almost across the board was that he was the bully

3   out there.  He was the that came in and said, "There's a new

4   sheriff on the block."  He's the one that spearheaded this

5   whole thing.

6        I'm convinced that if it had not been for him, none of the

7   other defendants would have gotten involved in this.  That's

8   the impression you get from the testimony that I heard.  Sure,

9   there's a lot of nice things to be said about Wiley Chandler,

10  but that's something else that was said about him.

11          MR. SANGSTER:  Well, I think he's, in a sense, a very

12  easy and convenient person to throw in front of the bus.  The

13  people throwing him in front of the bus were professional real

14  estate investors.  They were professional real estate

15  salespeople, real estate brokers.

16       Most of them had been down at that courthouse for years.

17  They knew this business a heck of a lot better than Wiley

18  Chandler did.  I think their attempts to blame a guy who is,

19  essentially, a newbie for this are a little too convenient.

20          THE COURT:  I'm not saying they necessarily blamed

21  him, but the way they described his conduct was consistent

22  among all the witnesses that he was down there taking charge.

23          MR. SANGSTER:  I just find that difficult to accept

24  that you've got that many people with that much education and

25  that much training and that many licenses who are somehow

1    ensorcelled by Wiley Chandler.

2           THE COURT:  They were.

3           MR. SANGSTER:  That may have been what they said.  I

4    just -- I just have trouble reconciling that with the fact of

5    who was there.

6           THE COURT:  All right.  How about a fine?

7           MR. SANGSTER:  I think he has the ability to pay a

8    fine, Your Honor.  He doesn't have the same ability, he

9    doesn't have the same wealth that some of the people that have

10   come before you today, but the court posed the question

11   earlier this morning about a sliding scale between

12   incarceration and payment of fine.

13      He certainly can pay a fine.  He's already agreed to pay a

14   substantial amount in restitution.  I think the court should

15   consider the total financial obligations that he faces, but he

16   is a person who can pay a fine but he shouldn't both pay an

17   exceptional fine and end up as the only person who does a

18   multi-year term of incarceration.

19          THE COURT:  I don't know if he can afford the fine

20   that Mr. Northcutt has to pay.

21          MR. SANGSTER:  He couldn't.  But in terms of

22   punishing somebody, it's interesting to the extent I thought

23   the court was following a pattern in terms of fines and the

24   court was evaluating it as a percentage of people's net worth,

25   I think that's a reasonable way of imposing punishment; that

1   the court can decide if somebody has got a $5 million net

2   worth, they can pay a lot bigger fine.

3       Or it takes a lot bigger fine to punish them than it does

4   for somebody like Mr. Chandler whose net worth is about a

5   million three, the court can impose a fine and use that as a

6   means of deterrence to send a message rather than a lengthy

7   term of lengthy incarceration, but the court can send that

8   message and punish him with less money than somebody that has

9   several times his net worth.

10       THE COURT:  It may be, but if you look at this from

11   the outside, the kind of fine you're suggesting Mr. Chandler

12   could pay doesn't seem like much.

13       Could he pay a half million dollars?

14       MR. SANGSTER:  He would certainly do that in order to

15   get Mr. Northcutt's seven months in prison.  He would find a

16   way to do it.  He couldn't pay it immediately, but he's got a

17   business that he's built up and generates income, and given

18   sufficient time, he would pay it off.

19       THE COURT:  He's not going to buy his way out of

20   prison, so if you're telling me he is going to do this in

21   order to get Mr. Northcutt's term in prison, no, it doesn't

22   work that way.

23       MR. SANGSTER:  I understand that.  At the same time,

24   I don't want to volunteer him to pay a large fine.

25       THE COURT:  I'm not asking you volunteer.  You

1    answered my question.  He can pay it.

2              MR. SANGSTER:  Yes, Your Honor.

3              THE COURT:  I'm going to talk to the probation

4    officer for a moment.  Bear with me.

5         (A discussion was held off the record.)

6              THE COURT:  Anything else you want to say on behalf

7    of Mr. Chandler?

8              MR. SANGSTER:  Yes, Your Honor.  I don't think he

9    should have a lengthier prison term that Mr. Northcutt.

10             THE COURT:  Which was seven months?

11             MR. SANGSTER:  Yes, Your Honor.

12             THE COURT:  Mr. Chandler, anything you want to say on

13   your own behalf before the court pronounces judgment?

14             DEFENDANT CHANDLER:  Since this happened, I don't go

15   to the courthouse.  I don't buy real estate at all anymore.  I

16   just stay at the grocery store.  Doron Weinberg was mistaken

17   earlier when he stated I was still doing business with Rick

18   Northcutt.  I don't do any real estate and don't go down there

19   at all any more.  I just stay at the grocery store.  I'm very

20   sorry about everything and what happened.

21             THE COURT:  How much time do you spend in the grocery

22   store?  You own it, don't you?

23             DEFENDANT CHANDLER:  Yes.

24             THE COURT:  I'm thinking about community service.  Do

25   you have the time to go out and do some of the type of

1    community service that we've been talking about?

2              DEFENDANT CHANDLER:  Yes.

3              THE COURT:  Do you have time to do 500 hours?

4              DEFENDANT CHANDLER:  Yes, sir.

5              THE COURT:  Well, I'm in partial agreement with

6    several of the suggestions that have been made.  I'm not in

7    full agreement with any of them.  I think in terms of the

8    length of the sentence that Mr. Chandler is fairly on par with

9    Mr. Northcutt.

10        If anything, I think he's more culpable because there

11   can't be that much talk about the role he was playing out

12   there without there being a lot of truth to it.  We heard

13   credible testimony of how he was out there taking charge of

14   the proceedings and we heard testimony about his role in the

15   so-called round robins.

16        He was a moving force.  I'm not going to use any of the

17   terms described in the guidelines for leadership because I'm

18   not using it as a term of art, but he was a moving force in

19   this whole scheme that got everybody that's now here before

20   the court into trouble.

21        Now, I'm happy to hear that he's not in the business any

22   more.  I'm happy to hear that he is making a good living with

23   his family grocery store, but in terms of the amount of

24   incarceration, there isn't that much difference.  Chandler and

25   Northcutt were partners and I'm going to treat them fairly the

1   same with regard to that.

2       Northcutt has substantially more assets.  I just don't

3   think that the court can expect Mr. Chandler to pay the same

4   fine that Mr. Northcutt was ordered to pay, and so it's going

5   to be something less, but he says he can pay it.  I expect him

6   to pay it.

7       Pursuant to the Sentencing Reform Act of 1984, it is the

8   judgment of the court that the defendant, Wiley Chandler, is

9   hereby committed to the custody of the Bureau of Prisons to be

10  imprisoned for a term of seven months on each of Counts One

11  and Two to be served concurrently to each other for a total

12  term of seven months.

13      The defendant shall pay a special penalty assessment of

14  $200.  Payment to begin immediately.

15      The defendant shall pay a fine to the United States in the

16  amount of $500,000.  Payment to begin immediately.  During the

17  term of incarceration, the fine will be due at the rate of not

18  less than $25 per quarter and payment shall be made through

19  the Bureau of Prisons Inmate Financial Responsibility Program.

20      It is further ordered that the defendant shall pay

21  restitution in the amount of $614,982.44.  That will paid to

22  the victims identified in the victim impact statement that

23  will be filed by the government and agreed to by the defense

24  in the amounts set forth therein.

25      Restitution will be sent to the clerk of the court who

will forward it to the victims.  The payment of restitution
will also be due at the rate of not less than $25 per quarter
and paid through the Bureau of Prisons Financial
Responsibility Program.

Upon release from imprisonment, the defendant shall be
placed on supervised release for a term of 24 months on each
of Counts One and Two to be served concurrently to each other
for a total term of 24 months.

Within 72 hours of release from the custody of the Bureau
of Prisons, the defendant shall report in person to the
probation office in the district to which he's released.

While on supervised release, the defendant shall not
commit another federal, state or local crime.

Shall not possess a firearm, ammunition, destructive
device or other dangerous weapon, and shall not illegally
possess controlled substances.

He shall cooperate in the collection of DNA as directed by
the probation officer and shall comply with standard
conditions recommended by the United States Sentencing
Commission and adopted by this court.

The court will dispense with a mandatory drug testing
based upon his determination that Mr. Chandler poses a low
risk of future substance abuse.

I'm going to read the special conditions of supervised
release to you, Mr. Chandler, so you don't have to have

1    somebody else read them to you.

2         The defendants shall also comply with the following

3    special conditions of supervised release.

4         First, he shall submit to the search of his person,

5    property, home, and vehicle by a United States Probation

6    Officer or any other authorized person under the immediate and

7    personal supervision of the probation officer based upon

8    reasonable suspicion without a search warrant.  The failure to

9    submit to search may be grounds for revocation.

10        The defendant shall warn any other residents that the

11   premises may be subject to searches pursuant to this

12   condition.

13        Second, he shall not dispose of or otherwise dissipate any

14   of his assets until the fine and restitution ordered by this

15   court is paid in full unless the defendant obtains the prior

16   approval in advance of the probation officers or the court.

17        Third, the defendant shall apply all monies received from

18   income tax refunds, lottery winnings, inheritance, judgments

19   and any anticipated or unexpected financial gains to any

20   unpaid fine or restitution ordered by this court.

21        Fourth, the defendant shall provide the probation officer

22   with access to any requested financial information.

23        Fifth, the defendant shall not open additional lines of

24   credit without the approval in advance of the probation

25   officer.

1        Sixth, the defendant shall complete 500 hours of unpaid

2   community service as directed by the probation officer.

3        Now, Mr. Chandler I'm hoping that will be something like

4   Habitat for Humanity, because even though you've gotten out of

5   the real estate business, this is something you did well.  You

6   could use these skills in this charitable venture.  Get out

7   and fix these houses up for people who can't afford them.  Do

8   the kinds of things you were doing for your own profit, do it

9   for them.  You can do it.

10            DEFENDANT CHANDLER:  Yes, sir.

11            THE COURT:  I hope you get into this.

12        Seven, the defendant shall participate in a cognitive

13   behavioral treatment program as directed by the probation

14   officer.

15        Eighth, as directed by the probation officer, the

16   defendant shall participate in a copayment plan for treatment

17   or testing and shall make payment directly to the vendor under

18   the contract with United States Probation Office of up to $25

19   per month.

20        Those are the special conditions of supervised release.

21            MR. SANGSTER:  Your Honor had been asking counsel if

22   they had any issues with those conditions, and I didn't have a

23   chance to raise those.  One is the firearms.

24            THE COURT:  This is the thing about firearms.  When

25   the defendants who wanted to possess firearms asked me about

1  them, I saw no reason to restrict them.  They, in my view, are

2  no more dangerous than any other individual who has their

3  Second Amendment Right to possess a firearm, but those

4  defendants who have mental problems, and Mr. Chandler has

5  indicated he does.  That's why we have these special

6  conditions.  I don't want them to have firearms.

7       Does he need a firearm?

8            MR. SANGSTER:  He doesn't have a mental illness.  I

9  thought I heard illness, but he doesn't have a mental illness,

10  he's got a --

11            THE COURT:  I said "mental problems."  I don't know

12  what his learning disability is.  I just don't think somebody

13  who's been convicted of a crime ordinarily should have a

14  firearm.

15      Let me ask you this:  Does he have a particular reason to

16  have a have a firearm?  Is there something I don't know?

17            DEFENDANT CHANDLER:  Yes.  I have five children and

18  they all have hunting licenses and several of my police

19  officer friends, we all go hunting and we have been for the

20  last 20 years.

21            THE COURT:  Hunting?

22            DEFENDANT CHANDLER:  Yes.

23            THE COURT:  Would you use the firearm strictly for

24  hunting and not use it in any other way?  It's locked up

25  unless you go hunting?

1            DEFENDANT CHANDLER:  That's right.  Deer hunting, elk

2    hunting, dove hunting.  I would not drive around Stockton with

3    any guns.  I would be with those family or those police

4    officers I've been hunting with all these years.

5            MS. O'BRIEN:  Speaking to that point, the particular

6    exception we discussed earlier today is applicable to the

7    antitrust count, but not a fraud count.  In this situation, I

8    think some of the same factors are in place.  We have a

9    different circumstance.  I wanted you to be aware of that.

10           THE COURT:  Tell me again what the circumstance was.

11   It doesn't apply if it's just the antitrust count?

12           MS. O'BRIEN:  Correct, Your Honor.

13           THE COURT:  Isn't this ironic.  We had Mr. Heller

14   addressing the issue and you were addressing the issue.  The

15   Sentencing Commission got really down on the antitrust

16   defendants and said they ought to go to prison, but then they

17   said it's okay for them to have firearms.

18           MS. O'BRIEN:  Your Honor, I have done some research

19   in the legislative history here, and just so you know, it

20   remains on the books because of years when an antitrust crime

21   was a misdemeanor on the books.

22           THE COURT:  It's because it is inconsistent.  You

23   have to admit that.

24           MS. O'BRIEN:  It is, Your Honor.

25           THE COURT:  All right.  All you're saying is the

1  court can impose this condition here?

2          MS. O'BRIEN:  I think in either case, the court can

3  impose it.

4          THE COURT:  Let me ask the probation officer, would

5  there be a concern if we put a limitation on it that he can

6  only possess firearms for hunting and that they had to be

7  locked up unless he's hunting?

8          PROBATION OFFICER:  I'm not sure how they would be

9  able to impose that particular special condition.

10          THE COURT:  You're not sure how you would be able to

11  impose it or enforce it?

12          PROBATION OFFICER:  How they would be able to enforce

13  it.

14          MS. O'BRIEN:  I do believe it is a standard condition

15  and part of it, as we discussed before, is safety.  There are

16  also underlying state laws that may prohibit that.  I know

17  Your Honor mentioned there's a separate supervised release

18  condition about violations of state law, but state law is at

19  play here.

20          THE COURT:  Well, if state law prohibits it, it's a

21  moot question, Mr. Sangster.

22          MS. O'BRIEN:  I believe it may be, Your Honor.

23          MR. SANGSTER:  Well, I believe the court did not

24  impose it as a condition on other defendants and I don't think

25  there's anything different --

1          THE COURT:  There is something different.  If I had

2   my druthers on this, I would only allow him to possess the

3   firearms while he's hunting and I would require that he keep

4   them locked up unless he's actually using them for hunting.

5   That is different from the other defendants.

6          MR. SANGSTER:  He would be pleased to live under that

7   condition.

8          THE COURT:  I know, but the probation officer is

9   telling me they have a hard time enforcing that.  They have to

10  go out and do this all the time.  In other words, if you found

11  a gun other place other than lock and key and he wasn't

12  actually hunting, it would be a violation of the condition.

13         PROBATION OFFICER:  Correct.

14         THE COURT:  But if you went out and they said, "Where

15  is Mr. Chandler?"  And he was hunting, it wouldn't a violation

16  if he was hunting.

17         PROBATION OFFICER:  It wouldn't be a violation, but

18  he could get stopped for state.

19         THE COURT:  I know.  But if he gets stopped for

20  state, there's between him and the state.

21         PROBATION OFFICER:  Correct.

22         THE COURT:  I will do it, but you have to be very

23  careful because if it's a state crime, then that's a violation

24  even though it's a not a separate condition of your federal,

25  so you have to look into that.

1          Maybe you can help him, Mr. Sangster, but I make the

2     specific condition that he not possess a firearm, which I've

3     already read.  That he may possess guns for hunting purposes

4     while he is using them for hunting and that they shall remain

5     under lock and key at all times when he is not actually using

6     them for hunting.  That will be a qualification under that

7     terms.

8               MR. SANGSTER:  Thank you, Your Honor.  There is one

9     other term and that is that he engage in cognitive behavioral

10    therapy.  I have read that initially and objected to it as

11    thinking that has something to do with treating his learning

12    disability.  I'm not sure what that is.

13              THE COURT:  I'm not either.  What is it?

14              PROBATION OFFICER:  It's a program to help offenders

15    come in and make other decisions, their decisionmaking.

16              THE COURT:  That's a good program.  He's made some

17    bad decisions.

18              MR. SANGSTER:  He has, but he has lived for six years

19    without any bad ones.

20              THE COURT:  There's nothing wrong with that program.

21              MR. SANGSTER:  Thank you.  We would request the same

22    provision about release or designation to a Northern

23    California facility.

24              THE COURT:  All right.  The court will recommend that

25    Mr. Chandler be incarcerated at an institution in Northern

1   California insofar as the recommendation accords with security

2   classification and space availability.

3             MR. SANGSTER:  Then one final ask, he requests a

4   March 1st surrender date for two reasons, one to give him more

5   time to wrap up his business affairs.  He's going to

6   essentially have to figure out somebody to run his business.

7   For reasons discussed in the sentencing memorandum, it's not

8   as easy as turning it over to a family member.

9      He also advises me that he's got physical therapy relating

10  to an injury that is causing him to be limping the last couple

11  of weeks.  I don't know how long that will last, but he has

12  requested until March 1st.

13            THE COURT:  Any objection having to do with the

14  business?

15            MS. LINNETT:  The government has some concerns about

16  that.  I think that Mr. Chandler has known this day is coming.

17            THE COURT:  He didn't know what it would be though.

18            MS. LINNETT:  There was something that came up this

19  week about cash moving around that I've been given an

20  explanation to it, but I still am not sure that Mr. Chandler

21  should be treated differently as to other defendants because

22  of their surrender date.

23            THE COURT:  He has a business that the others don't

24  have, but I haven't given any specifics as to why it's going

25  to take longer than three months to make those arrangements.

1          MR. SANGSTER:  I can't identify what those obstacles

2     are today.  I've been discussing with Mr. Chandler at some

3     point he would probably need to have somebody in line to take

4     over the business.  It's a business that's both small but not

5     so small and not so easy.

6          THE COURT:  It may be a little difficult during the

7     holidays.  I'll give him to February 1st.

8          DEFENDANT CHANDLER:  My leg is swollen and I haven't

9     been able to get around.

10          THE COURT:  I won't be able to diagnose the problem,

11     but you're ordered to turn yourself into the institution

12     designated by the Bureau of Prisons by 2:00 p.m. on February

13     the 1st.  Understood?

14          DEFENDANT CHANDLER:  Yes.

15          MS. LINNETT:  Your Honor, one additional point about

16     the waiver in the plea agreement.  The same language is in the

17     plea agreement in Section 7(b) that Mr. Chandler waived his

18     right to appeal any aspects of the sentence imposed in this

19     case so long as his sentence is no longer in the top of the

20     sentencing guideline range determined by the court.

21          Now, as to the fine, I believe that since Your Honor has

22     adopted the PSR recommendations, that under those guidelines

23     calculations, the fine range would be 124,000 to 620,000;

24     therefore, the $500,000 fine would be within that guidelines

25     range.

1          However, that was a different guidelines range than was

2     contemplated in the plea agreement and that range was

3     determined under the fraud guidelines, so 5E1.2(c), and that

4     fine range was 10,000 to 100,000.

5               THE COURT:  So give me the language of the waiver

6     again.  Was it "the guidelines as calculated by the court" or

7     "as set forth in the agreement"?

8               MS. LINNETT:  "As determined by the court."

9               THE COURT:  Then the sentence is within the

10    guidelines and he's waived his right to appeal.

11              MS. LINNETT:  Thank you.

12              THE COURT:  Correct, Mr. Swanger?

13              MR. SANGSTER:  I am trying to go open up the language

14    in the plea agreement, Your Honor.  I thought I had this

15    opened.

16              THE COURT:  She has a hard copy.  You can show him

17    the hard copy.

18              MR. SANGSTER:  She's correctly reading the plea

19    agreement.

20              THE COURT:  He's waiving his right to appeal?

21              MR. SANGSTER:  That's correct.

22              THE COURT:  Anything else?

23              MS. LINNETT:  No.

24              THE COURT:  Any questions, Mr. Chandler?

25              DEFENDANT CHANDLER:  No.

 1          THE COURT:  Mr. Joachim, the court has received the

 2   final presentence report in this matter which was made

 3   available August the 1st.

 4      Mr. Johnson, have you received a copy of that report?

 5          MR. JOHNSON:  Yes, I have.  Tom Johnson on behalf of

 6   Tony Joaquin.

 7          THE COURT:  You did say that earlier.  I

 8   mispronounced it several times today.  Have you discussed the

 9   presentence fully with Mr. Joachim?

10          MR. JOHNSON:  I have.

11          THE COURT:  Mr. Joachim, have you received a copy of

12   the final presentence report?

13          DEFENDANT JOACHIM:  Yes, I have.

14          THE COURT:  Have you discussed it fully with

15   Mr. Johnson?

16          DEFENDANT JOACHIM:  Yes, Your Honor.

17          THE COURT:  Mr. Johnson, do you have any objections

18   to the findings in the presentence report with respect to the

19   calculation of the guidelines?

20          MR. JOHNSON:  There is one guideline issue that

21   Ms. O'Brien wants to take up with the court.  I think what it

22   should be is a level 13, not a level 14.

23          THE COURT:  What is your objection?

24          MS. O'BRIEN:  I do agree.  The situation here was the

25   number provided was a little bit higher than it should have

1  been to probation, so the correct number should be a $94,000

2  fraud loss, which results at paragraph 54 instead of an eight

3  level adjustment it should be have been a six level

4  adjustment.

5           THE COURT:  All right.  The court will make that

6  correction to the presentence report, and with that

7  correction, the court will adopt the findings in the

8  presentence report, determines them to be true and correct,

9  and finds that the applicable offense level is 13.

10          MS. O'BRIEN:  I'm sorry, Your Honor.  There's just a

11  little nuance here.  That is correct as in the PSR, but the

12  antitrust guideline was not laid out in the PSR, and with that

13  adjustment they come out the same.

14      So with that adjustment to paragraph 54, they would be

15  correct, but they would be resulting in the same offense level

16  as the antitrust, which should be calculated as the base

17  offense of 12 adding one point for bid rigging, adding two

18  points for value of commerce greater than a million dollars,

19  so they both result in an offense level 15.  That was what was

20  in the plea agreement.

21          THE COURT:  You mean 14?

22          MS. O'BRIEN:  No.  12 plus one plus two.  Offense

23  level 15.

24          THE COURT:  The probation officer has it at 14.

25          MS. O'BRIEN:  I don't think the probation office ran

1   the numbers for the antitrust.  The guidelines contained in

2   there were for mail fraud offense.

3              THE COURT:  If you both can agree on the guidelines,

4   I don't have to understand what you just said, but if you

5   can't agree, we have to have a discussion here.

6              MS. O'BRIEN:  We absolutely agree.  They are offense

7   level 13 as a total.

8              MR. JOHNSON:  15 minus two for a total of 13.

9              MS. O'BRIEN:  After acceptance of responsibility.

10             THE COURT:  Are we in agreement that the total

11  offense level is 13?

12             MS. O'BRIEN:  Yes, Your Honor.

13             MR. JOHNSON:  Yes, Your Honor.

14             THE COURT:  The court so finds and the court finds

15  the criminal history category is one; therefore, the

16  guidelines are 12 to 18 months.

17     The court has received the government's sentencing

18  memorandum and motion for downward departure pursuant to

19  Section 5k1.1 of the sentencing guidelines.

20             MS. O'BRIEN:  There is no substantial assistance

21  motion.  If the caption was incorrect, I apologize, but there

22  was no downward department motion here.

23             THE COURT:  That's what the caption is.

24             MS. O'BRIEN:  It may be an error, but the substance

25  reflects that he was the last defendant to plead post

1   indictment and there is no 5K recommendation.

2          THE COURT:  Your recommendation is a for a term of

3   imprisonment of 12 months; correct?

4          MS. O'BRIEN:  Correct.

5          THE COURT:  How is it Mr. Joachim was the only

6   defendant who didn't cooperate, Mr. Johnson?

7          MR. JOHNSON:  They didn't need him.  They didn't call

8   and ask for his assistance.  We called a couple of times and

9   just didn't receive any return calls from them.  They didn't

10  want specifically to speak to him, and that was fine with us.

11         THE COURT:  It puts him in a little different

12  posture.  It can be said that the court sentenced within the

13  guidelines because we had a 5K motion and the court is within

14  the guidelines, whether it accepts the level of the departure

15  or not, as long as the government makes a 5K.1.1 motion.

16      With regard to Mr. Joachim, in order for the court to

17  sentence to anything less than 12 months, it has to be a

18  variance from the guidelines based purely on the 3553

19  sentencing factors.  It's a slightly different posture.

20         MR. JOHNSON:  I agree it is slightly different.

21         THE COURT:  What's the government's position?  You're

22  sticking with your recommendation?

23         MS. O'BRIEN:  I am.  It is a little different here

24  because if you look at the dates here, we're talking about a

25  December 30, 2013 plea post indictment.  The defendant simply

1   had nothing to offer the government that wasn't cumulative at

2   that point, so he wasn't in a 5K position.

3            THE COURT:  Was there some reason you didn't get to

4   talk to him earlier?

5            MS. O'BRIEN:  He was indicted, Your Honor.  There was

6   no engagement in plea negotiations prior to that.

7            THE COURT:  Mr. Johnson, why isn't he talking to them

8   earlier if he wants to get credit for acceptance and

9   cooperation?

10            MR. JOHNSON:  Part of the issue also with

11   Mr. Joachim, during that period of time, he was suffering from

12   significant health issues and we were trying to determine the

13   best time to resolve the case and plead guilty, and the

14   combination of factors led us to plead when we did.

15       It wasn't for lack of his intent to cooperate.  They had

16   witnesses literally coming out their ears and they were trying

17   to decide who to put on at the trial and Mr. Joachim was not

18   needed for trial.  I think it's based more on his physical

19   condition than it was anything.

20            THE COURT:  What would you like to say on his behalf?

21            MR. JOHNSON:  Yes, Your Honor.  In that regard, if I

22   could take the court back to the late nineties when

23   Mr. Joachim was in his early thirties.  He started big homes,

24   improving them, repairing them, and selling them.  It was a

25   good business and a legitimate business.  It's for people that

1    can value the price of a home, value what it would cost to put

2    the home in a place it could be sold and would be sold.

3         The phrase that we've heard a lot today is "flipping

4    houses."  I guess that's kind of a crass way of saying what

5    Mr. Joachim was doing.  He bought homes, he walked the homes,

6    he improved them and sold them.

7         Then, unfortunately, in 2005 when he was then 38 years

8    old, Mr. Joachim was the victim of drunk driver who literally

9    took him off his feet and projected him 50 to 75 feet out and

10   he suffered greatly from that.  He had numerous broken bones

11   throughout his body.  He was involuntarily put into a coma for

12   which he remained for three months.

13        It included a broken vertebra, broken legs, crushed ankle,

14   ruptured eye socket, and those injuries that he suffered, he

15   still carries with him today.

16        I think when the court is thinking what the appropriate

17   sentence for Mr. Joachim would be -- I know you're trying to

18   determine what is fair for Mr. Joachim.  Mr. Joachim has

19   really been in pain since that time.

20        He went back to the business of big and selling homes and

21   having them improved because he could do that in 2009.  The

22   prosecutor and I agreed not to fight about the role, Chandler

23   and Northcutt and the role that Mr. Joachim played, but I

24   think it's fair to say that's the only business he had was to

25   buy a home and sell a home.

1      He did not create the system that Northcutt and Chandler

2   created at all.  But in order to do the business that he was

3   physically capable of doing, he went along with their system.

4   He knows that that was wrong, Your Honor, but that was the

5   only real way for him to continue to make a living.

6          THE COURT:  You heard the prosecutor say just the

7   opposite when I was talking about Mr. Chandler.  Nobody is

8   forcing him to go with them.

9          MR. JOHNSON:  I think I heard it, Your Honor.

10          THE COURT:  It wasn't just the prosecutor, but

11   Chandler's lawyer.

12          MR. JOHNSON:  I heard it from Chandler and Northcutt,

13   but I think what you heard from the other attorneys and other

14   defendants today was a different perspective, which was it was

15   very difficult for people to do business there otherwise.  If

16   you wanted to go and buy a house and you weren't going to do

17   it their way, they were going to increase the price of the

18   house for you.  They were going to make it extremely difficult

19   to buy a house.

20      The thing for Mr. Joachim, he had years and years of doing

21   it without having that system in place here in San Joaquin

22   County.  I don't mean to minimize what he did.  I think that's

23   important.  I don't want to say but for Northcutt and

24   Chandler, Mr. Joachim would never have been here.  The court

25   said that this morning and this afternoon.

1    I would say Mr. Joachim, when you look at the letters that

2    he has from the people that are closest to him, these are

3    people of some significance in the community and have some

4    weight and they describe Mr. Joachim as a person who is

5    compassionate, generous.  One person said they held him in the

6    highest regard.  This came from family, neighbors, old

7    friends, all paint a picture of a person who lives that life

8    and wants to continue to do that.

9    Sometime after 2005 after his accident after his

10   rehabilitation began, he suffered setbacks in terms of his

11   rehabilitation.  There were good days and bad days.  As he

12   stands here now, he has two rods in his legs.  He has train

13   track stitches up and down his both of his legs.  He doesn't

14   really walk.  He teeters.  He needs surgery in his ankle.  His

15   one eye is blind.  His eye other needs a contact.  He's told

16   eventually he will go blind.

17   I think putting him in prison would not serve anybody's

18   interest and it would be incredibly difficult for him in

19   prison.  I think that what he has done over the past couple of

20   years, as you can see in the report and with the information

21   from his family, he's raised his three sons after they sort of

22   fell off the ledge under their mother's care.

23   I've heard it consistently today, Your Honor, when you say

24   the conduct of a person ripples out to their family, and I

25   agree.  It does ripple out to the family, but these are

1    teenagers and young adults, and without Mr. Joachim present,

2    they would be in a much different place.  It's not just a

3    spouse or adult child.

4        Finally, I know that you think a lot about what the

5    punishment should be for Mr. Joachim.  I'm sure you have

6    considered what his medical history and how that balances out.

7    He didn't ask for the drunk driver to hit him.  He's not

8    clicking his heels leaving this courtroom if you gave him

9    probation thinking he somehow got over the court or got over

10   on anybody.

11       He lives in daily pain.  He takes Percocet and other pain

12   medications just to deal with the pain.  So he's here or in

13   prison, he's going to be physically in pain.

14       I did some research with the Bureau of Prisons and they

15   have something called a level II care facility and then the

16   highest one would be a level III, which would be a person who

17   needs monthly monitoring, medication, and perhaps surgery.

18   That's Mr. Joachim.  On his good days that's him.

19       He does need surgery, another surgery on his legs.  He has

20   a dead man's vertebra in his back just to hold himself

21   upright.  He's got a cadaver vertebra in his back.  None of

22   this is made up.

23       You do what you can to survive when you're disabled.  He's

24   permanently disabled and will receive permanent disability

25   check for the rest of his life.  He can't go out like other

1   folks do and run a store, restart a real estate business --

2          THE COURT:  Who gives him a check for permanent

3   disability?  He's got a lot of money.

4          MR. JOHNSON:  Social Security.

5          THE COURT:  It's not related to whether you need it

6   or not?

7          MR. JOHNSON:  I can't speak to that.  I know it's

8   about $1,400 a month.  I would like to talk to you about the

9   assets.  Can I move onto that, Your Honor?

10          THE COURT:  Yes.

11          MR. JOHNSON:  When the court looks at his assets --

12          THE COURT:  I'm looking at five parcels of land in

13  Red Bluff.

14          MR. JOHNSON:  What page are you on, Your Honor?

15          THE COURT:  19.

16          MR. JOHNSON:  That's about 14 acres of property, Your

17  Honor.  That property, about half of it, was purchased in

18  2000-ish, the remainder was purchased on or about 2005, but it

19  preceded 2009.  I tried to determine what the liquid value of

20  that is, and its bare land, so if sold, it would be a slow and

21  difficult sale, but portions or parcels could be sold, I

22  suppose.

23          THE COURT:  These are reasonable values?

24          MR. JOHNSON:  I looked at that also, and this is

25  representing as an officer of the court, in the Red Bluff

1    area, it is plus or minus about $500 an acre for undeveloped

2    land.  If you look at the number of acres and the cost here,

3    it's approximately correct.

4              THE COURT:  So one of these is 500,000, one is

5    248,000.  All you have to do is sell one of those and he would

6    have half a million dollars.  He could use that pay to a fine

7    or the other one, he would have a quarter of a million

8    dollars.

9              MR. SANGSTER:  If you're thinking about what a number

10   would be if you want to fine Mr. Joachim, I think a quarter

11   million dollars would be the --

12             THE COURT:  Why?  Just sell one parcel of land.

13             MR. JOHNSON:  If I could just talk about that for a

14   second.  When you look at the balance sheets, you see he has

15   1.3 in assets and he's got a couple of hundred grand in

16   liabilities.

17       If you would think about it this way, Judge.  That land up

18   in Red Bluff really was Mr. Joachim's plan for his retirement

19   and it's a place where he takes his family and his kids.  That

20   doesn't mean some of the parcels couldn't be sold, but that's

21   a slow sale, Your Honor.

22             THE COURT:  He would have a period of time to pay his

23   fine.

24             MR. JOHNSON:  Correct.  I agree.  I understand that.

25   And then the other part of the asset that I wanted to mention

1    to you is the $275,000.

2            THE COURT:  Personal effects.  I don't know what that

3    is.

4            MR. JOHNSON:  What that means, it's a 10 percent

5    interest in a business.  It's a privately-held business and

6    that would also be something that would be difficult to sell.

7    It would be dependent on whether the owner of the company

8    wanted to sell it to somebody else or sell it to somebody he

9    did not know.

10       These are just things to consider, Your Honor.  I know

11   you've struggled with these decisions about what an

12   appropriate fine would be, but if you think Mr. Joachim can't

13   work, and he can't really, for the rest of his life -- he's

14   only 49 -- a fine consistent with how you have been fining

15   other people, might be too much.

16       We ask you not to go to that place.  If you're thinking of

17   round numbers for a fine.  I think the maximum would be 250.

18   You sentenced Chandler to 500.  He's a country mile in terms

19   of Chandler in terms of responsibility.

20           THE COURT:  Chandler got seven months in jail too.

21           MR. SANGSTER:  I know that.  I submit it, Your Honor.

22           THE COURT:  Mr. Joachim, is there anything you would

23   like to say on your own behalf before the court pronounces

24   judgment?

25           DEFENDANT JOACHIM:  I just want to say I'm very, very

1    sorry.  I really can't even imagine how I ever got here, how I

2    ever made a mistake like this and how horrible it's been for

3    my family.  I'm very sorry to the court for the court's time.

4    There's very bad stuff going out there.  I'm sorry this had to

5    be one of those things.

6        This is going to be a huge hardship for me regardless of

7    what happens, but, you know what?  I'm going to be okay

8    whatever happens.  Thank you.

9            THE COURT:  I don't think any useful purpose would be

10   served by locking Mr. Joachim up in jail, so I'm not going to

11   do that, but there needs to be a sanctions that will act as a

12   deterrent to others and properly address the seriousness of

13   the offense.

14       I'm going to place him on probation with a fine, and I

15   think it needs to be a fine that does hurt, but that doesn't

16   destroy the rest of his life.

17       So, therefore, pursuant to the Sentencing Reform Act of

18   1984, it is the judgment of the court that the defendant,

19   Anthony Joachim, is hereby committed to the custody -- placed

20   on probation for a term of three years on each of Counts One

21   and Two to be served concurrently to each other for a total

22   term of probation of three years.

23       Is that better than the time served that you recommended?

24   He hasn't served any time as far as I know.

25            PROBATION OFFICER:  Your Honor, the reason I

 1    recommended time served is because he served a day.

 2          THE COURT:  He did?  Do you think procedurally in his

 3    case if I'm not requiring any time, that it would be better to

 4    sentence him to time served and put him on supervised release

 5    or sentence him to probation?

 6          PROBATION OFFICER:  It would be easier to recommend

 7    time served and a term of supervised release.

 8          THE COURT:  I'll change that and go back to what I

 9    originally started to say.  The defendant is committed to the

10    custody of the Bureau of Prisons to be imprisoned for a term

11    of time served on each of Counts One and Two to be served

12    concurrently to each for a total term of time served.

13       He shall pay a special assessment of $200.  Payment to

14    begin immediately.

15       The defendant shall pay a fine to the United States in the

16    amount of $200,000.  Payment to begin immediately.

17       It is further ordered that the defendant shall pay

18    restitution in the amount of $94,154.71.

19          MS. O'BRIEN:  If we could take the 71 cents off.  The

20    charts we have going to victims doesn't account for that.  I

21    don't think the defendant objects.

22          MR. JOHNSON:  If we can save 71 cents today, we'll

23    take it.

24          THE COURT:  Is he one of those that brought a check

25    today?

1          MR. JOHNSON:  He's not liquid like that.

2          THE COURT:  I didn't realize and I don't want to

3     regret this and say that I should have done something

4     different.  I didn't realize in his case that the amount of

5     restitution was as high as it is.

6       I'm going to make the fine $175,000 instead of $200,000.

7     That's more consistent with what I thought.  I didn't realize

8     the restitution was that great, so the fine will be $175,000.

9     The restitution will be $94,154, and both are due immediately.

10      The term of supervised release is 24 months on each of

11    Counts One and Two to be served concurrently to each other for

12    a total term of 24 months.

13      While on supervised released, the defendant shall not

14    commit another federal, state, or local crime.

15      He doesn't need to possess a firearm, does he?

16          MR. JOHNSON:  Only for purposes to be with his sons

17    when he teaches them hunting, so it would --

18          THE COURT:  He's almost blind.  No, I don't think he

19    should possess a firearm.

20      The defendant shall not possess ammunition, destructive

21    device, or any other dangerous weapon and shall not illegally

22    possess controlled substances.

23      He shall cooperate in the collection of DNA as directed by

24    the probation officer and comply with the standard conditions

25    which have been recommended by the United States Sentencing

1    Commission and adopted by this court.

2          Further, he shall refrain from any unlawful use of a

3    controlled substance.

4          He shall submit to one drug test within 15 days of release

5    from imprisonment and at least two periodic drug tests

6    thereafter, not to exceed four drug tests per month.

7          Mr. Johnson, have you gone over the special conditions

8    listed on pages 25 and 26 of the presentence report with Mr.

9    Joachim?

10               MR. JOHNSON:  Yes, I read them to him today.

11               THE COURT:  Do you understand them, Mr. Joachim?

12               DEFENDANT JOACHIM:  Yes.

13               THE COURT:  The court adopts the special conditions

14   recommended by the probation officer on pages 25 and 26 of the

15   presentence report and imposes all of those listed as special

16   conditions with the exception, as I have with all the others

17   except one, I'm going to increase the number of unpaid

18   community service hours directed by the probation officer, but

19   because of his physical disability, it's going to be increased

20   to 250 hours.

21               MR. JOHNSON:  Can we do that over the course of

22   supervised release, Your Honor?

23               THE COURT:  Yes.  Over the course of three years.

24         Karen, they should all say that.  Instead of the first

25   year of supervised release, they should all say, "over the

1    term of supervised release."

2          MR. JOHNSON:  Mr. Joachim would like to address the

3    court with one question.

4          DEFENDANT JOACHIM:  I don't personally hunt any more.

5    I can barely walk, but the ranch is a hunting and recreational

6    piece and I'm with my children.  Is that an issue that I am

7    with them while they are --

8          THE COURT:  I don't know.  It's a question of how you

9    define "possession" which can be "actual" or "constructive" or

10   "joint and several."

11         MR. JOHNSON:  I'll take the time to explain it to

12   him, Your Honor.

13         THE COURT:  Explain it to him.  You understand.  Just

14   being on the ranch while your children have guns is not

15   possession, but if you exercise dominion or control over the

16   guns, then it could be regarded as possession.  Mr. Johnson is

17   very familiar with those terms because he's been in several

18   trials where we've had those issues.

19         DEFENDANT JOACHIM:  Thank you, Your Honor.

20         THE COURT:  I've completed the sentence.

21         PROBATION OFFICER:  For clarification of the record,

22   the basis of the sentence outside the guideline range, is that

23   downward departure or downward variance?

24         THE COURT:  It's a downward variance.  In other

25   words, for all the other defendants, the court could sentence

1    to any term below the guidelines because there was a 5K

2    motion, but here there was no such motion so the sentence is

3    based on a variance from the guidelines on the basis of all of

4    the other sentencing factors, including his health, including

5    the lack of need for protection of society, and all the other

6    guidelines.

7             PROBATION OFFICER:  Thank you.

8             THE COURT:  Now, is the sentence consistent with the

9    plea agreement?

10            MS. O'BRIEN:  Paragraph 7(b) contains a limited

11   waiver, and, again with respect to the fine, based on a 1 to

12   5 percent of the volume of commerce --

13            MR. JOHNSON:  We're prepared to waive it.

14            THE COURT:  You're waiving your right to appeal?

15            MR. JOHNSON:  I don't want to shut Ms. O'Brien down.

16            THE COURT:  I think she was going to say it was

17   within the guidelines.

18            MS. O'BRIEN:  No, actually, the amount would be

19   20,000 to 60,000 under the guidelines, and Your Honor has

20   sentenced him to 100,000.

21            MR. JOHNSON:  So we're outside the guidelines and it

22   is something we could appeal, but we're grateful for the

23   court's consideration of all that we have put to you today.

24   If you want to take a waiver from him, he's prepared to waive

25   it.

```
 1            THE COURT:  Do you want to waive it; is that correct?
 2            DEFENDANT JOACHIM:  That's correct, Your Honor.
 3            THE COURT:  The defendant waives his right to appeal.
 4       The clerk has pointed out he pled to a superseding
 5    indictment; is that correct?
 6            MS. O'BRIEN:  I think he pled to the counts in the
 7    indictment.
 8            THE CLERK:  Superseding indictment.
 9            THE COURT:  The U.S. Attorney's Office takes the
10    strange position that even though they file a document called
11    a superseding indictment that the original indictment is still
12    viable, so after they plead and are sentenced on the
13    superseding indictment, they make a motion to dismiss the
14    original indictment.
15            MS. O'BRIEN:  I will so move, Your Honor.
16            THE COURT:  That motion is granted.
17       Anything else?  Court is adjourned for the day.
18       (Proceedings concluded at 5:28 p.m.)
19                          ---o0o---
20
21
22
23
24
25
```

1                          CERTIFICATION

2              I, Michelle L. Babbitt, certify that the foregoing is

3      a correct transcript from the record of proceedings in the

4      above-entitled matter.

5              Dated:  September 20, 2016.

6

7

8                                    /s/ MICHELLE L. BABBITT
                                     MICHELLE L. BABBITT CSR #6357
9                                    Official Court Reporter
                                     United States District Court
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25